UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____

|  |  |  |
|---|---|---|
| Lynn E., by her guardian, | ) | |
| Barry Ellsworth; Kenneth R., | ) | |
| by his guardian, Tri-County CAP, Inc./GS; | ) | |
| Sharon B., by her guardian, Office of | ) | |
| Public Guardian, Inc.; Amanda D., by | ) | |
| her guardian, Louise Dube; Amanda E., | ) | |
| by her guardian, Office of Public | ) | |
| Guardian, Inc.; and Jeffrey D., | ) | |
| on behalf of themselves and all | ) | |
| others similarly situated, | ) | Civ. No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| John H. | ) | |
| Lynch, Governor of the State of New | ) | |
| Hampshire; Nicholas A. Toumpas, | ) | |
| Commissioner, New Hampshire | ) | |
| Department of Health and Human | ) | |
| Services; Nancy L. Rollins, | ) | |
| Associate Commissioner, New Hampshire | ) | |
| Department of Health and Human Services, | ) | |
| Community Based Care Services; | ) | |
| Mary Ann Cooney, | ) | |
| Deputy Commissioner, New Hampshire | ) | |
| Department of Health and Human Services, | ) | |
| Direct Programs/Operations; Erik G. Riera, | ) | |
| Administrator, New Hampshire Bureau of | ) | |
| Behavioral Health, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**CLASS ACTION COMPLAINT**

1

## I.      INTRODUCTION

1.      This action challenges the needless institutionalization of adults with serious mental illness at the New Hampshire Hospital ("NHH") and the Glencliff Home ("Glencliff") in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*, and the Nursing Home Reform Act ("NHRA"), 42 U.S.C. §§ 1396r *et seq.* New Hampshire Hospital is a state-operated psychiatric hospital and Glencliff is a state-operated nursing facility primarily for individuals with mental illness.

2.      Plaintiffs Lynn E., Kenneth R., Sharon B., Amanda D., Amanda E., and Jeffrey D. are individuals with serious mental illness. These individuals and the class they seek to represent ("plaintiff class" or "class members") are currently institutionalized at NHH or Glencliff or are at serious risk of being institutionalized at one of these state-operated facilities. Although plaintiffs and the plaintiff class are qualified to receive mental health services in more integrated community settings, New Hampshire (the "State") has failed to provide the community services they need to leave NHH and Glencliff or to avert their needless institutionalization in these facilities.

3.      Plaintiffs and the plaintiff class have been injured by their prolonged or repeated institutionalization. They have been isolated from families, and have lost opportunities to work and participate in community life. When institutionalized, they forfeit nearly all the freedoms that others take for granted. They cannot choose where they live or sleep, what they will do during the day, or even what they will eat. They cannot pursue chosen education or jobs, and have little opportunity to participate in community events or recreational activities. They have virtually no contact with their non-disabled peers, except for paid institutional staff.

4.      There are numerous individuals, like plaintiffs Lynn E., Kenneth R., and Sharon B., who are unnecessarily institutionalized at NHH and at Glencliff because they lack access to community services. Many, like plaintiffs Amanda D., Amanda E., and Jeffrey D., are at serious risk of being institutionalized because they lack access to needed community services. Without such services, many class members are repeatedly and needlessly readmitted to NHH, or forced into other inappropriate settings, such as hospital emergency rooms, homeless shelters, and jails. Frequent visits or admissions to these inappropriate and institutional settings make it difficult for class members to maintain apartments, jobs, and relationships.

5.      New Hampshire knows how to successfully serve the plaintiffs and the plaintiff class in integrated community settings. New Hampshire's community mental health system has demonstrated its ability to serve individuals with the most severe forms of mental illness in their own homes and communities. However, the State has limited the community services available to plaintiffs and the plaintiff class, thereby perpetuating their needless institutionalization at NHH and/or Glencliff.

6.      The State has long known that New Hampshire's mental health system is, in the State's own words, "failing" with "the consequence … being realized across the community." NH Dep't of Health and Human Servs., Bureau of Behavioral Health, NH Cmty. Behavioral Health Ass'n, NH Mental Health Council, and Nat'l Alliance on Mental Illness-NH, *Addressing the Critical Mental Health Needs of NH's Citizens: A Strategy for Restoration, Report of the Listening Sessions* 1 (April 2009) ("*A Strategy for Restoration* II"). Not only are individuals with serious mental illness suffering, so are their families and communities. The State's broken system has contributed to homelessness and, as acknowledged by the State, put "stress … on local law enforcement, hospital emergency rooms, the court system and county jails." *Id.*

3

7.      Although long aware of these problems, the State has failed to correct them. The fundamental problem is that the State has elected to continue to fund an excessive amount of institutional care at NHH and Glencliff, and to underfund community services -- an "imbalance" that has been repeatedly brought to the State's attention. *See, e.g.,* Governor's Study Comm. on Mental and Developmental Disabilities, *Report* (1982) *("Wheelock-Nardi Report")*; Dep't of Health and Human Servs., NHH Census: A Task Force Report (Draft Proposal) (2004) ("Task Force Report"); NH Dep't of Health and Human Servs., New Hampshire Hosp., Bureau of Behavioral Health, and The Cmty. Behavioral Health Ass'n, *Addressing the Critical Mental Health Needs of NH's Citizens: A Strategy for Restoration (*August 2008*) ("A Strategy for Restoration* I*")*. By correcting this imbalance, the State could avoid needlessly institutionalizing plaintiffs and the plaintiff class, while providing them with better and more cost-effective care.

8.      The needless institutionalization of plaintiffs and the plaintiff class at NHH and Glencliff is not only a human tragedy, it is also a violation of their rights under federal law. The ADA and the Rehabilitation Act mandate an end to discrimination against persons with disabilities, which includes unnecessary segregation in institutions like NHH and Glencliff. The NHRA requires the State, before admitting an individual with mental illness to a nursing facility like Glencliff, to determine whether the individual's needs could be met in an alternative community setting.

9.      Through this action, plaintiffs and the plaintiff class seek declaratory and injunctive relief against the State's ongoing violation of the ADA, the Rehabilitation Act, and the NHRA. They seek an order from this Court directing the State to expand community services as required to avoid their needless institutionalization at NHH and Glencliff.

## II.    JURISDICTION AND VENUE

10.    This civil action is brought pursuant to the ADA, 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983, to vindicate the civil rights of and safeguard the privileges guaranteed to persons with disabilities under federal law.

