# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

---

| | |
|---|---|
| LYNN E., by her guardian, Barry Ellsworth; KENNETH R., by his guardian, Tri-County CAP, Inc./GS; SHARON B., by her guardian, Office of Public Guardian, Inc.; AMANDA D., by her guardian, Louise Dube; AMANDA E., by her guardian, Office of Public Guardian, Inc.; and JEFFREY D., on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) |
|      Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN H. LYNCH, Governor of the State of New Hampshire; NICHOLAS A. TOUMPAS, Commissioner New Hampshire Department of Health and Human Services; NANCY L. ROLLINS, Associate Commissioner, New Hampshire Department of Health and Human Services, Community Based Care Services; MARY ANN COONEY, Deputy Commissioner, New Hampshire Department of Health and Human Services, Direct Programs/Operations; ERIK G. RIERA, Administrator, New Hampshire Bureau of Behavioral Health, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
|      Defendants. | ) ) |

1:12-CV-53-LM

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) ) |
|      Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| THE STATE OF NEW HAMPSHIRE, | ) ) |
|      Defendant. | ) ) |

**UNITED STATES' COMPLAINT-IN-INTERVENTION**

## UNITED STATES' COMPLAINT-IN-INTERVENTION

1. Because of the manner in which the State of New Hampshire (the "State") plans, structures, and administers its mental health service system, scores of people with mental illness in New Hampshire are unjustifiably forced to obtain needed mental health services in segregated residential institutions like the State's psychiatric hospital, New Hampshire Hospital ("NHH"), and the State's nursing facility for persons with mental illness, the Glencliff Home ("Glencliff"), and/or are placed at serious risk of institutionalization, even though they could be appropriately served in community-based settings.  The State's failures have led to the needless and prolonged institutionalization of individuals with disabilities who could be served in more integrated settings in the community with adequate services and supports.

2. The State discriminates against individuals with mental illness by unnecessarily institutionalizing them in segregated, restrictive settings such as NHH and Glencliff, and by creating a serious risk of institutionalization for individuals with mental illness due to the State's failure to provide them with sufficient community services.  As a result, the State is in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

3. Title II of the ADA prohibits the unjustified isolation of persons with disabilities, *see* 42 U.S.C. § 12132 and *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), and requires states and other public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28

C.F.R. § 35.130(d); *accord* 29 U.S.C. § 794(a); 28 C.F.R. § 41.51(d) (Rehabilitation Act).

4. Integrated and appropriate alternatives for persons with mental illness already exist within New Hampshire's mental health service system.  These alternatives include supportive housing and an array of mental health services to support people with mental illness living in the community, including Assertive Community Treatment ("ACT"), mobile crisis services, and supported employment.  If administered appropriately, these community-based services would be  both cost-effective and capable of meeting the needs of people with mental illness.

5. Nonetheless, because of the manner in which the State has administered its service system, people with mental illness in institutions, and many of those at serious risk of institutionalization, have not been afforded meaningful access to adequate and effective community-based alternatives.  Because adequate and effective community-based alternatives are not available in sufficient supply in the State's system, people with mental illness are often given no choice but to enter an institution to receive needed mental health services from the State, many are forced to be readmitted multiple times, and many remain institutionalized for unnecessarily prolonged periods.

6. Gaps and weaknesses in the State's mental health system too often subject individuals with mental illness to needless trauma, especially during a crisis.  Individuals with mental illness who experience a crisis in New Hampshire often spend days in local hospital emergency rooms that are ill-equipped to address their needs, before ultimately being transported to the State's psychiatric facility, sometimes by the police.  This needlessly traumatic process, rife with delayed treatment and undue restrictions, is

costly and not therapeutic, especially when compared to proven and effective community alternatives.

7. The State has been candid about the many limitations, shortcomings, and deficiencies in its mental health system. Addressing the Critical Mental Health Needs of NH's Citizens, A Strategy for Restoration (hereinafter "State Ten-Year Plan"), Aug. 2008; Addressing the Critical Mental Health Needs of NH's Citizens, A Strategy for Restoration, Report of the Listening Sessions (hereinafter, "State Report"), Apr. 2009. The State has characterized its mental health system as "failing," "broken," and "in crisis," and has recognized that people with mental illness are not receiving the care they need in the system. State Report at 1, 17. The State has concluded that the lack of adequate community capacity in its system is unnecessarily forcing these individuals into institutional settings to obtain needed services for their mental illness, and too often prompting unwanted contact with local law enforcement, hospital emergency rooms, the court system, and county jails. *Id.*