11.    This Court has jurisdiction over the claims brought under the ADA pursuant to 42 U.S.C. § 12133, the Rehabilitation Act pursuant to 29 U.S.C. § 794a, and the NHRA pursuant to 42 U.S.C. § 1396r and 42 U.S.C. § 1983. This court also has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

12.    Venue is proper in the District of New Hampshire pursuant to 28 U.S.C. § 1391(b).

## III.    THE PARTIES

### A.    The Individual Plaintiffs

13.    Plaintiff Lynn E. is a 54-year-old woman from Danville, New Hampshire who is confined to NHH. She brings this action through her husband and guardian, Barry Ellsworth, who lives in Danville, NH.

14.    Plaintiff Kenneth R. is a 65-year-old man who resides at Glencliff. He brings this action himself, and through his guardian, Tri-County CAP, Inc./GS, 34 Jefferson Road, Whitefield, NH 03598.

15.    Plaintiff Sharon B. is a 55-year-old woman who resides at Glencliff. She brings this action through her guardian, Office of Public Guardian, 2 Pillsbury Street, Suite 400, Concord, NH 03301.

16.    Plaintiff Amanda D. is a 22-year-old woman who lives in Newport, NH. She brings this action through her guardian, Louise Dube, who lives in Newport, NH.

5

17.     Plaintiff Amanda E. is a 30-year-old woman who lives in Manchester, New Hampshire. She brings this action through her guardian, Office of Public Guardian, 2 Pillsbury Street, Concord, NH, 03301.

18.     Plaintiff Jeffrey D. is a 45-year-old man. He lives in Rochester, NH.

**B.      The Defendants**

19.     Governor John H. Lynch is the chief executive officer of the State of New Hampshire. He is responsible for directing, supervising, and controlling the executive departments of state government, as well as for seeking and expending funds from the legislature to implement the programs and deliver the services of those executive agencies. Defendant Lynch appoints the Commissioner of the New Hampshire Department of Health and Human Services ("DHHS").  He is sued in his official capacity.

20.     Nicholas A. Toumpas is the Commissioner of DHHS. DHHS is New Hampshire's single state Medicaid agency responsible for receiving federal funding under the Medicaid Act and complying with all provisions of the Act. As Commissioner, Defendant Toumpas oversees all DHHS programs, including its program of mental health services and its Medicaid program. His responsibilities include, among other things, overseeing NHH and Glencliff, as well as designing and delivering a comprehensive and coordinated system of community services for individuals with serious mental illness. DHHS's program of community services for individuals with serious mental illness is administered largely through 10 non-profit community mental health centers ("CMHC"). Each CMHC has a contract with DHHS to provide an array of mental health services to individuals with serious mental illness. Defendant Toumpas is sued in his official capacity.

21.     Nancy L. Rollins is Associate Commissioner of the Community Based Care Services office within DHHS. She has direct oversight over, among other things, the operations of the Bureaus of Behavioral Health, Drug & Alcohol Services, Homeless & Housing Services, Elderly & Adult Services, and NHH. The Bureau of Behavioral Health ("BBH") is charged with delivering community mental health services and ensuring that each CMHC is meeting its contractual obligations to provide an appropriate array of services to persons with disabilities, including those with serious mental illness. Ms. Rollins is also charged with overseeing the State's compliance with the Preadmission Screening and Resident Review ("PASRR") requirements of the NHRA. Her responsibilities include ensuring that persons seeking admission to Glencliff are properly screened, assessed, and evaluated for alternative placement. Defendant Rollins is sued in her official capacity.

22.     Mary Ann Cooney is Deputy Commissioner of Direct Programs/Operations at DHHS. She has direct oversight over, among other things, Glencliff. Ms. Cooney has supervisory responsibility for Glencliff operations and management, including being responsible in part for the provision of ongoing PASRR reviews and determinations of the need for continued institutionalization at Glencliff. Defendant Cooney is sued in her official capacity.

23.     Erik G. Riera is the Administrator of BBH. BBH is New Hampshire's designated State Mental Health Authority. As the State Mental Health Authority, BBH funds and oversees each of the 10 CMHCs. As Administrator of BBH, Mr. Riera is charged with ensuring the effective and efficient delivery of services to adults with serious mental illness, and ensuring that the CMHCs meet their contractual obligations to the State. Defendant Riera is sued in his official capacity.

24.     All defendants are responsible for ensuring that persons with serious mental illness are served in accordance with federal law, including the ADA, the Rehabilitation Act, and the NHRA.

## IV.     CLASS ACTION ALLEGATIONS

25.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the plaintiffs bring this action on behalf of themselves and other individuals with serious mental illness institutionalized at NHH or Glencliff or at serious risk of being institutionalized in these facilities. Plaintiffs seek declaratory and injunctive relief individually and on behalf of the class to remedy and prevent their needless institutionalization at NHH and Glencliff.

26.     The plaintiff class is so numerous that joinder of all members is impracticable. The class consists of hundreds of individuals. Approximately 125 individuals are confined at NHH at any one time, most of whom could be served and desire to be served in community settings. Approximately 120 individuals reside at Glencliff, most of whom are individuals with serious mental illness who could be served and would prefer to be served in the community. On any given day, scores of additional individuals with serious mental illness are at serious risk of institutionalization at NHH because they lack access to needed community services, as evidenced by the large number of individuals with previous, and sometimes repeated, needless hospitalizations.

27.      Every year hundreds of individuals with serious mental illness cycle in and out of NHH or are forced to seek services at other State-supported psychiatric units across New Hampshire. They often struggle to return to and remain in integrated settings due to State-imposed limitations on needed community-based services. For many individuals, these

institutional admissions/hospitalizations result from the inability of existing community programs to meet their service needs and prevent their unnecessary institutionalization.

28.     There are questions of law and fact common to the plaintiff class including, *inter alia*:

a.   Whether defendants are violating the ADA and the Rehabilitation Act by failing to serve plaintiffs and the plaintiff class in the most integrated setting appropriate to their needs;

b.   Whether defendants are violating the ADA and the Rehabilitation Act by failing to provide plaintiffs and the plaintiff class community mental health services needed to avoid their unnecessary institutionalization at NHH or Glencliff;

c.   Whether defendants are violating the ADA and the Rehabilitation Act by administering their mental health system in a way that discriminates against plaintiffs and the plaintiff class;

d.   Whether defendants have a comprehensive and effectively working plan for serving plaintiffs and the plaintiff class in the community instead of in institutional settings; and

e.   Whether defendants are violating the PASRR requirements of the NHRA by failing to properly determine whether individuals referred to Glencliff could be served in a more integrated setting.