8. Although the State has drafted a remedial plan to address acknowledged deficiencies in its mental health system, the State has failed to sufficiently implement its plan or to put in place needed reforms to meet the needs of persons with mental illness. *See* N.H. Cmty. Beh. Health Ass'n ("CBHA"), N.H. Ten-Year Mental Health Plan Progress, Four Years Out, Mar. 5, 2012; and Two Years Out, Sept. 24, 2010 (both reports concluding that the State had failed to implement critical elements of its plan, most notably in the areas of housing and crisis services).

9. On February 9, 2012, six individually-named Plaintiffs filed this class action on behalf of themselves and other individuals with serious mental illness at NHH or Glencliff or

at serious risk of being institutionalized in these facilities.  The suit alleges violations of federal law, including the ADA and the Rehabilitation Act, and seeks declaratory and injunctive relief.

10. Plaintiffs and the members of the plaintiff class, who receive services in, or are at serious risk of entry into an institutional setting, are individuals with mental illness that substantially limits one or more major life activities, such as personal care, working, concentrating, thinking, and/or sleeping.  They are, therefore, qualified persons with a disability for the purposes of the ADA and Rehabilitation Act.

11. On April 7, 2011, the United States issued an extensive findings letter to New Hampshire Attorney General Michael A. Delaney, notifying the State that it was failing to comply with federal law by unnecessarily segregating individuals with mental illness in institutional settings and by placing individuals with mental illness living in the community at serious risk of placement into institutional settings.  The letter reported in detail the findings of the United States' investigation, provided the State notice of its failure to comply with the ADA and the Rehabilitation Act, and outlined the steps necessary for the State to meet its obligations pursuant to federal law.

12. The United States' letter identified numerous remedial measures the State could take to comply with federal law, and further advised the State that, in the event that a resolution could not be reached voluntarily, the Attorney General may initiate a lawsuit pursuant to the ADA.

13. In the latter half of 2011, the United States met with State officials, including the New Hampshire Attorney General, on several occasions, both in person in Concord, New Hampshire, and by telephone, and exchanged several written proposals in an attempt to

reach agreement on remedial measures to address the deficiencies identified in the United States' letter.  Despite these good faith efforts, the United States has determined that voluntary compliance cannot be reached at this time.  Judicial action is, therefore, necessary to remedy the violations of law identified in the United States' letter and to vindicate the rights of the persons with mental illness in or at serious risk of being admitted to an institutional setting like NHH or Glencliff.

14. On March 27, 2012, the United States filed an assented-to motion to intervene in this case.  On April 4, 2012, the Court granted the United States' motion "for all the reasons outlined in the United States' memorandum."  Endorsed Order, Apr. 4, 2012 (Doc. 20). Through this intervention, the United States seeks to vindicate the rights of people with mental illness in New Hampshire's institutions, and those at serious risk of entry into these institutions, to receive services in the most integrated setting appropriate to their needs.

## JURISDICTION AND VENUE

15. This Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C. § 12133, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, and 28 U.S.C. §§ 1331, 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

17. Plaintiff-Intervenor is the United States of America.

18. Defendant, State of New Hampshire, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. pt. 35.

19. At all times relevant to this action, the State of New Hampshire has been a "recipient" of "federal financial assistance," including Medicaid funds, and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794.

20. The Plaintiffs bring this action on behalf of "themselves and other individuals with serious mental illness institutionalized at NHH or Glencliff or at serious risk of being institutionalized in these facilities."  Complaint ¶ 25, Feb. 9, 2012.

21. Each individually-named Plaintiff is a qualified individual with a disability, as defined by the ADA and the Rehabilitation Act.  Each has one or more impairments that substantially limit one or more major life activities.  According to their complaint, Plaintiff Lynn E. has schizophrenia and bipolar disorder with psychosis; Plaintiff Kenneth R. has depression and a mood disorder, a brain injury from a motor vehicle accident, and paraplegia; Plaintiff Sharon B. has a schizoaffective disorder, bipolar type, and post-traumatic stress disorder; Plaintiff Amanda D. has bipolar disorder, post-traumatic stress disorder, and borderline personality disorder; Amanda E. has schizoaffective disorder, post-traumatic disorder, and borderline personality disorder; and Plaintiff Jeffrey D. has bi-polar disorder with psychosis.  These individuals bring their action on behalf of themselves and other qualified individuals with a disability.