29.     The named plaintiffs' claims are typical of the plaintiff class, allowing the named plaintiffs to adequately and fairly represent the interests of the class members. The named plaintiffs will fully and vigorously prosecute this action and are represented by attorneys experienced in federal class action litigation and disability law. Individual members of the class

would have difficulty pursuing their own claims or remedying systematic violations on their own.

30.     New Hampshire has administered its mental health system in a way that discriminates against persons with serious mental illness by failing to provide the community-based services required to prevent the unnecessary institutionalization, including needlessly prolonged or repeated institutionalization, of plaintiffs and the plaintiff class. Therefore, the defendants have acted or refused to act on grounds that apply generally to the class, making injunctive and/or corresponding declaratory relief appropriate with respect to the class as a whole. As a result, and consistent with similar civil rights actions, the plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(b)(2).

## V.     STATEMENT OF FACTS

### A.     Statutory Framework

(a)  The Requirements of the Americans with Disabilities Act and the Rehabilitation Act

31.     On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101 *et seq.*, to create "a clear and comprehensive national mandate" for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1).

32.     In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

33.     Among the forms of "discrimination" recognized by Congress and prohibited in the ADA is the needless segregation of persons with disabilities in institutions. 42 U.S.C. § 12101(a)(3) ("discrimination against individuals with disabilities persists in . . . institutional-

ization"); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598-601 (1999) (needless segregation in an institution constitutes "discrimination" under the ADA).

34.     In promulgating regulations to implement the ADA, the Attorney General has required that New Hampshire and other states "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). According to the Attorney General, the hallmark of an "integrated setting" is that it "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. Pt. 35, App. B.

35.     In addition to requiring services in the "most integrated setting," the Attorney General's regulations also prohibit states from utilizing "criteria or methods of administration" that have the effect of subjecting individuals with disabilities to any form of discrimination prohibited by the ADA, including segregation. 28 C.F.R. § 35.130(b)(3).

36.     The regulations also require states to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, including segregation, unless the state can demonstrate that making the modifications would fundamentally alter the nature of the service program or activity. 28 C.F.R. § 35.130(b)(7).

37.     The Rehabilitation Act similarly prohibits discrimination on the basis of disability, 29 U.S.C. § 794(a) and 28 C.F.R. § 41.51(a), requires the provision of services in the most integrated setting, 28 C.F.R. § 41.51(d), and makes it a violation of the Act to use methods of administration that subject individuals to discrimination, 28 C.F.R. § 41.51(b)(3), 45 C.F.R. § 84.4(b)(4).

     (b)    <u>The Requirements of the Preadmission Screening and Resident Review (PASRR) Provisions of the Nursing Home Reform Act</u>

38.    Congress enacted the PASRR provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with mental illness in nursing facilities. 42 U.S.C. §§ 1396r(b)(3)(F) and 1396r(e)(7).

39.    All persons with mental illness for whom an admission to Glencliff is sought, must be screened by the State to determine if they have a mental illness and satisfy the State's nursing facility level of care criteria ("Level I screen"). The State must then evaluate and determine whether their needs could be met in the community through the provision of appropriate services, and whether they could benefit from the provision of specialized services to maximize their ability for self-determination and independence. This more in-depth evaluation is named a "Level II" PASRR review. 42 C.F.R. §§ 483.128 *et seq.*

40.    The State is required in its Level II review to conduct a functional assessment of the individual's ability to engage in activities of daily living and must document the level of support that would be needed to assist the individual to perform these activities while living in the community.  42 C.F.R. § 483.134(b)(5).  The Level II review must determine whether it would be possible to meet the individual's needs through the provision of services in the community, as an alternative to institutionalization at Glencliff.

**B.**    **Effective Services for Individuals with Mental Illness**

41.    Many individuals will suffer from mental illness at some point in their lives. While some may have a mental illness that is mild and short in duration, others will experience more serious mental illness as a disabling condition requiring intensive services.

42.    People with serious mental illnesses -- such as schizophrenia, severe depression, and bipolar disorder -- can have successful and fulfilling lives. Without access to appropriate

services, however, living in one's own home, maintaining relationships with family and friends, or finding and keeping a job can be challenging or even impossible.

43.     Experience and research has produced a consensus on the services individuals with serious mental illness need to succeed in the community, including mobile crisis services, Assertive Community Treatment, supportive housing, and supported employment. *See* The President's New Freedom Comm'n on Mental Health, *Achieving the Promise: Transforming Mental Health Care in America* (2003). These services enable individuals to access a coordinated array of psychiatric, rehabilitation, and medical supports in the community. Individuals with serious mental illness with access to such services are able to live in their own homes, obtain employment, and contribute to their communities. *See* U.S. Dep't of Health and Human Servs., Substance Abuse and Mental Health Servs. Admin., Ctr. for Mental Health Servs., Nat'l Inst. of Health, Nat'l Inst. of Mental Health, *Mental Health: A Report of the Surgeon General – Chapter 4*  (1999). Without access to such services though, individuals instead can spend years of their lives institutionalized, revolving in and out of institutions, hospitals, nursing homes, emergency rooms, homeless shelters, and jails.

a)     <u>Mobile Crisis Services</u>

44.     Mobile crisis service is a short-term intervention that prevents unnecessary admissions to psychiatric hospitals, nursing facilities, emergency rooms, homeless shelters, and jails. The intensity and duration of the service is based on need.  Mobile crisis services are available to individuals in their homes and in the community around the clock on a 24/7 basis. Appropriate care is to be provided when and where it is needed, including access to overnight respite, detoxification services, and short-term crisis stabilization beds.

b)   Assertive Community Treatment

45.     Assertive Community Treatment ("ACT") is a long-term intervention, often provided to individuals with serious mental illness for a period of years. ACT is delivered by a multidisciplinary team of professionals. The team is available around the clock and provides a wide range of flexible services, including outreach, intensive case management, medication management, and psychosocial rehabilitation. ACT teams are mobile, providing services in individuals' homes and in other community settings in which individuals spend their time. ACT is a proven method of preventing psychiatric hospitalizations and nursing home stays, as well as needless visits and admissions to emergency rooms, homeless shelters, and jails.

c)   Supportive Housing

46.     Supportive housing is a treatment intervention. In supportive housing, individuals are provided with their own apartment along with the services they need to be successful tenants and members of the community. Individuals in supportive housing have access to an array of services, including social skills training, medication management, and medical treatment. Supportive housing services have proven to be very successful at helping persons with serious mental illness manage their mental illness while continuing to live in the community.

d)   Supported Employment

47.     Supported employment enables individuals with serious mental illness to find and maintain competitive employment at job sites in the community, where they are integrated with their non-disabled peers. In supported employment, individuals with serious mental illness receive both individualized placement and ongoing support services. In addition to being therapeutic and reducing the risk of institutionalization, supported employment enables individuals to earn money to support a household and their participation in community activities.