## STATUTORY AND REGULATORY BACKGROUND

A.      *The Americans with Disabilities Act and the Rehabilitation Act*

22. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

23. For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

24. Title II of the ADA prohibits discrimination on the basis of disability by public entities. This encompasses the State of New Hampshire, its agencies, and its mental health system, because a "public entity" includes any state or local government, as well as any department, agency, or other instrumentality of a state or local government, and it applies to all services, programs, and activities provided or made available by public entities, such as through contractual, licensing, or other arrangements.  42 U.S.C. § 12131(1).

25. Congress directed the Attorney General to issue regulations implementing Title II of the ADA.  42 U.S.C. § 12134.  The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate

to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The

preamble discussion of this "integration regulation" explains that "the most integrated

setting" is one that "enables individuals with disabilities to interact with nondisabled

persons to the fullest extent possible[.]"  28 C.F.R. pt. 35, App. B at 673 (2011).

26. Regulations implementing Title II of the ADA further prohibit public entities from

utilizing "criteria or methods of administration" that have the effect of subjecting

qualified individuals with disabilities to discrimination or "[t]hat have the purpose or

effect of defeating or substantially impairing accomplishment of the objectives of the

public entity's program with respect to individuals with disabilities[.]"  28 C.F.R. §

35.130(b)(3); *accord* 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

27. In *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), the Supreme Court held that Title II

prohibits the unjustified segregation of individuals with disabilities.  The Court

explained that its holding "reflects two evident judgments."  *Id.* at 600.  "First,

institutional placement of persons who can handle and benefit from community settings

perpetuates unwarranted assumptions that persons so isolated are incapable or

unworthy of participating in community life."  *Id.*  "Second, confinement in an

institution severely diminishes the everyday life activities of individuals, including

family relations, social contacts, work options, economic independence, educational

advancement, and cultural enrichment."  *Id.* at 601.

28. Under *Olmstead*, public entities are required to provide community-based services

when (a) such services are appropriate, (b) the affected persons do not oppose

community-based treatment, and (c) community-based services can be reasonably

accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

29. Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a):

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity[.]

30. The Rehabilitation Act's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4.

31. Similarly, New Hampshire has numerous statutes and regulations that strongly favor integrated community services and supports.  See the "Mental Health Services System" law, N.H. RSA 135-C, making it the policy of the State to provide mental health care that is within each person's own community, is directed to promoting independence, and is the "[l]east restrictive to" the person's freedom and participation in the community.  N.H. RSA 135-C:1, 15.  Regulations implementing the statute require that services must "promote community integration and participation."  He-M 401.10.  Other regulations mandate that Community Mental Health Centers ("CMHCs"), the entities with which the State contracts to provide most community services, "strive to provide all services … in each consumer's own community, and in a manner which promotes the personal self-sufficiency, dignity and maximum community participation of each consumer," He-M 403.06, and that individuals receiving mental health services

have a right to services that promote full participation in community living.  He-M

309.06; He-M 311.06.

B.      *The Nursing Home Reform Amendments to the Medicaid Act*

32. The federal Nursing Home Reform Act requires that states develop and implement a

Preadmission Screening and Resident Review ("PASRR") program for all Medicaid-

certified nursing facilities.  42 U.S.C. § 1396r(e)(7); 42 C.F.R. §§ 483.100 to 483.138.

33. Pursuant to PASRR, the State must identify all individuals seeking admission to a

nursing facility who are suspected of having mental illness; this is known as a Level I

PASRR review.  42 C.F.R. § 483.128(a).  Then the State must assess these persons to

determine, *inter alia*, whether the "individual's total needs are such that his or her

needs can be met in an appropriate community setting" (42 C.F.R. § 483.132(a)(1)),

and "[i]f specialized services are recommended, [the evaluation must] identif[y] the

specific … mental health services required to meet the evaluated individual's needs[.]"

42 C.F.R. § 483.128(i)(5); *see also* 42 C.F.R. § 483.134.  This evaluation is referred to

as the Level II PASRR review.  42 C.F.R. § 483.128(a).