14

C.      **New Hampshire Fails to Provide Services in Integrated Settings**

      a)      <u>New Hampshire's Initial Commitment to Provide Mental Health Services in the Community</u>

48.     New Hampshire was once a leader in the delivery of community services to individuals with disabilities. State policy and practice strongly favored serving people with serious mental illness in the community rather than in institutions. A New Hampshire Study Committee on Mental and Developmental Disabilities reported to the Governor in 1982:

> The heart of any statewide mental health system is the community. Experience in New Hampshire has shown that when community services are in place, admissions to the state hospital are greatly reduced.

*Wheelock-Nardi Report* at 12.

49.     The Study Committee's report declared that "the traditional concept of the 'State Hospital' is obsolete" and recognized that "the development of community-based services have made it possible for people with chronic or severe mental illness to receive care near their homes." The report called for the closure of the Laconia State School, an institution for people with intellectual disabilities, the downsizing of NHH, the State's sole state-operated psychiatric facility, and the development of community services, including treatment, case management, residential, and vocational services.

50.     Consistent with the *Wheelock-Nardi Report,* the New Hampshire Legislature in 1986 passed the Mental Health Services System law, N.H. Rev. Stat. Ann. 135-C, making it the policy of the State to provide mental health care that is within each person's own community, is directed at promoting independence, and is the "[l]east restrictive to" the person's freedom and participation in the community. N.H. Rev. Stat. Ann. 135-C:1, 15. Regulations implementing the statute require that services must "[p]romote[] community integration and participation." N.H. Code Admin. R. Ann. He-M 401.10(h). Other regulations mandate that CMHCs, the entities with

which the State contracts to provide most community services, "strive to provide all services …
in each consumer's own community, and in a manner which promotes the personal self-
sufficiency, dignity, and maximum community participation of each consumer," N.H. Code
Admin. R. Ann. He-M 403.06(j), and that individuals receiving mental health services have a
right to services that promote full participation in community living. N.H. Code Admin. R. Ann.
He-M 309.06(a)(3); He-M 311.06(a)(6).

51.     The State initially made good progress in implementing the recommendations of
the *Wheelock-Nardi Report* by expanding community treatment and residential services. By the
late 1980s, New Hampshire was recognized by the National Institute of Mental Health for its
leadership in providing services in community settings.

> b)     New Hampshire Reneges on Its Commitment to Provide Mental Health
> Services in the Community

52.     The State's commitment and leadership, however, were short-lived. The
availability of community services began to decrease and institutionalization began to rise. From
1989 to 2010, the number of annual admissions to NHH increased from approximately 900 to
about 2,300 -- a 150 percent increase.

53.     In 2004, DHHS, recognizing there were significant "imbalances in the mental
health system of New Hampshire that cause many consumers to receive care at NHH rather than
community alternatives," convened another expert panel comprised of mental health
professionals, administrators, and stakeholders. Task Force Report at 2. The panel was asked "to
assess … causes and remedies." *Id.* The panel concluded that "many people are admitted to and
remain at NHH because of a lack of … alternatives." *Id.* at 12.

54.     According to the panel, the underlying causes were a decline in crisis and other
intensive community mental health services and the fact that there had been "virtually no

investment or development" in community residential services. *Id*. at 6. The panel reported that many individuals remained institutionalized at NHH due to the unavailability of adequate residential services in the community. Some persons with mental illness in crisis ended up in the emergency rooms of general hospitals, from which they were "discharged … in unsafe condition." *Id*. at 12. Others found themselves in community hospitals ill-equipped to serve them or "were held … in jails." *Id*.

55.     Three years later, in 2007, a legislative commission issued a report echoing the findings of DHHS's 2004 expert panel. Comm'n to Develop a Comprehensive State Mental Health Plan, *Fulfilling the Promise: Transforming New Hampshire's Mental Health System* (2007). The report decried the "shrinking community resources" for individuals with serious mental illness, *id.* at 2, and highlighted the need for the State to expand supportive housing and other evidenced-based services, such as ACT and supported employment. *Id*. at 18.

56.     By 2008, growing concern led to yet another report. A panel of knowledgeable mental health professionals was convened, with the support of DHHS, to assess the status of mental health services and make recommendations for meeting the critical needs of New Hampshire citizens. Its report, *Addressing the Critical Mental Health Needs of NH's Citizens, A Strategy for Restoration,* August 2008  ("*A Strategy for Restoration* I"), portrayed a system in crisis, marked by an ever-increasing number of admissions to NHH and the continued unavailability of community services. Both problems, the panel concluded, were leading to needless institutionalization. As the panel explained, "many individuals are admitted to New Hampshire Hospital because they have not been able to access sufficient [community] services in a timely manner (a "front door problem") and remain there, unable to be discharged, because of a lack of viable community-based alternatives (a "back door problem")." *A Strategy for*

*Restoration* I at 4. The report called for, among other things, additional crisis services, ACT teams, and residential services, including supportive housing.

57.     Commenting on the report, defendant DHHS Commissioner Toumpas acknowledged that "NH's mental health care system is failing and the consequence of these failures is being realized across the community. The impacts of the broken system are seen in the stress it is putting on local law enforcement, hospital emergency rooms, the court system and county jails, and, most importantly, in the harm under-treated mental health conditions cause NH citizens and their families." *A Strategy for Restoration* II at 1 (April 2009).

c)      New Hampshire's Discriminatory Administration of Its Service System

58.     As the State has acknowledged, its mental health service system is failing, subjecting plaintiffs and the plaintiff class to needless institutionalization. Plaintiffs and the plaintiff class are being deprived of services they require to live in their own homes and communities.

59.     In New Hampshire, there are ten regional CMHCs charged with providing community services to individuals with serious mental illness. However, as a direct result of the State's actions and inactions, these CMHCs are limited in their ability to provide the kinds of services and supports required to prevent the unnecessary institutionalization of plaintiffs and the plaintiff class. The State offers a very limited amount of residential services, such as supportive housing, to individuals with serious mental illness. The State has severely limited mobile crisis services, ACT, and supported employment services, which are uniquely effective in preventing the prolonged or repeated institutionalization of individuals with serious mental illness, including those with the most complex needs.