34. For individuals with mental illness in nursing facilities, "specialized services" means

the services specified by the state which, combined with services provided by the

nursing facility, results in the "continuous and aggressive implementation" of an

individualized plan of care that is developed and supervised by an interdisciplinary

team, and which, among other things, is "directed toward diagnosing and reducing the

resident's behavioral symptoms that necessitated institutionalization, improving his or

her level of independent functioning, and achieving a functioning level that permits

reduction in the intensity of mental health services to below the level of specialized

services at the earliest possible time."  *See* 42 C.F.R. § 483.120(a)(1).

35. If an individual in a nursing facility requires specialized services, then "[t]he State must

provide or arrange for the provision of the specialized services needed by the individual

while he or she resides in the [nursing facility]."  42 C.F.R. § 483.116(b)(2); *see also* 42

C.F.R. § 483.126.

36. The nursing facility must provide mental health services which are of a lesser intensity

than specialized services to all residents who need such services.  42 C.F.R. §

483.120(c).

## FACTUAL ALLEGATIONS

A.      *New Hampshire's Mental Health System*

37. New Hampshire has a mental health service system through which it delivers services,

programs, and activities (hereinafter, "services") to persons with mental illness.  The

State determines what mental health services to provide, who will provide them, in

what settings to provide them, and how to allocate funds among various services and

settings.

38. The New Hampshire Department of Health and Human Services ("DHHS") is the State

agency responsible for providing and administering mental health services for persons

with mental illness, including setting strategic goals and determining how state, local,

and federal resources will be deployed.  The Commissioner of DHHS is responsible for

the overall management of DHHS, which includes setting mental health policy for

DHHS, overseeing the implementation of services for persons with mental illness, and

providing the leadership and direction necessary to ensure the design and delivery of a

comprehensive and coordinated system of mental health services.  Within DHHS, the

Division of Community Based Services ("DCBS") manages the State's mental health

system.  Also within DHHS, the State's Office of Medicaid Business and Policy is

responsible for the management of the State's Medicaid program, which includes

coverage of mental health, developmental disabilities, substance abuse, and other

services to Medicaid-eligible individuals in institutional and other settings.  DHHS is

the single state Medicaid agency.

39. As part of its mental health system, New Hampshire, through DHHS, delivers publicly-

subsidized inpatient psychiatric and other mental health services in institutional settings

– at NHH and at Glencliff.

40. NHH is a State-operated psychiatric facility.  NHH provides acute treatment services

for persons with severe mental illness.  The State operates NHH under the

administrative management of DCBS.

41. Glencliff is a State-operated Medicaid-certified nursing facility that provides long-term

care for persons with severe mental illness and/or developmental disabilities.  The State

operates Glencliff directly through DHHS.

42. Both NHH and Glencliff are segregated, institutional settings.  Physically, both NHH

and Glencliff are isolated from the general community.  They provide little opportunity

for individuals with disabilities to interact with individuals without disabilities outside

the institution.  Institutionalized individuals live in close quarters, primarily with other

persons with disabilities.  Most aspects of their daily lives are regimented and limited

by rigid rules and inflexible practices which segregate individuals from the community

and impede interactions with people without disabilities.  These rules and practices

include rights restrictions, involuntary searches, imposed quiet times, structured meal and medication times, limits on the ability to have visitors, and limits on travel outside the facilities.  As a result, most aspects of their daily lives are controlled by the institutions, and they have limited autonomy, privacy, or meaningful opportunities to participate in the community.

43. Within DCBS, its Bureau of Behavioral Health ("BBH") is responsible for planning, coordinating services, allocating public funds, contracting, enforcing policies and regulations, and monitoring New Hampshire's system of public mental health services. BBH is the State Mental Health Authority, obligated to ensure the provision of effective services to persons with severe mental, emotional, and behavioral impairments.

44. The State offers some community mental health support and residential services.  BBH has designated ten community mental health regions throughout New Hampshire.  BBH contracts with a CMHC to provide mental health services in each of the ten geographic regions.  The CMHC's are to offer a variety of mental health programs, including psychiatric services, individual and group therapy, symptom management, as well as more intensive services, such as ACT.  Residential services include supportive housing and group homes.

45. BBH maintains responsibility for the services offered in the community through its provider network.  BBH conducts various reviews of CMHC operations and requires financial and performance reporting.  BBH also approves community service programs for each CMHC, provides staff training, and details what services are to be provided,

how clinical records are to be maintained, and oversees other aspects of CMHC operations.