60.     The plaintiffs and the plaintiff class are unnecessarily institutionalized or at serious risk of unnecessary institutionalization because the State has chosen to limit the availability of mobile crisis, ACT, supportive housing, and supported employment services. Currently, half of New Hampshire's CMHC regions have no ACT teams, and others do not have a sufficient number of ACT teams. Similarly, mobile crisis services, supportive housing, and supported employment are available in such limited quantity that the need far exceeds existing State capacity. If these services were sufficiently available to plaintiffs and the plaintiff class, they would not be needlessly segregated in the State's institutions. Instead, they would experience far fewer hospitalizations at NHH and other state-supported psychiatric units, and their hospitalizations would not be inappropriately prolonged.

61.     In addition to being needlessly institutionalized at NHH or Glencliff, plaintiffs and the plaintiff class are at times forced to seek care in homeless shelters or emergency rooms, or are confined in jail, because the State has chosen to limit the availability of mobile crisis, ACT, supportive housing, and supportive employment services. This is both expensive and damaging to the individuals forced into these settings. If mobile crisis, ACT, supportive housing, and supported employment services were available to plaintiff and the plaintiff class, the number and duration of inappropriate admissions to homeless shelters, emergency rooms, and jails would be significantly reduced.

62.     Many people are institutionalized at NHH for prolonged periods of time. New Hampshire's 2011 data reflects that approximately 45 percent of individuals in NHH had been there for longer than 30 days. 16 percent of individuals at NHH have been there over a year. For most of these individuals, NHH provides little more than custodial care. They suffer a loss of autonomy and choice. They have no contact with their non-disabled peers, except for paid staff,

and lack privacy in their living and sleeping arrangements. Their most basic rights are curtailed. If adequate mobile crisis, ACT, supportive housing, and supported employment services were available to them, nearly all the long-term patients at NHH could be served instead in their own homes and communities, and would prefer to be served in an integrated community setting rather than in an institution.

63.     There were over 1,800 adult admissions to NHH in 2010, nearly 800 of which were readmissions of individuals who had been at NHH within the previous 180 days. Over 17 percent of adults discharged from NHH in 2010 were readmitted within 30 days of discharge, and 35 percent were readmitted within 180 days of discharge. Individuals discharged from psychiatric hospitals often struggle to successfully remain in integrated settings due to State limitations on community-based services. New Hampshire's staggeringly high readmission rates highlight the State's failure to provide sufficient services to enable individuals with mental illness to remain in their communities.

64.     Prolonged institutionalization at Glencliff is also a severe problem. Glencliff is a state-operated, 120-bed nursing facility, located in an isolated area of northern New Hampshire. Persons institutionalized there experience most of the same deprivations, conditions, and rights restrictions as class members at NHH. In addition, individuals placed at Glencliff are far from family and friends; the facility's remote location makes it difficult for many family members or friends to visit their loved ones.

65.     Moreover, few individuals ever return to the community from Glencliff. Between 2005 and 2010, there were a total of 13 discharges from Glencliff. Of those discharges, 11 were to NHH or other facilities, while only two people returned to their homes. In recent years, more people have died at Glencliff than have returned to the community.

66.     Sadly, younger and younger individuals are being placed in this remote facility. In 2010, 28 percent of the individuals at Glencliff were in their 40's or 50's. Glencliff residents would prefer to be served in a community setting, near family and friends, rather than spend the rest of their lives in an institution.

67.     Many Glencliff residents were transferred directly from NHH. The State has relied on transfers to Glencliff to help relieve the "front-door" problem of increasing admissions to NHH and the "backdoor" problem of prolonged stays at NHH.  *See A Strategy for Restoration* I at 4. However, the State's strategy has actually solidified the "imbalances in the mental health system of New Hampshire that cause many consumers to receive care at NHH rather than community alternatives." Task Force Report at 2.  Money that could be spent on expanding mobile crisis, ACT, supportive housing, and supported employment services is spent instead on largely unnecessary and costly institutional care at Glencliff.

68.     Many of the individuals transferred from NHH to Glencliff do not have physical health problems that require care in a nursing home. Others have physical health problems, ranging from chronic obstructive pulmonary disease to diabetes, that regularly are treated in the community. These individuals would need access to medical and personal care services that the State already provides to individuals with similar health conditions living in the community.

69.     Some of Glencliff's residents are transferred from other nursing facilities, and a few are admitted directly from the community. These individuals usually are admitted to Glencliff because of behaviors related to their mental illness. Their physical and mental health needs could be successfully met in community settings with appropriate support services. They would prefer to receive services in an integrated community setting, closer to their families and/or home communities, rather than in an isolated institutional setting like Glencliff.

d)      Findings of Legal Violations by U.S. Department of Justice

70.      The U.S. Department of Justice recently found that New Hampshire is violating the ADA for the very same reasons asserted in this Complaint. On April 7, 2011, the United States issued detailed findings, concluding that New Hampshire is violating the ADA and *Olmstead* by failing to provide services to individuals with serious mental illness, like plaintiffs and the plaintiff class, in the most integrated setting appropriate to their needs. The United States found that this failure "has led to the needless and prolonged institutionalization of individuals with disabilities…" and that the "systemic failures in the State's system place qualified individuals with disabilities at risk of unnecessary institutionalization now and going forward." U.S. Dep't of Justice, *United States' Investigation of the New Hampshire Mental Health System Pursuant to the Americans with Disabilities Act* 2 (April 7, 2011), http://www.justice.gov/crt/about/spl/documents/New_Hampshire_MH_findlet_04-07-11.pdf.

e)      New Hampshire Is Violating the PASRR Requirements of the NHRA

71.      States like New Hampshire that choose to participate in the Medicaid program must ensure compliance with the PASRR requirements of the NHRA. 42 U.S.C. § 1396r (b)(3)(F); 42 U.S.C. § 1396r(e); 42 C.F.R. §§ 483.100 *et seq*.

72.      The State is obliged to comply with PASRR in operating Glencliff, since Glencliff is certified by the State as a nursing facility and receives funding through the Medicaid program. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. §§ 483.100 *et seq*.

73.      The State's PASRR program does not appropriately assess the needs of each individual with mental illness who is referred to Glencliff and determine whether the  individual can be served in the community prior to admission to Glencliff, or upon a change in condition, as

required by federal law. Instead, it assumes that an individual with both serious mental illness and any medical needs should be institutionalized at Glencliff.

74.     The State's PASRR program does not appropriately assess whether an individual needs specialized services and, if so, what specific services are needed. As a consequence, the State does not provide necessary specialized services at Glencliff.