B. *Individuals with Mental Illness Residing in NHH or Glencliff Are Qualified to Receive Services in More Integrated Settings*

46. Upon information and belief, the vast majority of persons with mental illness who are or become institutionalized at NHH or Glencliff, including the individually-named Plaintiffs and the members of the proposed plaintiff class, are qualified to receive mental health services, and can be served, in more integrated community settings.

47. People who are or become institutionalized at NHH or Glencliff are similar to people with mental illness who receive services in the community.  They have similar diagnoses and needs as people who live successfully in more independent settings, with the types of supports and services that currently exist in the State's community mental health system.

48. The State already offers an array of community-based services to individuals with mental illness, including supportive housing, crisis services, ACT, and supported employment which, if expanded to meet the needs of the plaintiff class, would enable them to live in the community.

49. Numerous individuals have expressed their desire to leave NHH or Glencliff and become members of their communities once again.  Upon information and belief, persons with mental illness in NHH and Glencliff would not oppose moving to integrated settings if  appropriate community services were available and they had a fully-informed choice and a realistic opportunity to do so.

C.   *The State Discriminates Against Qualified Individuals with Mental Illness by*
     *Unnecessarily Institutionalizing Them in Segregated, Restrictive Settings*

50. New Hampshire unnecessarily segregates qualified individuals with mental illness in

    institutions and/or places them at serious risk of institutionalization.  The State's

    planning, structuring, and funding of its system of mental health care has isolated

    qualified persons with mental illness, including individually-named Plaintiffs and

    members of the proposed plaintiff class, and has unnecessarily forced them to obtain

    needed mental health services in institutional settings like NHH and Glencliff, even

    though they could be appropriately served in more integrated community-based

    settings.  Systemic failures in the State's system place certain other qualified

    individuals with disabilities, including individually-named Plaintiffs and members of

    the proposed plaintiff class, at serious risk of unnecessary institutionalization now and

    going forward.

51. The State of New Hampshire has recognized that its mental health system is failing,

    broken, and in crisis.  In a public State report, the Commissioner of DHHS concluded:

    "NH's mental health system is failing, and the consequence of these failures is being

    realized across the community.  The impacts of the broken system are seen in the stress

    it is putting on local law enforcement, hospital emergency rooms, the court system and

    county jails, and, most importantly, in the harm under-treated mental health conditions

    cause NH citizens and their families."  State Report at 1.

52. Community capacity in New Hampshire has declined in recent years, and this has led to

    unnecessary institutionalization, unnecessarily prolonged institutionalization, and a

    heightened risk of institutionalization.  Although the State offers an array of

    community-based services, scores of qualified individuals with mental illness in the

16

community are at serious risk of being institutionalized because needed mental health services are in insufficient supply in the State's community system.

53. The State has acknowledged that some people with mental illness "are not receiving the care that they need." *Id*. at 2.  The State has concluded that, in recent years, "[a]s community capacity to serve more people declined, access to critical services became more difficult to get.  More individuals found themselves in a system that could no longer meet their needs, some ending up in settings not designed to provide mental health care, such as the state corrections system and county jails." *Id*. at 17.

54. The State has recognized that it has not been spending its money on services for persons with mental illness effectively, and that this has had a negative impact on community services and on the health and welfare of persons with mental illness in need of such services.  *Id*. at 8.

55. In 2008, the State developed and publicized a ten-year plan purportedly to resolve the plainly-evident deficiencies in its mental health system.  The State recognized the need to expand existing community capacity to meet outstanding needs in areas including, but not limited to:  supportive housing, bridge subsidies for community housing, crisis services, ACT, and more intensive services and supports for persons with more complex health and/or mental health needs.  State Ten-Year Plan at 9-15.

56. In spite of this, the State has thus far taken insufficient measures to implement its plan, especially in foundational bedrock areas needed to promote and achieve positive outcomes for persons with mental illness who are in need of residential, crisis, and other key community services.

57. In September of 2010, at about the two-year anniversary of the State's publication of its plan, the New Hampshire Community Behavioral Health Association, the association of the State's CMHC community contractors, issued a report on whether the State had met deadlines and accomplished what had been set forth in the plan.  The CBHA concluded that the State had taken little or no action in a host of important areas. CBHA Progress Rep., Sept. 24, 2010, at 2-3.  The CBHA very recently issued an updated report, once again finding that the State had failed to meet important benchmarks within its ten-year plan, including in such areas as supportive housing, crisis services, intensive services like ACT, and services for persons with developmental disabilities.  CBHA Progress Rep., Mar. 5, 2012, at 1-2.   In separate correspondence, the CBHA recently informed a fellow federal agency that the situation in New Hampshire has deteriorated in recent years:  "We regret to inform you that our community system has less capacity in January of 2012 than it had in August of 2008 when the "Ten-Year Plan" called for additional investment."  Letter from Roland P. Lamy, Exec. Dir., CBHA, to Kathleen Sebelius, Sec'y, U.S. Dep't of Health & Human Svcs., Feb. 29, 2012, at 1.