75.     If the State were properly performing PASRR reviews, it would have determined that most individuals admitted to Glencliff could be served instead in community settings.   It also would have determined that most Glencliff residents could be transitioned to the community with appropriate supports, including mobile crisis, ACT, supportive housing, and supported employment services.

f) The Impact on the Named Plaintiffs

(1)     Lynn E.

76.     Lynn E. is a 54-year-old woman who currently is at NHH. Lynn's home is in Danville, New Hampshire with her husband and two of her children. She brings this action through her guardian and husband, Barry Ellsworth.

77.     Lynn was born and raised in Cambridge, Massachusetts, the second of four children. She graduated from high school and completed two years of college. Lynn has three children, ages 30, 25, and 15. Lynn was trained as a Licensed Nursing Assistant (LNA). Prior to the onset of her mental illness, she worked for a number of nursing homes and agencies as an LNA.

78.     Lynn has a serious mental illness. She has varying diagnoses of schizophrenia and bipolar disorder with psychosis. Her symptoms began after the birth of her first child, when Lynn was 26 years old. Since that time, she has been institutionalized on numerous occasions, both at

NHH and in community hospitals in New Hampshire and Massachusetts. Her current admission to NHH began on April 5, 2011, when she was transferred from the Emergency Room at Parkland Medical Center in Derry, NH.  She has remained at NHH for almost 10 months.

79.     Since 2007, Lynn has received community-based mental health services from the Center for Life Management in Derry, New Hampshire. Her main goal is to stay out of the hospital; being hospitalized is her worst fear. Lynn would very much like to work. Her mental health clinician believes that working would add structure to her daily routine and bolster her self esteem. Unfortunately, the only services Lynn was receiving in the community were psychotherapy once a month and medication monitoring every two months. These services were insufficient to prevent her first hospitalization at NHH in 2008 and have not effectively addressed her ongoing risk of institutionalization.

80.     Lynn needs, but has not received, mobile crisis intervention, assertive community treatment, and supported employment. If these services were available to her in sufficient intensity and duration, she would make gains towards recovery, be better able to assist her family, and be able to avoid repeated, costly hospitalizations.

(2)     Kenneth R.

81.     Kenneth (Ken) R. is a 65-year-old man who resides at Glencliff. Ken brings this action on his own behalf and through and with the support of his guardian, Tri-County CAP, of Whitefield, New Hampshire.

82.     Ken was born in Massachusetts, but has spent most of his adult life in New Hampshire. He has four siblings and five children. Ken is very social and enjoys interacting with many people. He is compassionate, routinely engaged with other Glencliff residents, and often

tries to help them with their problems. He likes gardening and weightlifting and spends time in the game room listening to music.

83.     Ken has a diagnosis of depression and mood disorder. As a result of a motor vehicle accident over twenty-five years ago, Ken also has paraplegia and a brain injury. For most of the time since his accident, Ken lived successfully and independently in the community.  He received some support services from West Central Behavioral Health in Claremont, New Hampshire.

84.     At one time, Ken was an avid wheelchair racer and is proud of his participation in this sport. Because he is now confined in an isolated nursing institution, he is unable to participate in this activity which had had once brought him so much joy and satisfaction.

85.     Ken has a long history of psychiatric admissions to community hospitals. In 2004, he had his first admission to NHH and two months after his discharge he returned to NHH where he then remained for the next six months. Ken was then transferred from NHH to Glencliff in May of 2005 when NHH and West Central Behavioral Health failed to identify an appropriate housing alternative for him. He never wanted to be in Glencliff, and only agreed to move there as a temporary residence. Ken has now been stuck at Glencliff for seven years.

86.     More than anything, Ken wants to return to the community and to live in his own apartment. Ken's public guardian, appointed after his admission to Glencliff, supports his desire to return to the community with appropriate services. Ken needs assistance transferring in and out of his chair. One of his goals is to gain the skills to become more independent and transfer by himself. The State has not provided Ken with sufficient community home health, mental health, and support services that he needs to live in the community. If these services were available in sufficient intensity and duration, Ken would not have to remain institutionalized in Glencliff.

Ken needs, but has never received, supportive housing, supported employment, and mobile crisis intervention services. As a result of the lack of these services, Ken is now faced with the likelihood of spending the rest of his life at Glencliff.

   (3)   <u>Sharon B.</u>

87.    Sharon B. is a 55-year-old woman who resides at the Glencliff Home. Sharon brings this action through her guardian, the Office of Public Guardian in Concord, New Hampshire.

88.    Sharon was born in Dover, New Hampshire and has spent almost her whole life here. Sharon is divorced and has two grown boys and three grandchildren. She enjoys reading, listening to the radio, art, and gardening.

89.    Sharon has a diagnosis of schizoaffective disorder, bipolar type, and post-traumatic stress disorder. She has spent most of the last 5 years at either NHH or Glencliff.  She had her first psychiatric hospitalization at age 20 and has endured 5 separate hospitalizations at NHH since that time. Sharon was institutionalized at NHH from July 2009 to February 2010, and then transferred to Glencliff where she remains today. Sharon rarely gets to see the people that are important to her, including her mother, siblings, children and grandchildren. Her family lives a significant distance away and is unable to visit Sharon as often as they and Sharon would like. Sharon's prolonged isolation from her family and community is an ongoing source of pain and loss.

90.    When she lived in the community, Sharon was a client of Riverbend Mental Health Center in Concord, New Hampshire. Sharon lived in apartments on her own; however, without adequate support services, she struggled. She was transferred to other residential settings, including Riverbend's Mill House and Miller House, as well the Transitional Housing

Program on the grounds of NHH. Ultimately, Sharon left each of these programs, in one instance because the program closed, in the others because the programs could not meet her needs.

91.     Although the defendants have offered Sharon care in multiple congregate care settings, they have not provided the community home health and mental health services that she needs to live successfully in her own apartment. Sharon needs, but has never received, supportive housing, ACT, mobile crisis intervention, and supported employment.  Sharon's medical needs could be managed with appropriate community health services. If community health and mental health services were available in sufficient intensity and duration, Sharon would not have to remain institutionalized, nor would she be faced with the prospect of spending the rest of her life in the Glencliff Home.

(4)     <u>Amanda D.</u>

92.     Amanda D. (Mandy) is a 22-year-old woman who lives in her mother's home in Newport, New Hampshire. She brings this action through her mother and guardian, Louise Dube.