58. With reasonable modifications, the types of services that already exist in New Hampshire's community mental health system would be able to meet the needs of people with mental illness in institutions or at serious risk of being institutionalized. These services include but are not limited to, supportive housing, crisis services, ACT, integrated supported employment, and other intensive community supports.

59. Supportive housing is a program that is designed to meet the needs of persons with mental illness in the community.  The State has acknowledged that supportive housing

is an effective service for persons with serious mental illness and achieves positive outcomes in terms of housing and health stability and improvement in quality of life for persons with mental illness.  State Ten-Year Plan at 3, 8-9.  In the alternative, the State has recognized that "[u]nstable housing and homelessness leads to greater levels of impairment, more difficulty in accessing services and supports, and a loss of stability, which leads to hospitalization or in some cases incarceration and then difficulties with discharge from the hospital or other institutional settings."  *Id*. at 6.

60. Nonetheless, there is an insufficient amount of safe, affordable, and stable community housing, including supportive housing, for persons with mental illness in New Hampshire.  The State has recognized that sufficient supportive housing is not available to meet the needs of persons with mental illness in New Hampshire, concluding that formal supportive housing "is not available to most NH residents with a mental illness disability," in part, because "home-based services need to be further developed to meet the current need."  *Id*. at 8.

61. There are insufficient crisis, intensive, and other services and supports in the State's community system, which cause unnecessary institutionalization and increase the risk of unnecessary institutionalization.  The State has acknowledged that "care in the middle and at the higher intensity end of the spectrum of treatment … is not easily available to many individuals with severe mental illness, resulting in an overburden on [NHH] and poor outcomes for individuals who are unable to access sufficient treatment choices to remain in the community or to be discharged from the hospital when ready."  *Id*. at 4.

62. The State recognizes, and has seen first-hand, the benefits of intensive/crisis services like ACT in terms of promoting positive outcomes among persons with mental illness. *Id.* at 13.  The State has concluded that ACT "has been shown to be effective at helping individuals with serious mental illness manage their illnesses while living independently in the community.  When applied to homeless individuals with serious mental illness, ACT reduces homelessness. … When applied to individuals with frequent hospitalizations, ACT reduces their hospital use and enhances their ability to maintain employment and personal satisfaction."  *Id.*

63. In spite of this, the State has no ACT program in at least half of its ten geographic regions statewide, leaving thousands of persons in need without the ability to even access ACT.  Not only does the State recognize that ACT can produce positive outcomes, it acknowledges that ACT is "cost-effective," especially for frequently-institutionalized individuals.  *Id.* at 14.

64. In recent years, hundreds of persons with mental illness have been admitted or readmitted to NHH each year to address acute symptoms and/or crisis situations that could have been, but were not, addressed satisfactorily outside the confines of an institutional setting.  Many individuals cycle through NHH because community capacity in the State's system is not adequate.  Admission and readmission rates to NHH are high and reveal that there are inadequacies in the State's system that force people with mental illness to obtain needed services at an institutional facility, even though these services generally could be provided effectively and cost-effectively in integrated community settings.  The State reported that the "primary finding" of its plan taskforce was that many individuals have been admitted to NHH because they have not

been able to access sufficient community services in a timely manner (a "front door

problem"), and remain there, unable to be discharged, because of a lack of viable

community-based alternatives (a "back door problem").  *Id.* at 6.

65. Individuals with mental illness are often admitted to Glencliff without being

appropriately assessed for whether they can be served in the community.  The State's

PASRR program also does not adequately or appropriately assess whether an individual

with mental illness needs specialized services.  Moreover, the State fails to provide

necessary specialized services at Glencliff.  The failure of the State's PASRR program

results in the unnecessary institutionalization of persons with mental illness.