93.     Mandy is an intelligent young woman who obtained her high school diploma despite spending many years, and much of her childhood, in hospitals and residential placements. She loves animals, and cares for her companion cat and her yellow Labrador that she is training to become a psychiatric service dog. She is an award-winning poet and loves music.

94.     Mandy has been diagnosed at various times with bipolar disorder, post-traumatic stress disorder, and borderline personality disorder. She requires services to manage her symptoms and is working to improve her independent living skills.

95.     Mandy was only 12 years old when she experienced her first hospitalization at the Anna Philbrick Center, the former children's psychiatric hospital on the grounds of the NHH. This was the beginning of a cycle of repeated hospital admissions, robbing Mandy of the normal

educational and social experiences of adolescence. Over the past 10 years, Mandy has had 20 psychiatric hospitalizations at NHH. She also endured dozens of additional psychiatric hospitalizations at Dartmouth-Hitchcock Medical Center, Cheshire Hospital, Valley Regional Hospital and the Springfield Hospital, in large part because she did not receive adequate community-based mental health services. Mandy continues to be at serious risk of institutionalization at NHH.

96.     Mandy has lived in various residential settings, including Connecticut Valley House in Claremont, New Hampshire. In August 2010, when this house closed, Mandy moved into her mother's basement. Due to the lack of appropriate services, she suffered repeated admissions to various emergency rooms and psychiatric wards. For a brief period, Mandy went to live in her own apartment, but because adequate services were not available, her mother was forced to stay with her, sleeping on Mandy's floor. When it became clear that Mandy needed intensive services that the defendants did not offer, Mandy ended up back in the hospital.

97.     Mandy currently receives services from West Central Behavioral Health, the community mental health center in Claremont, New Hampshire. She has access to limited case management, counseling, and medication monitoring, but not to the community mental health services, including supportive housing, mobile crisis intervention, ACT and supported employment, that would address her ongoing and serious risk of unnecessary institutionalization.

98.     Mandy's greatest wish is to live in her own apartment as her peers do.  However, the lack of community-based services prevents her from doing this. Instead, her life is marked by constant disruption as she cycles in and out of various psychiatric units and hospitals.

99.     With services such as supportive housing, mobile crisis intervention, supported employment and ACT, Mandy could avoid needless hospitalizations in the future and create

more stability for herself in the community, as well as move closer to her goal of a job working with animals.

    (5)   <u>Amanda E.</u>

100.    Amanda E. is a 30-year-old woman who lives in Manchester, New Hampshire. Amanda brings this action through her guardian, the Office of Public Guardian in Concord, New Hampshire.

101.    Amanda was born in Fitchburg, Massachusetts, and shortly thereafter was abandoned by her biological mother. She experienced abusive conditions in foster care placements before being placed with her adoptive parents, who raised her in Hudson, New Hampshire. Amanda received special education services for emotional disabilities. She attended an out-of-district day school placement, where she liked to play basketball.  As a child, she had multiple hospitalizations in Massachusetts for suicidal ideation.

102.    Amanda has been diagnosed with post-traumatic stress disorder, schizoaffective disorder, poly-substance abuse, borderline personality disorder, and seizures. She has experienced more than 30 hospitalizations at NHH. She also has a lengthy history of emergency room visits and psychiatric hospitalizations in community hospitals. Amanda has not had access to the community-based mental health services needed to prevent her repeated institutionalization. Her marriage ended and she lost custody of her only daughter.

103.    Amanda has lived in a variety of settings in Nashua and Manchester, NH, including a group home, an apartment, and a homeless shelter. She currently resides in a rooming house in Manchester. During the day, Amanda attends the peer support center in Manchester. She enjoys reading, going for walks, creative writing, and listening to music, and she hopes to get her GED and go to college. She receives some community mental health services from The

Mental Health Center of Greater Manchester, including case management, therapy, and functional support. These services have been insufficient to prevent her repeated hospitalizations, and she remains at serious risk of institutionalization. In the last three months alone, Amanda has spent multiple days at the Cypress Center, an acute psychiatric residential treatment center, the emergency room at Elliott Hospital, and NHH.

104.    Amanda has the strength and courage to live successfully in the community, but she needs mobile crisis intervention, occasional access to a crisis respite bed, ACT, supported employment, and especially supportive housing. Without these services, she will continue to suffer repeated, unnecessary hospitalizations.

(6)    Jeffrey D.

105.    Jeffrey (Jeff) D. is a 45-year-old man who resides in Rochester, New Hampshire.

106.    Jeff was born and raised in Connecticut, the third of four children. He obtained his high school diploma and moved with his wife to the Seacoast region of New Hampshire in 1985. Jeff and his wife have three daughters.

107.    Jeff is a skilled carpenter and loves the outdoors. He has a variety of hobbies, including fishing and woodworking. With the proper services, Jeff can be successful and independent in the community.

108.    Jeff has a diagnosis of bi-polar disorder with psychosis. He has been admitted to NHH five times, with four of these hospitalizations occurring within the past four years. Jeff was confined to NHH from September 2009 through August 2011. Since his discharge in August 2011, he has returned to NHH once for a brief stay.

109.    Jeff is at serious risk of re-institutionalization. He went to the emergency room at Frisbie Hospital in Rochester three times in January 2012 to obtain treatment for his psychiatric

condition; when discharged home, he did not receive the community mental health services he needs.

110.    While Jeff languished at NHH, his wife was forced to sell their home. Jeff now lives in an apartment with his wife and youngest daughter. Because of his lengthy institutionalization, Jeff has severe difficulty with social interaction. Jeff has been unable to access the community mental health services he needs, including mobile crisis intervention and ACT to prevent periodic crises from turning into unnecessary, prolonged periods of institutionalization. He currently receives only medication management and case management, and is on a waitlist for psychotherapy.

111.    If Jeff were to receive mobile crisis intervention, and ACT in sufficient intensity and duration, his condition would improve, he would become more independent and productive, and he would be able to avoid repeated hospitalizations. However, in the absence of these services, Jeff remains at serious risk of institutionalization.

## VI.    LEGAL CLAIMS

112.    In their capacities as state officials and under color of law, the defendants have subjected the plaintiffs to unnecessary institutionalization and segregation in violation of the ADA, the Rehabilitation Act, and the NHRA.

### COUNT I

### Violation of the Americans with Disabilities Act

113.    The plaintiffs reallege paragraphs 1 through 112 as though fully set forth herein.

114.    The named plaintiffs and the members of the plaintiff class, due to their mental illnesses, are individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2).