66. Individuals at NHH and Glencliff are relegated to unnecessarily prolonged stays

because discharge and transition planning and implementation efforts are insufficient

and because housing and other critical services and supports are available in too limited

supply in the community.  Many individuals admitted to NHH and Glencliff, especially

those with more complex physical and/or mental health needs, remain there longer than

necessary simply because community-based alternatives with adequate and appropriate

intensive services and supports are not available in sufficient supply in the community.

The State has acknowledged that, once admitted to NHH, almost a third of the

individuals remain "longer than necessary."  *Id*. at 6.  The State has recognized that

some individuals with complex mental health issues have lived at NHH for "prolonged

periods of time" because adequate community housing and treatment alternatives are

"not available."  *Id*.  The State has concluded that the "scarcity of high intensity

community resources, including supervised residences and intensive community

treatment" is one of several "barriers to discharge."  *Id*.  At Glencliff, the average

length of stay is measured not in days or weeks, but in years, with some individuals

having been at Glencliff for decades. In recent years, only a handful of individuals

have been discharged to integrated community settings; in fact, more individuals have

died at Glencliff than have been placed into community settings in any given year.

67. The State's failure to develop sufficient community capacity and services is a barrier to

the discharge of individuals from NHH and Glencliff who could be served in more

integrated community settings with adequate and appropriate services and supports.

68. Individuals with mental illness and a dual diagnosis of a developmental disability or an

acquired brain disorder have remained unnecessarily institutionalized, often for

prolonged periods, in the State's mental health system because of a lack of community

alternatives with proper supports. *Id.* at 14-15. The State has acknowledged that about

half of the persons with developmental disabilities at NHH remained there "longer than

required" to provide acute evaluation and stabilization of their presenting psychiatric

symptoms." *Id.* at 14.

C. *The State Can Provide Services in Integrated Settings By Reasonably Modifying its Mental Health Services System*

69. The State can provide services in integrated community settings to institutionalized

persons with mental illness and to persons with mental illness at serious risk of entry to

an institution through reasonable modifications to its mental health services system.

70. The types of services needed to support people with mental illness in community-based

settings already exist in New Hampshire's community-based mental health service

system, including but not limited to ACT teams, case management services, peer

support services, supported employment services, psychosocial rehabilitation services,

and crisis services. However, none of the services are provided in sufficient supply and

geographic location to meet the needs of persons who are unnecessarily institutionalized. Supportive housing also exists in the State's mental health system, but on a scale that is inadequate to meet the needs of persons who are unnecessarily institutionalized.

71. Much of the remedial action needed in New Hampshire could be achieved through redirection of resources. The State could redirect the ample funds it currently spends on services in institutions and use them to better support persons with mental illness in more integrated community settings.

72. In spite of a challenging fiscal environment, the State has continued to fund costly institutional care at NHH and Glencliff, even though cost-effective and therapeutic alternatives could be developed in integrated community settings. Total expenditures for operations at NHH have risen steadily in recent years. It cost nearly ten million dollars more to run NHH in FY 2010 than it did in FY 2006. Virtually all of these costs are paid for with State-only dollars, as the federal government does not provide Medicaid matching funds for most services provided in psychiatric hospitals. State fund expenditures for operations at Glencliff have also risen steadily in recent years, rising about two million dollars from FY 2006 to FY 2010.

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

### 42 U.S.C. §§ 12131 *et seq*.

73. The allegations of Paragraphs 1 through 72 of this Complaint-in-Intervention are hereby realleged and incorporated by reference.

74. Defendant, State of New Hampshire,  is  considered a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1).

75. Plaintiffs and the members of the proposed plaintiff class are persons with a disability covered by Title II of the ADA, and they are qualified to receive mental health services, programs, or activities from defendants.  42 U.S.C. §§ 12102, 12131(2).

76. Defendants violate the ADA by administering the State's mental health service system in a manner that denies qualified individuals with a disability the benefits of the State's mental health services, programs, or activities in the most integrated setting appropriate to their needs and by failing to reasonably modify the State's mental health services system to avoid discrimination against, and unnecessary segregation of, plaintiffs.  42 U.S.C. § 12132.

77. The State's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. pt. 35.

## COUNT II

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

### 29 U.S.C. § 794

78. The allegations of Paragraphs 1 through 72 of this Complaint-in-Intervention are hereby realleged and incorporated by reference.

79. The State of New Hampshire, as a recipient of federal financial assistance, is subject to the Rehabilitation Act.  29 U.S.C. § 794.