115.    Defendants, acting in their official capacities, are public entities within the meaning of the ADA.

116.    The named plaintiffs and the plaintiff class are qualified to participate in New Hampshire's system of community services for individuals with serious mental illness.

117.    Defendants violate the ADA when they needlessly institutionalize individuals with serious mental illness at NHH and Glencliff, instead of providing them the services they need to remain in their own homes and communities.

118.    Defendants are failing to administer services, programs, and activities in "the most integrated setting" appropriate to the needs of plaintiffs and the plaintiff class. 28 C.F.R. § 35.130(d).

119.    Defendants are using methods of administering New Hampshire's mental health system that subject the plaintiffs and the plaintiff class to unjustified institutionalization and segregation. 28 C.F.R. § 35.130(b)(3).

120.    It would not fundamentally alter the defendants' programs, services, or activities to provide plaintiffs and the plaintiff class the community services they need to avoid needless institutionalization and segregation at NHH and Glencliff.

121.    Defendants lack a comprehensive and effectively working plan for serving people with serious mental illness in community rather than institutional settings.

## COUNT II

### Violation of Section 504 of the Rehabilitation Act

122.    The plaintiffs reallege paragraphs 1 through 121 as though fully set forth herein.

123.    The named plaintiffs and the members of the plaintiff class are qualified individuals with disabilities under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

124.    DHHS, a state agency, receives federal financial assistance for its programs and activities.

125.    DHHS violates Section 504 when they needlessly institutionalize individuals with serious mental illness at NHH and Glencliff, instead of providing them the services they need to remain in their own homes and communities.

126.    Defendants have failed to administer services, programs, and activities "in the most integrated setting" appropriate to the needs of plaintiffs and the plaintiff class. 28 C.F.R. § 41.51(d).

127.    Defendants are using methods of administering New Hampshire's mental health system that subject the plaintiffs and the plaintiff class to unjustified institutionalization and segregation. 28 C.F.R. § 41.51(b)(3).

128.    It would not fundamentally alter the defendants' programs, services, or activities to provide plaintiffs and the plaintiff class the community services they need to avoid needless institutionalization and segregation at NHH and Glencliff.

129.    Defendants lack a comprehensive and effectively working plan for serving people with serious mental illness in the community rather than institutional settings.

## COUNT III

### Violation of the Nursing Home Reform Act

The plaintiffs reallege paragraphs 1 through 129 as though fully set forth herein.

130.    Defendants have failed to develop and implement a PASRR program as required by the NHRA that appropriately determines whether the needs of applicants to and residents of Glencliff could be met in an alternative, more integrated setting than Glencliff; and advises the

individuals of the available alternatives to Glencliff, in violation of 42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A) & (B), and 42 C.F.R. §§ 483.130, 483.132, 483.134.

131.   Defendants' failure to appropriately assess all applicants with mental illness and determine whether the needs of these individuals could be met in a more integrated community-based setting has resulted in the inappropriate placement and retention individuals with serious mental illness in Glencliff, in violation of 42 U.S.C. §§ 1396r(e)(7)(B)(ii) & (C) and 42 C.F.R. § 483.132(a).

## VII.   PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs and the plaintiff class respectfully request that this Court:

1.   Certify this case a class action pursuant to Fed. R. Civ. P. 23.

2.   Issue a declaratory judgment that:

(a)   Defendants are violating the ADA and the Rehabilitation Act by failing to provide the plaintiffs and the plaintiff class with services in the most integrated setting and by needlessly institutionalizing them at NHH and Glencliff;  and

(b)   Defendants are violating the PASRR requirements of the NHRA by failing to properly assess class members' ability to be served in a more integrated setting than Glencliff and to determine if the individual should be served in an alternative setting to Glencliff.

3.   Grant permanent injunctive relief to remedy Defendants' violations of the ADA, the Rehabilitation Act, and the NHRA, including requiring Defendants:

(a)   To expand community services that plaintiffs and plaintiff class members need to avoid unnecessary institutionalization at NHH and Glencliff, including

especially mobile crisis intervention, ACT, supportive housing, and supported employment services

(b)     To conduct proper PASRR assessments to determine whether Glencliff residents and individuals referred to Glencliff could be served in a more integrated setting.

4.     Award the plaintiffs costs of this litigation and their reasonable attorneys' fees pursuant to 29 U.S.C. § 794(b), 42 U.S.C. §§ 1988 and 12133, and any other applicable provision of law; and

5.     Grant such further and other relief as may be just and proper.

Dated: February 9, 2012

Respectfully submitted,

Lynn E., by her guardian, Barry Ellsworth; Kenneth R., by his guardian, Tri-County CAP, Inc./GS; Sharon B., by her guardian, Office of Public Guardian, Inc.; Amanda D., by her guardian, Louise Dube; Amanda E., by her guardian, Office of Public Guardian, Inc.; and Jeffrey D.,

By their attorneys:

*Pro Hac Vice* Applications
to be Submitted:

DISABILITIES RIGHTS CENTER

Steven Schwartz (MA BBO 448440)
Kathryn Rucker (MA BBO 644697)
CENTER FOR PUBLIC
REPRESENTATION
22 Green Street
Northampton, MA  01060
(413) 586-6024
SSchwartz@cpr-ma.org
KRucker@cpr-ma.org

By:   /s/ Amy B. Messer   
    Amy B. Messer (NH Bar 8815)
    Adrienne Mallinson (NH Bar 17126)
    Aaron Ginsberg (NH Bar 18705)
    18 Low Avenue
    Concord NH 03301
    (603 228-0432
    amym@drcnh.org
    adriennem@drcnh.org
    aarong@drcnh.org

Ira Burnim (D.C. Bar 406154)
Jennifer Mathis (D.C. Bar 444510)
JUDGE DAVID L. BAZELON CENTER
FOR MENTAL HEALTH LAW
1101 15th Street, NW, Suite 1212
Washington, D.C.  20005
(202) 467-5730
irab@bazelon.org
jenniferm@bazelon.org

DEVINE, MILLIMET & BRANCH
PROFESSIONAL ASSOCIATION

By:    /s/ Daniel E. Will
   Elaine M. Michaud (NH Bar 10030)
   Daniel E. Will (NH Bar 12176)
   Kristen R. Blanchette (NH Bar 19616)
   Joshua M. Wyatt (NH Bar 18603)
   111 Amherst Street
   Manchester, NH  03101
   (603) 669-1000
   emichaud@devinemillimet.com
   dwill@devinemillimet.com
   kblanchette@devinemillimet.com
   jwyatt@devinemillimet.com

36