80. Plaintiffs and the members of the proposed plaintiff class are persons with a disability covered by the Rehabilitation Act and they are qualified to receive mental health services, programs, or activities from the State.

81. The State violates the Rehabilitation Act by discriminating against qualified individuals with a disability within the meaning of the Rehabilitation Act by administering mental health programs and activities receiving federal financial assistance in a manner that denies these individuals the benefits of such programs or activities in the most integrated setting appropriate to their needs and by failing to reasonably modify the State's mental health services system to avoid discrimination against, and unnecessary segregation of, plaintiffs.  29 U.S.C. § 794(a).

82. The State's actions constitute discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations at 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.  Grant judgment in favor of the United States on its Complaint-in-Intervention and declare that the Defendant has violated Title II of the ADA, 42 U.S.C. §§ 12131 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

B.  Enjoin Defendant from:

  1.  failing to provide appropriate, integrated community services, programs, or activities for Plaintiffs and the members of the plaintiff class, consistent with their individual needs;

  2.  discriminating against Plaintiffs and the members of the plaintiff class by failing to provide services, programs or activities in the most integrated setting appropriate to their needs;

C.  Issue a declaratory judgment declaring that:

1. Defendant has violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to services, programs, or activities for persons with mental illness to enable Plaintiffs and the members of the plaintiff class to obtain the services, programs, and activities they require to reside in the most integrated setting appropriate to their needs; and

D. Order such other appropriate relief as the interests of justice may require.

/

/

/

/

/

/

/

/

/

/

/

Dated:  April 4, 2012

Respectfully submitted,


_____/s/ Thomas E. Perez_____

JOHN P. KACAVAS                          THOMAS E. PEREZ
United States Attorney                    Assistant Attorney General
District of New Hampshire

                                          EVE L. HILL
                                          Senior Counselor to the Assistant Attorney General
JOHN J. FARLEY
Assistant United States Attorney
       New Hampshire Bar No. 16934        ALISON BARKOFF
District of New Hampshire                 Special Counsel for *Olmstead* Enforcement
U.S. Attorney's Office                    Civil Rights Division
53 Pleasant Street
Concord, NH  03301
(603) 225-1552
John.Farley@usdoj.gov

                                          _____/s/ Richard J. Farano_____
                                          JONATHAN M. SMITH, Section Chief
                                          JUDITH C. PRESTON, Deputy Chief
                                          RICHARD J. FARANO, Senior Trial Attorney
                                                 District of Columbia Bar No. 424225
                                          DEENA S. FOX, Trial Attorney
                                                 New York Bar Registration No. 4709655
                                          Special Litigation Section
                                          Civil Rights Division
                                          U.S. Department of Justice
                                          950 Pennsylvania Avenue, NW – PHB
                                          Washington, DC  20530
                                          Telephone: 202-307-3116
                                          Facsimile: 202-514-0212
                                          richard.farano@usdoj.gov

                                          Counsel for Plaintiff-Intervenor,
                                          United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2012, I electronically filed the United States' Complaint-in-Intervention with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.  I also certify that on April 4, 2012, I sent the Complaint-in-Intervention, along with a completed Notice of a Lawsuit and Request to Waive Service of a Summons form (AO 398), and two copies of the accompanying Waiver of the Service of Summons form (AO 399), by FedEx and email to counsel for Defendants, Michael Brown, Esq., Senior Assistant Attorney General for the State of New Hampshire, 33 Capitol Street, Concord, NH 03301.  I included in the FedEx shipment a stamped, self-addressed envelope for returning one signed copy of the Waiver form.


　　　　　　　　　　　　　　　 */s/ Richard J. Farano*
　　　　　　　　　　　　　　RICHARD J. FARANO, Senior Trial Attorney
　　　　　　　　　　　　　　　　District of Columbia Bar No. 424225
　　　　　　　　　　　　　　Special Litigation Section
　　　　　　　　　　　　　　Civil Rights Division
　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　950 Pennsylvania Avenue, NW – PHB
　　　　　　　　　　　　　　Washington, DC  20530
　　　　　　　　　　　　　　Telephone: 202-307-3116
　　　　　　　　　　　　　　Facsimile: 202-514-0212
　　　　　　　　　　　　　　richard.farano@usdoj.gov

　　　　　　　　　　　　　　Counsel for Plaintiff-Intervenor,
　　　　　　　　　　　　　　United States of America