UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Kenneth R., by his Guardian
Tri-County CAP, Inc./GS;
Sharon B. and Amanda E.,
by Their Guardian the Office
of Public Guardian, Inc.;
Jeffrey D., by his Guardian
Monique Doukas; and Amanda D.,
    Plaintiffs

                                        Case No. 12-cv-53-SM
        v.                              Opinion No. 2013 DNH 123

Margaret W. Hassan, Governor
of the State of New Hampshire;
Nicholas A. Toumpas, Commissioner
of the NH Department of Health
and Human Services;
Nancy L. Rollins, Associate
Commissioner of the NH Department
of Health and Human Services,
Community Based Care Services;
Mary A. Cooney, Deputy Commissioner,
NH Department of Health and Human
Services, Direct Programs/Operations;
Erik G. Riera, Administrator,
NH Bureau of Behavioral Health,
    Defendants
_____

The United States of America,
    Plaintiff-Intervenor

        v.

The State of New Hampshire,
    Defendant


                      **O R D E R**


    The plaintiffs and intervenor claim that the State of New

Hampshire unnecessarily institutionalizes people with serious

mental illnesses, in violation of the integration mandates of the Americans With Disabilities Act, 42 U.S.C. § 12131(2), and the Rehabilitation Act, 29 U.S.C. § 794.  The named plaintiffs seek certification of an appropriate class, doc. no. 73, and class-based relief.  The United States, as intervenor, supports the motion for class certification.  Defendants object, however, arguing that the requirements for certification under Fed. R. Civ. P. 23(a) and 23(b)(2) are not met.

## Background

Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Id. at § 12131(2).  A "public entity" includes State and local governments, and "any department, agency, special purpose district or other instrumentality of a State . . . or local government."  Id. at § 12131(1)(A) & (B).

The needless segregation of persons with disabilities — in institutions — is a form of "discrimination" prohibited by the ADA.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 587, 588

(1999) (relying, in part, on Congress's finding "[i]n the opening provisions of the ADA," that "discrimination against individuals with disabilities persists in . . . institutionalization").  To comply with the ADA's "integration mandate" (i.e., the requirement that persons with disabilities be "integrated" in general society to the extent reasonably feasible), states must "provide community-based treatment for persons with mental disabilities" when

> (1) the State's treatment professionals have determined that community placement is appropriate,
>
> (2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and
>
> (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."

Id. at 607.

The Attorney General's implementing regulations also contain an integration mandate, which requires public entities to administer programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).[1]  The regulations, likewise, prohibit public entities from "utiliz[ing] criteria or methods of

---

[1] An "integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."  28 C.F.R. Pt. 35, App. B.

3

administration . . . that have the effect of subjecting qualified
individuals with disabilities to discrimination," 28 C.F.R.
§ 35.130(b)(3), including needless segregation.  See Day v.
District of Columbia, 894 F. Supp. 2d 1, 22 (D.D.C. 2012) (To
state a claim under the ADA, it is "sufficient to allege . . .
that the [government] has utilized criteria or methods of
administration that have caused plaintiffs to be confined
unnecessarily in nursing facilities.") (internal punctuation and
quotation marks omitted).

Although a public entity must make "reasonable modifications
in policies, practices, or procedures" to avoid unnecessarily
segregating persons with disabilities, 28 C.F.R. § 35.130(b)(7),
that obligation is not absolute.  The regulations "allow[] States
to resist modifications" to their policies, practices, and
procedures that "entail a fundamental alteration" of their
services and programs.  Olmstead, 527 U.S. at 603 (internal
punctuation omitted) (citing 28 C.F.R. § 35.130(b)(7)).

The Rehabilitation Act ("RA") and its regulations similarly
prohibit discrimination on the basis of disability, 29 U.S.C.
§ 794(a) and 28 C.F.R. § 41.51(a); require that services be
provided in the most integrated setting, 28 C.F.R. §§ 41.51(d);
and make it a violation of the Act to use methods of

administration that subject individuals to discrimination, 28
C.F.R. § 41.51(b)(3), 45 C.F.R. § 84.4(b)(4).  See Bryson v.
Stephen, 2006 WL 2805238, at *3 (D.N.H. Sept. 29, 2006) ("The
Rehabilitation Act contains . . . similar provision[s]" to the
ADA).

     The Nursing Home Reform Act ("NHRA"), 42 U.S.C.
§ 1396r(e)(7)(D)(ii), also addresses the unnecessary segregation
of people with mental disabilities.  The NHRA mandates a
screening process "called a Preadmission Screening and Annual
Resident Review (PASARR)."  Voss v. Rolland, 592 F.3d 242, 246
(1st Cir. 2010) (citing 42 U.S.C. § 1396r(e)(7)(B)(ii)).  Under
the PASARR provisions, applicants to Medicaid-certified nursing
facilities must be evaluated to determine whether they have a
mental illness and whether they meet level-of-care criteria.
Those that pass this initial screening are evaluated to determine
the most appropriate setting for their needs, which may include a
community setting.  42 C.F.R. § 483.128, et seq.

     The named plaintiffs in this putative class action are
people with serious mental illnesses who are institutionalized in
one of the State's institutional treatment facilities, New
Hampshire Hospital ("NHH") or the Glencliff Home ("Glencliff"),
or who are alleged to be at serious risk of institutionalization

in those facilities.  Seeking to represent a class of similarly situated persons, the named plaintiffs allege that the defendants – the Governor of New Hampshire, officials of the New Hampshire Department of Health and Human Services, and the Administrator of the New Hampshire Bureau of Behavioral Health (collectively, the "State") – are violating the integration mandates of the ADA and the RA, in that they rely excessively on the provision of institutional care to treat mental illness, rather than appropriate community-based care programs, and, relatedly, have failed "to develop an adequate array" of community-based services.  Complt., doc. no. 1, at ¶¶ 6-7, Pl. Br., doc. no. 73-1, at 4.  Plaintiffs also allege that the State is violating the NHRA by failing "to develop and implement an [adequate] PASARR program" for Glencliff residents and applicants.  Complt., doc. no. 1, at ¶ 130.

With regard to their integration mandate claims, plaintiffs assert two legal theories.  They say that the State's pattern and practice of under-funding community services and its over-reliance on institutional treatment has created a systemic deficiency in the array of available community services, which, in turn, has 1) contributed to the unnecessary institutionalization of people with serious mental illnesses; and 2) contributed to the placement of people with serious mental

illnesses at serious risk of unnecessary institutionalization.[2]
The "at risk" theory is based on the Attorney General's technical
guidance interpreting its integration mandate regulation.   See
U.S. Dept. Of Justice, Statement of the Department of Justice on
Enforcement of the Integration Mandate of Title II of the
American with Disabilities Act and Olmstead v. L.C.,
http://www.ada.gov.olmstead/q&a_olmstead.htm (last updated June
22, 2011).  As counsel for the United States explained at oral
argument: "We clearly state [in our technical assistance guide]
that the ADA and Olmstead do[] extend to people who are at
serious risk of institutionalization, and you don't have to wait
until you suffer the harms of being institutionalized before
being able to state a claim."  Hrg. Tr., doc. no. 89, at 119.
The appellate courts for the Fourth, Ninth, and Tenth Circuits
agree.  See Pashby v. Delia, 709 F.3d 307, 321-22 (4th Cir.
2013); M.R. v. Dreyfuss, 663 F.3d 1100, 1116-17 (9th Cir. 2011),
amended by 697 F.3d 706 (9th Cir. 2012); Fisher v. Okla. Health
Care Auth., 335 F.3d 1175, 1181 (10th Cir. 2003).  The court
accepts the theory as viable.

---

[2]  The State suggests, without developed argument, that class
members who are "at serious risk" of needless
institutionalization do not have standing.  The State did not
brief the issue, but only mentioned it at oral argument, and it
is, as presented, unpersuasive.

Plaintiffs seek a declaratory judgment, and injunctive relief requiring the State to develop and provide an adequate array of identified community-based treatment services: mobile crisis services, Assertive Community Treatment ("ACT"), supported housing, and supported employment.  They do not seek individually-tailored injunctions regarding appropriate treatment for each class member.

The court denied, without prejudice, plaintiffs' first motion for class certification and allowed limited discovery on the certification issue.  See 6/11/12 Minute Order.  That preliminary discovery period is now concluded.  In support of their renewed motion for certification of a Rule 23(b)(2) injunctive class, plaintiffs have provided a body of evidence they say fully supports their request, because it shows that the State's pattern or practices relating to the funding and provision of community-based services has had the effect of creating a system-wide deficiency in community services that adversely affects a large class of persons with serious mental illnesses.

Plaintiffs point first to the State's own reports, in which the State has itself repeatedly identified a widespread, and problematic, deficiency in community services.  In 2004, DHHS

convened a task force of experts comprised of mental health
professionals, administrators, and stakeholders to study the
causes of, and to suggest remedies for, the significant
"imbalances in the mental health system of New Hampshire that
cause many consumers to receive care at NHH rather than community
alternatives."  Complt., doc no. 1, at ¶ 53.  The task force
concluded that "many people are admitted to and remain at NHH
because of a lack of . . . alternatives."  Id.  It found a
problematic decline in crisis and other community mental health
services, and it pointed out that there had been "virtually no
investment or development" in community residential services.
Id. at ¶ 54.

      In 2007, a legislative commission made similar findings and
warned of "shrinking community resources."  It emphasized the
need for the State to expand services such as ACT, supported
employment, and supportive housing.  Id. at ¶ 55.  In 2008, with
the support of DHHS, another panel of mental health professionals
was convened to assess New Hampshire's mental health services
system and to make recommendations for meeting the critical needs
of people with serious mental illnesses.  In its report, entitled
"Addressing the Critical Mental Health Needs of NH's Citizens, A
Strategy for Restoration," the panel found that "many individuals
are admitted to New Hampshire Hospital because they have not been

able to access sufficient [community] services in a timely manner (a 'front door' problem) and remain there, unable to be discharged, because of a lack of viable community-based alternatives (a 'back door' problem)." <u>Id</u>. at ¶ 56.  The report called for, among other things, additional crisis services, supportive housing, and ACT teams.  <u>Id</u>.

Plaintiffs also rely on evidence of statistical patterns of repeated hospitalizations at NHH and lengthy institutionalization at Glencliff suggesting a systemic deficiency in available community-based services that forces people to seek treatment in institutions and to remain institutionalized unnecessarily.  In addition, they point to the findings of the United States.  In its review of the State's mental health system, the U.S. Dept. of Justice found that the State's failure to provide services to individuals with serious mental illness in the most integrated setting appropriate to their needs "has led to the needless and prolonged institutionalization of individuals with disabilities," and that the "systemic failures in the State's system place qualified individuals with disabilities at risk of unnecessary institutionalization now and going forward." <u>Id</u>. at ¶ 70, (quoting United States' Investigation of the New Hampshire Mental Health System (April 7, 2011)).

Plaintiffs' experts echo that finding. In their "System Review," the experts found the same systemic deficiencies in community services that the State previously identified. Pl. Br., doc. no. 73-1, at 12-14. In a separate "Client Review," plaintiffs' experts also concluded that there exists a large class of persons with mental illnesses who are affected by the deficiency in available community-based services. For that study, the "NHH and Glencliff experts reviewed approximately two years of facility and community mental health records, conducted in-person meetings and observations with review participants, and interviewed guardians and mental health providers." Pl. Br., doc. no. 73-1, at 9. The experts concluded that 80-96% of review participants would have avoided institutionalization, would have spent less time hospitalized, or could be discharged, and would likely choose to live in the community, if they were fully informed of and had access to community-based treatment services. One of plaintiffs' experts, Dr. Sally Rogers, opined that these conclusions can be reliably generalized to the broader population of persons institutionalized in the named facilities. Rogers Aff., doc. no. 73-18, ¶¶ 11, 14. Glencliff is a 120-bed facility, and NHH experienced over 1800 adult admissions in 2010. Extending those conclusions to the larger populations would yield a class size pertinent to the ADA and RA claims numbering in the hundreds.

11

The State argues that the experts' client review should be excluded from consideration under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), because the review's design was not methodologically sound and its implementation was not reliable. In support of its argument, the State submitted an affidavit from its expert, Dr. Leonard Flynn.  Dr. Flynn has experience in conducting research studies and is Professor Emeritus at Framingham State University, where he has "taught courses at the graduate and undergraduate level through the Psychology and Math Departments since 1970," including Statistics, Research Methods, and Experimental Psychology.  Flynn Aff., doc. no. 77-17.  Dr. Flynn avers that the client review suffers from several errors.

Although the State advanced its Daubert argument in its brief in opposition, it did not seek a Daubert hearing or press the issue at oral argument.  Development of the issue, therefore, has been minimal.  Nevertheless, the argument is unsupportable in light of the averments of plaintiffs' expert, Dr. E. Sally Rogers, Research Associate Professor and Director of Research for the Center for Psychiatric Rehabilitation at Sargent College of Health and Rehabilitation Sciences, Boston University.  See Rogers Aff., doc. no. 73-18; Rogers Supp. Aff., doc. no. 82-2. Dr. Rogers cogently, directly, and persuasively rebuts Dr.

Flynn's challenges to the client review.  See Rogers Supp. Aff.,
doc. no. 82-2.


    Beyond its challenge to the client review, the State
submitted evidence regarding the needs and preferences of persons
institutionalized at Glencliff and NHH.  The State's experts –
NHH's Associate Medical Director and Glencliff's Administrator –
conducted reviews of patient histories and health records,
concluding that a large percentage of patients were properly
admitted to these institutions and continue to need institutional
care "no matter what community-based services are available," and
that they prefer such treatment.  Def. Br., doc. no. 77, at 20-
27.


**Discussion**

    This case presents as a familiar Olmstead integration
putative class action.  The named plaintiffs "challenge[] a
system-wide policy or practice that [allegedly] affects" a class
of persons with disabilities, and they seek class treatment of
the claims despite differences in class member disabilities,
needs, and treatment preferences.  Armstrong v. Davis, 275 F.3d
849, 868 (9th Cir. 2001).  Relying on a developed body of case
law permitting class certification in cases similar to this one,
and on intimations in Olmstead itself that class certification is

13

generally appropriate in integration mandate cases,[3] plaintiffs argue that class certification is warranted.

The State opposes class certification primarily on grounds that individual differences in disabilities and treatment preferences exist between and among putative class members, and similar differences exist between and among putative class members and the named plaintiffs.  The crux of the State's objection is that, while courts in many <u>Olmstead</u> integration cases have granted class certification, the Supreme Court's relatively recent decision in <u>Wal-Mart Stores, Inc. v. Dukes</u>, __ U.S. __, 131 S. Ct. 2541 (2011), has dramatically changed the class action landscape, such that the individualized nature of each putative class member's particular circumstances necessarily undermines plaintiffs' ability to meet Rule 23(a)'s commonality,

---

[3]  As the United States points out, in defining rights and duties under the ADA's integration mandate, the court in <u>Olmstead</u>, by negative implication, seemed to tie the class action procedural device to vindication of rights under the integration mandate. <u>See</u> <u>Olmstead</u>, 527 U.S. at 606 (warning against "displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions.").  <u>Id</u>. That <u>Olmstead</u> claims may, as a general matter, be suited for class treatment is also suggested by the fact that the fundamental alteration defense involves an inquiry into the needs of all persons served by the state's mental health system.  <u>Id</u>. Class treatment would avoid "repetitious resolution" of that inquiry.  <u>Gintis v. Bouchard Transp. Co.</u>, 596 F.3d 64, 67 (1st Cir. 2010) ("[M]ost or all cases, if individually litigated, would require repetitious resolution of an objection by [defendant] that is common to each one of them.").

typicality, and adequacy of representation prerequisites, as well as Rule 23(b)(2)'s requirements.  <u>See</u> Def. Surreply, doc. no. 88, at 2.  The State also argues that class certification should be denied outright, because the involvement of the intervenor-plaintiff, the United States, makes class-based litigation unnecessary in this case.


I.   <u>The Involvement of the United States</u>

Under the "reasonably clear" language of Rule 23(b)(2), "whether the action should be maintained as a class action depends on the <u>appropriateness</u> of injunctive or corresponding declaratory relief with respect to the class as a whole."  <u>Dionne v. Bouley</u>, 757 F.2d 1344, 1356 (1st Cir. 1985) (emphasis in original).  One factor a court may consider in determining the appropriateness of class certification is the fact that "the same relief can be obtained without certifying a class . . . ."  <u>Id</u>. The State notes that the United States is seeking the same relief as are plaintiffs.  So, it asserts, the court should exercise its discretion to deny class certification as unnecessary.


The court in <u>Bouley</u>, however, recognized that "[t]here may . . . be situations where a class certification under Rule 23(b)(2) will arguably be unnecessary, but where other considerations may render a denial of certification improper."

Id.  It offered, as one of several examples, a situation in which "class certification does not impose any significant burden on the court." Id.  That is the case here.  As the United States points out, full discovery will be at the "same scale and the Parties will be moving toward trial at the same rate, whether or not the Plaintiff class is certified."  Intervenor Br., doc. no. 84, at 6.

And, there is another reason why the United States' participation does not render class certification inappropriate. Although the interests of the plaintiff class and the United States overlap significantly, those interests are not coextensive — and the differences can reasonably be expected to affect both litigation and settlement strategies.  As the United States says, it is "[c]harged with developing a national enforcement program," and it seeks consistency in its approach across all of its cases, without compromising its decision-making "to meet the specific needs of class members in a particular case." Id. at 3-4. Representative plaintiffs, on the other hand, are duty-bound to advocate for the best interests of the particular defined class, regardless of how decisions or outcomes in this litigation might influence governmental policy positions, or other cases in litigation, across the country.

For these reasons, class certification is not rendered "inappropriate" by virtue of the involvement of the United States.

II.   <u>Legal Standards for Class Certification</u>

The party seeking certification must establish "the elements necessary for class certification: the four requirements of 23(a) and one of the several requirements of Rule 23(b)." <u>In re Relafen Antitrust Litig.</u>, 218 F.R.D. 337, 341 (D. Mass. 2003) (citing <u>Smillow v. Southwestern Bell Mobile Sys.</u>, 323 F.3d 32, 38 (1st Cir. 2003)).  Whether the movant has carried that burden is a question the district court must resolve through a "rigorous analysis" of Rule 23's requirements. <u>Id</u>. (citing <u>General Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 161 (1982)).  That analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" <u>Amgen Inc. v. Connecticut Ret. Plans and Trust Funds</u>, ___ U.S. ___, 133 S. Ct. 1184, 1194 (2013) (quoting <u>Wal-Mart</u>, 131 S. Ct. at 2551).  But the overlap must necessarily be limited, for "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." <u>Id</u>.  Instead, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." <u>Id</u>. at 1195.  In short, "[b]y

17

sifting the abundant evidence through the sieve of the legal claims, [a] court [will] satisf[y] the requirement to perform a 'rigorous analysis.'" <u>Glazer v. Whirlpool Corp.</u>, __ F.3d __, 2013 WL 3746205, at *9 (6th Cir. July 18, 2013) (quoting <u>Wal-Mart</u>, 131 S. Ct. at 2551)).

In addition to the explicit requirements of Rule 23, courts generally recognize the "implicit requirement" that the class definition must be sufficiently definite to allow the court, parties, and putative class members to ascertain class membership. <u>Shanley v. Cadle</u>, 277 F.R.D. 63, 67-68 (D. Mass. 2011).

III.  <u>Class Definition</u>

The level of precision, or "definiteness" required, varies depending on the type of class sought to be certified under part (b) of Rule 23. <u>See</u> Newberg on Class Actions, § 3:7 (5th ed. June 2013).  A high level of precision in defining class membership is necessary, for example, in (b)(3) classes, because all class members must be identified in order to notify each of his or her opt-out rights, and, later, to distribute monetary relief.  <u>See</u> <u>Yaffe v. Powers</u>, 454 F.2d 1362, 1366 (1st Cir. 1972).  In contrast, where certification of a (b)(2) injunctive class is sought, "actual membership of the class need not . . .

be precisely delimited" because "notice to the members . . . is not required." Id. See also Shook v. El Paso Cty., 386 F.3d 963, 972 (10th Cir. 2004) (relying on Yaffe, and finding proposed class definition sufficiently definite, explaining that "Rule 23(b)(2) [is] well suited for cases where the composition of a class is not easily ascertainable" due to the "shifting" nature of the population); McCuin v. Sec. of Health and Human Svcs., 817 F.2d 161, 167 (1st Cir. 1987) ("[W]here only declaratory and injunctive relief is sought for a class, plaintiffs are not required to identify the class members once the existence of the class has been demonstrated.").

The named plaintiffs in this case seek certification of a (b)(2) injunctive class.  They propose the following class definition:

> All persons with serious mental illness who are unnecessarily institutionalized in New Hampshire Hospital or Glencliff or are at serious risk of unnecessary institutionalization in these facilities.

Hrg. Tr., doc. no. 89, at 60.

Plaintiffs originally proposed a definition that mirrored, and was as broad as, class definitions that have been routinely approved in previous ADA integration cases.  That proposed class definition did not include the words "unnecessarily" and "unnecessary" before the words "institutionalized" and

19

"institutionalization," respectively.  Plaintiffs added those words at oral argument, however, in response to the court's inquiries.  Although <u>Yaffe</u> does not require that the proposed definition of the (b)(2) class in this case "precisely delimit[]" class membership, the modification is a decided improvement because it narrows the class to include only those who are allegedly harmed or affected by the State's conduct.  In short, the proposed class definition, as modified, accurately articulates "the general demarcations" of the class of individuals who are being harmed by the alleged deficiencies in the State's provision of community services.  <u>Floyd v. City of New York</u>, 283 F.R.D. 153, 172 (S.D.N.Y. 2012) ("[G]eneral class descriptions based on the harm allegedly suffered by plaintiffs are acceptable in class actions seeking only declaratory and injunctive relief under Rule 23(b)(2).") (quotation omitted).

Contrary to the State's assertion, nothing in <u>Crosby v. Social Sec. Admin.</u>, 796 F.2d 576 (1st Cir. 1986), and <u>Carrier v. Am. Bankers Life Assur. Co. of Florida</u>, 2008 WL 312657, at *4 (D.N.H. Feb. 1, 2008) (DiClerico, J.)) prohibits defining this (b)(2) class by reference to the harm allegedly suffered, that is, by general reference to the harm associated with (the merits of) each class member's claim.  <u>See</u> <u>generally</u> Newberg on Class Actions, Sec. 3:6 (describing a "fail-safe" class — which some

20

courts prohibit under some circumstances — as one that
"require[s] a court to decide the merits of prospective
individual class members' claims to determine class
membership.").  In both Crosby and Carrier, unlike here,
notification to every class member would have been required, thus
the class members had to be readily ascertainable, i.e.,
ascertainable without "individualized fact-finding and
litigation."  Crosby, 796 F.2d at 580 (plaintiffs sought
certification of a (b)(2) class, but requested an injunction
ordering the defendant to notify all class members of their
rights under federal law; "Without an identifiable class of
disability claimants, we cannot grant class-wide relief in this
case either in the form of granting notices or compiling status
reports."); Carrier, 2008 WL 312657, at *2 (plaintiffs sought to
certify a (b)(3) class, which requires notice).  In the absence
of any need to notify each class member, or distribute monetary
relief, the proposed class here is appropriately defined in part
by reference to the harms allegedly suffered by its members as a
result of the violations asserted.

        Plaintiffs also proposed in their reply brief (but did not
formally include in their proposed class definition) additional
definitional language in response to the State's objection that
the phrase "at serious risk" is impermissibly "contingent on a

particular state of mind," and that this "imprecision [is] . . .
compounded by the failure to include any sort of temporal
limitation" on who is "at serious risk."  Def. Br., doc. no. 77,
at 8-9.  The proposed language reads:

> At risk of institutionalization means persons who,
> within a two year period: (1) had multiple
> hospitalizations; (2) used crisis or emergency room
> services for psychiatric reasons; (3) had criminal
> justice involvement as a result of their mental
> illness; or (4) were unable to access needed community
> services.

Although it does not define who is at "serious" risk, the
proffered language provides some objective and relevant limiting
criteria, and serves to narrow the class as well by imposing a
reasonable temporal limitation.  The proposed limiting language,
therefore, adequately addresses the State's objection.


For these reasons, the court finds that the proposed class,
as modified at oral argument and as supplemented by plaintiffs'
proffered language defining those "at risk," is sufficiently
definite.


IV.  <u>Rule 23(a)</u>

Rule 23(a) sets forth four "requirements applicable to all
class actions": numerosity, commonality, typicality, and adequacy

of representation.  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591,

613 (1997); Fed. R. Civ. P. 23(a).


    A.  <u>Numerosity</u>

Under Rule 23(a)(1), the class must be "so numerous that

joinder of all members is impracticable."  Fed. R. Civ. P.

23(a)(1).  The numerosity requirement "has two components, the

number of class members and the practicability of joining them in

a single case."  <u>Rolland v. Cellucci</u>, 1999 WL 34815562, at *3 (D.

Mass. Feb. 2, 1999).


    1.  <u>Number of Class Members</u>

The exact number of class members need not be established,

"particularly where . . . only declaratory and injunctive relief

is sought."  <u>Rolland</u>, 1999 WL 34815562, at *3.  In deciding

whether plaintiffs have met the numerosity requirement, the court

"may draw a reasonable inference as to the size of the class

given the facts before it."  <u>Id</u>. at *3.


Plaintiffs' evidence, which includes the State's own

reports, the findings of the United States, and the opinions of

plaintiffs' experts, establishes that the proposed ADA and RA

class is comprised of hundreds of persons.  With regard to the

PASARR claim, however, the number of class members has not been

even roughly established.  Assuming that there are, as alleged,
deficiencies in the State's PASARR screening protocol at
Glencliff, the proffered evidence does not support an adequate
inference that the number of persons negatively affected by the
asserted deficiencies is sufficiently large to warrant class
treatment.  Class certification, therefore, is denied as to the
PASARR claim.


         2.   Impracticability of Joinder

     The requirement that joinder of the ADA and RA class be
impracticable is easily met.  The size of the class, the asserted
disabilities of proposed class members, and geographic diversity,
make it "highly unlikely that separate actions would follow if
class treatment were denied."  Armstead v. Pingree, 629 F. Supp.
273, 279 (M.D. Fla. 1986).  See also Rolland, 1999 WL 34815562,
at *3 (finding joinder impracticable in light of "the inability
of nursing home residents with mental retardation and
developmental disabilities to initiate actions on their own
behalf").


     In sum, the evidence plainly demonstrates that the size of
the proposed ADA and RA class "is so numerous that joinder of all
members is impracticable."

B.   <u>Commonality</u>

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Although a court need find only a "single common question," <u>Wal-Mart</u>, 131 S. Ct. at 2556 (quotation and alterations omitted), a certain rigor, as prescribed by the Supreme Court in <u>Wal-Mart</u>, must attend the commonality inquiry.


The plaintiffs in <u>Wal-Mart</u> were current and former female employees who brought Title VII employment discrimination claims against the defendant company.  <u>Id</u>. at 2547.  They alleged that Wal-Mart operated under a general policy of gender discrimination relating to pay and promotion decisions, specifically, that the company had a policy of leaving such decisions to the discretion of local managers within a corporate culture suffused with gender-biased stereotypical thinking.  <u>Id</u>. at 2548.  The district court certified a class under Rule 23(b)(2), and the appellate court affirmed.  On appeal to the Supreme Court, the company argued that certification was improperly granted.  It contended, among other things, that there was no commonality among class members because plaintiffs had not shown that the company operated under a general policy of discrimination that affected all class members.  The Court agreed.

25

"Commonality," the Court stated, "requires the plaintiff to demonstrate that the class members have 'suffered the same injury.'"  Id. at 2551 (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982)).  This requirement cannot be met, however, simply by showing that the class members "have all suffered a violation of the same provision of law," since such a showing would "give[] no cause to believe that all [class members'] claims can productively be litigated at once." Id. at 2551.  Rather, "claims must depend upon a common contention" that is "capable of classwide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.  "'What matters to class certification," the Court emphasized, "is not the raising of common questions — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'"  Id. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original).  Notably, "dissimilarities within the proposed class . . . have the potential to impede the generation of common answers."  Id. at 2551 (quotation omitted).

26

Applying those principles to the case before it, the Court held that the named plaintiffs were required to provide "significant proof" that the defendant "operate[d] under a general policy of discrimination" that "touch[ed] and concern[ed] all members of the class." Id. at 2552, 2557 & n.10 (quotations omitted).  The Court found that plaintiffs did not carry their burden.  Although they alleged that the defendant had a companywide policy of allowing local managers to exercise discretion in hiring and promotion decisions, plaintiffs failed to "identif[y] a common mode of exercising discretion that pervade[d] the entire company." Id. at 2555.  Their primary evidence of a common mode or practice was testimony from a sociological expert that gender "stereotypes play[ed] a meaningful role" in local managers' exercise of discretion. Id. at 2553.  But, the Court noted, the expert could not say "whether .05 percent or 95 percent of the employment decisions" were affected by stereotyped thinking. Id. at 2554.  The Court also rejected as insignificant the affidavits of 120 female employees detailing their experiences of sex discrimination.  Those employees, the Court noted, comprised only a very small percentage of the class ("about 1 for every 12,500 class members"). Id. at 2556.  Plaintiffs' regression analysis, which showed a gender disparity in promotions, likewise, did not provide the required significant proof.  The analysis failed to

27

link local decisions with the disparity shown.  Id. at 2555.  At
bottom, plaintiffs did not "provide . . . convincing proof of a
companywide discriminatory pay and promotion policy."  Id. at
2556-57.  The Court held, therefore, that the district court
erred in certifying the class.  Id.

Under Wal-Mart's clarification of the commonality
requirement, therefore, plaintiffs seeking class certification
must, among other things, (1) avoid framing common questions so
generally that they encompass myriad, distinct claims; (2)
provide significant proof that "there exists a common policy or
practice . . . that is the alleged source of the harm to [the]
class members," M.D. v. Perry, 2013 WL 4537955, at *14 (S.D. Tex.
August 27, 2013); (3) identify common questions of fact or law
that can be "answered either 'yes' or 'no' for the entire class,"
that is, identify central questions whose answers "'will not vary
by individual class members,'" Raposo v. Garelick Farms, LLC,
2013 WL 3733461, at *3 (D. Mass. July 11, 2013) (quoting Donovan
v. Philip Morris, USA, Inc., 2012 WL 957633, at *21 (D. Mass.
Mar. 21, 2012)); and (4) show that "dissimilarities in the
proposed class" do not "impede the generation of common answers."
Wal-Mart, 131 S. Ct. at 2551.  Plaintiffs here have done all of
that.

Substantial evidence suggests that the State's policies and practices have created a systemic deficiency in the availability of community-based mental health services, and that that deficiency is the source of the harm alleged by all class members.  The State's own reports, for example, demonstrate that there is a dearth of available community-based services within New Hampshire's mental health system.  They further show that this systemic condition "is a result of the way the State manages the system and is something that the State . . . can control." M.D., 2013 WL 4537955, at *38 (finding that the States' policies and practices brought about the challenged systemic conditions). In addition, the evidence suggests a causal connection between that systemic condition and the harm experienced by all class members: a serious risk of unnecessary institutionalization, which includes a serious risk of continued unnecessary institutionalization.  As noted above, the State's own reports show a "front door" and a "back door" problem, both of which the reports attribute to the systemic deficiency.  Likewise, plaintiffs' experts corroborate the reports' findings, concluding that there is a high rate of unnecessary placement into institutions and unnecessary continued institutionalization, both resulting from the short supply of community-based services.[4]

---

[4]  Evidence of a serious risk here seems substantial in light of cases applying that standard.  See e.g., Hunter ex rel. Lynah v. Cook, 2013 WL 2252917, at *6 (N.D. Ga. May 22, 2013); Pashby v.

The plaintiffs have also shown that common questions susceptible to common answers are present.  For instance, whether there is a systemic deficiency in the availability of community-based services, and whether that deficiency follows from the State's policies and practices, are questions central to plaintiffs' theory of the case.  These questions will, necessarily, be answered similarly for every class member.  And, whether the systemic conditions, if shown to exist, expose all class members to a serious risk of unnecessary institutionalization, including continued unnecessary institutionalization, is a central and common contention whose resolution will defeat or advance the claims of all class members, whether institutionalized or not.  In short, these common questions can be "answered either 'yes' or 'no' for the entire class," and the answers "will not vary by individual class members."  <u>Donovan</u>, 2012 WL 2012 WL 957633, at *21.

_____

<u>Cansler</u>, 279 F.R.D. 347 (E.D.N.C. 2011) <u>aff'd</u> <u>Pashby v. Delia</u>, 709 F.3d 307, 322 (4th Cir. 2012).  Moreover, the cases seem to indicate, at least by implication, that no individualized inquires need be made to determine whether a systemic condition places class members at serious risk of unnecessary institutionalization; instead, the inquiry can properly turn on systemwide proof.  Notably, as evidenced by its 2011 "Investigation of the New Hampshire Mental Health System," its brief in this case, and its comments at oral argument, the United States seems to agree with this interpretation of its regulation. Of course, whether plaintiffs can prove their claim is a question for trial.

The State argues that plaintiffs have, at most, shown the impact of myriad, distinct State funding and provision practices that relate to several types of community-based services.  The State posits, in other words, that its alleged practice of failing to provide an adequate array of community services is really a collection of separate, discrete practices relating to "numerous different types of community-based treatments," broadly articulated by plaintiffs as a single "systemic failure[]."  Def. Br., doc. no. 77, at 46-47.  Therefore, it says, the class members have nothing in common except for the fact that they each alleged a violation of the integration mandate — something Wal-Mart does not allow.  See 131 S. Ct. at 2551.

The State points to the recent decision in D.L. v. Dist. of Columbia, 713 F.3d 120 (D.C. Cir. 2013), in which the appellate court found that plaintiffs had not met Wal-Mart's commonality test.  Id. at 127-28.  But DL was decidedly different, and is distinguishable from this case.  In DL, plaintiffs alleged numerous violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  DL, 713 F.3d at 122.  Specifically, they challenged the defendants' practices with respect to four distinct steps in the IDEA's "Child Find" process.  Id.  The appellate court held that plaintiffs had not shown the existence of a common question because, contrary to

31

Wal-Mart's teaching, they articulated a common question at the highest level of generality – that is, whether "the District has violated the IDEA as to each class member" – in order to sweep within the question's scope the defendants' "multiple, disparate failures."  Id. at 128 (quotation omitted).

Unlike the disparate practices and deficiencies challenged in DL, the State practices plaintiffs challenge here all pertain to a discrete set of community-based services — services the State itself has persuasively identified as critical to solving the crisis in New Hampshire's mental health system.  Although it may be a matter of degree, and perhaps discretion, as to where the line should be drawn, the court is persuaded that common questions — such as, whether there is a systemic deficiency in a core set of community-based mental health services and whether this deficiency has placed class members at serious risk of unnecessary institutionalization or continued unnecessary institutionalization — are at a low enough level of generality (or high enough level of specificity) to pass muster under Wal-Mart.  In other words, the common questions here are not amorphous or "superficial."  Jamie S. v. Milwaukee Public Sch., 668 F.3d 481, 497 (7th Cir. 2012).

Moreover, and not unimportantly, in disability cases both pre- and post-Wal-Mart, the commonality requirement has been held to be met where, as here, plaintiffs challenge more than a single service deficiency and seek more than one service enhancement or improvement as part of the remedy.  See e.g., Gray v. Golden Gate Nat'l Recreation Area, 279 F.R.D. 501, 511-19 (N.D. Cal. 2011) (holding, post-Wal-Mart, that commonality was satisfied where defendant's general policies and practices failed to address "access barriers," despite the fact that different types of access barriers were at issue, the types and levels of class members' disabilities differed, and different types of accommodation would be required); Lane v. Kitzhaber, 283 F.R.D. 587 (D. Or. 2012) (post-Wal-Mart); Rolland v. Cellucci, 1999 WL 34815562 (D. Mass. Feb, 2, 1999) (pre-Wal-Mart).

The State also argues that dissimilarities in class member needs and preferences for community-based services, and dissimilarities in their current preferences and future needs as between institutional care and community-based services, make class certification improper.  "There is no commonality," it says, "when each class member needs or wants a different mix of community supports," or when some class members prefer acute psychiatric or nursing care over care in the community and, therefore, "want to remain in their current [institutional]

33

setting." Def. Br., doc. no. 77, at 5; Def. Surreply, doc. no.
88 at 1.[5]


1.  Needs and Preferences for Different Community-
Based Services

The State posits that the limited funding "pie" will
necessarily pit class members needing and wanting a particular
community service, or mix of services, against other members
needing and wanting some other community service or mix of
services.  The intra-class conflict that the State posits is
premised on its assertion that "the class as a whole cannot seek
maximum dollars for each [community] service, without turning
their rebalancing of the system into a fundamental alteration."
Def. Surreply, doc. no. 88, at 6, n.1.  In seeking to defeat
class certification, the State, it seems, is venturing into
issues that are properly addressed at trial, in the context of
its fundamental alteration defense, but which are not
particularly relevant to the class certification inquiry.  See
Amgen, 133 S. Ct. at 1203-04 (rejecting defendant's attempt to

---

[5]  The State also argues that another relevant dissimilarity is
that between class members who are already receiving community
services and those who are not.  That difference, however, does
not destroy commonality because, under plaintiffs' modified class
definition, those class members who are receiving community
services (meaning, they are not "unnecessarily
institutionalized") are, nevertheless, "at serious risk" of
needless institutionalization – a status that implies inadequacy
or insecurity of community service options.

litigate a defense as part of class certification).  <u>See</u> <u>also</u>
<u>Glazer</u>, 2013 WL 3746205, at *8 ("[D]istrict courts may not 'turn
the class certification proceedings into a dress rehearsal for
the trial on the merits.'") (quoting <u>Messner v. Northshore Univ.</u>
<u>HealthSys.</u>, 669 F.3d 802, 811 (7th Cir. 2012)).  In any event, if
the State turns out to be right in predicting an intra-class
conflict, the creation of "independently represented sub-classes"
stands as an available managerial device to resolve such
potential issues.  <u>Ortiz v. Fibreboard, Corp.</u>, 527 U.S. 815, 864
(1999).  <u>See</u> <u>also</u> <u>Manning v. Boston Med. Ctr. Corp.</u>, __ F.3d __,
2013 WL 3942925, at *21 (1st Cir. Aug. 1, 2013).


2.  <u>Future Need for Institutional Care</u>

The State also contends that differences in <u>future</u> needs
among the class members destroy commonality.  It has submitted
evidence suggesting that an increase in funding for community
services will result in a critical reduction in already
inadequate acute care services.  This is problematic, it says,
because many class members may need acute care in the future,
but, if plaintiffs secure the relief they seek, institutional
treatment may not be available.  According to Erik Reira,
Administrator of the New Hampshire Bureau of Behavioral Health,
if community-based services are expanded to the extent sought by
plaintiffs, "[t]he State would have to radically alter its mental

35

health care budget to the detriment of individuals who need acute
in-patient care or long-term care."  Reira Aff., doc. no. 77-2,
at ¶ 24.  He further states that, "[t]o make the expenditures
sought by Plaintiffs without raising the overall mental health
care budget will require drastic cuts to important programs the
Department runs."  Id. at ¶ 29.  He concludes that "[c]uts of
magnitude demanded by the expenditures Plaintiffs seek could only
be accomplished by a drastic reduction in funding for NHH and
Glencliff Home."  Id.  Reira's factual assertions are more
properly addressed in the context of the State's fundamental
alteration defense.


### 3.  Preference for Institutional Care

     The State's point about differences in treatment preferences
between community services and institutional care likely
overstates the willingness of individuals with serious mental
illness to accept needless institutionalization over services in
the community.  But even so, the existence of preference
differences among class members does not change the fact that the
State's practices with regard to community services have been
shown, by substantial proof, to affect all class members.  See
Glazer, 2013 WL 3146205, at *9 (on remand after Wal-Mart,
affirming district court's finding of commonality in products
liability case, explaining that, where the question of the

36

product's defectiveness was common to all class members, "[t]he
existence [in the class] of currently satisfied [product] owners
did not preclude the district court from certifying the . . .
class."). And, because preferences can change, class members who
today might prefer institutionalization, can reasonably be
thought to also have an interest in the availability of
community-based treatment options should their preferences change
tomorrow.

The State seems, therefore, to "exaggerate[] the impact on
the feasibility and desirability of class action treatment of the
fact" that some class members may prefer institutionalization.
McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, 672 F.3d
482, 490 (7th Cir. 2012) (Posner, J.) (finding commonality after
Wal-Mart, where plaintiff minority stockbrokers submitted
sufficient proof of a company-wide policy affecting all class
members, even though "the exercise of discretion at the local
level is undoubtedly a factor in the differential success of
brokers, even if not a factor that overwhelms the effect of the
corporate policies"). Indeed, the relatively recent decision in
Voss, 592 F.3d at 253, provides some assurance of feasibility
because it supports the notion, albeit by implication, that the
claims of people with different treatment preferences "can
productively be litigated at once." Wal-Mart, 131 S. Ct. at

37

2551. <u>See</u> <u>Voss</u>, 592 F.3d at 253 (approving class settlement providing for an increase in community services for developmentally disabled persons, and leaving for the State's individual service planning process, placement decisions that would take individual preferences into account).[6]

For all of these reasons, the court finds that plaintiffs have met the commonality requirement of Rule 23(a)(2).

C. <u>Typicality and Adequacy of Representation</u>

Rule 23(a)(3) provides that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The typicality and adequacy requirements overlap. <u>Shanley</u>, 277 F.R.D. at 69. The State argues that the named

---

[6] Such a process may best ensure vindication of rights under the ADA and RA, since the <u>meaningful</u> exercise of a preference will be possible only <u>if</u> an adequate array of community services are available to those who do not need institutionalization. As plaintiffs point out, preferences may be "conditioned by availability, . . . limited by information, and are likely to evolve in a system that complies with the ADA." Pl. Reply Br., doc. no. 82, at 49. <u>See</u> <u>also</u> Simpatico Supp. Aff. doc. no. 82-1, ¶ 10. <u>Cf</u>. <u>Green v. Cty. Sch. Bd. of New Kent Cty.</u>, 391 U.S. 430, 441 n.5 (1968) (recognizing — but not deciding for the case before it — that vestiges of segregation may influence minority students and parents to choose segregated schools under so-called "freedom of choice" desegregation plan).

plaintiffs are not adequate representatives of the class and that their claims are not typical of class member claims because (1) they seek to shift funds away from institutional care, yet some class members currently prefer institutional care, or may need care at a <u>particular</u> institution in the future; (2) some class members need or prefer different, or a different mix of, community-based services than the named plaintiffs; and (3) the State's review of the named plaintiffs' medical files purportedly reveals that some either need or prefer institutionalization, or may need institutionalization in the future.  The arguments are unpersuasive.

The court has determined that all class members, as defined and without regard to current preferences, have an abiding interest in securing the availability of community-based services options sufficient to preclude unnecessary institutionalization. Moreover, as noted, the State's arguments that funding for institutional care will be unavailable if the named plaintiffs get what they want, and that the funding "pie" is not large enough to maximize the funding of all four community-based services, are issues properly addressed at trial in the context of the State's fundamental alteration defense.

39

In addition, it has been adequately shown that, due to a shortage of the types of community-based services sought, each of the named plaintiffs either continues to experience unnecessary institutionalization, has experienced unnecessary institutionalization in the past, or, although currently not institutionalized, is otherwise at serious risk of being unnecessarily institutionalized. Plaintiffs' evidence also suggests that these same circumstances are shared by the defined class members. Although the State submitted contradictory evidence from its own experts with regard to the needs and preferences of the named plaintiffs, plaintiffs countered with supplemental affidavits from their mental health experts, and from the named plaintiffs themselves or their guardians. Having reviewed this evidence, the court finds that plaintiffs have shown that the named plaintiffs' experiences and claims are typical of those of the members of the class, and that the named plaintiffs are adequate representatives of the class.

The State does not challenge the experience or qualifications of the putative class attorneys, nor, reasonably, could it. The court finds, therefore, that plaintiffs' attorneys will adequately represent the class.

V.   Rule 23(b)(2)

Plaintiffs seek to maintain this suit as an injunctive class action under Rule 23(b)(2).  As noted, plaintiffs have submitted evidence to support their allegation that a systemic deficiency in the State's community-based mental health services system affects the class.  As the court of appeals for the Fifth Circuit noted in M.D. v. Perry, 675 F.3d 832, 841 (5th Cir. 2012), the requirements of Rule 23(b)(2) are met where plaintiffs show that the "State engages in a pattern or practice of agency action or inaction – including a failure to correct a structural deficiency within the agency . . . with respect to the class."  Plaintiffs have, therefore, met their burden to show that the State has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Nevertheless, the State argues that certification of a (b)(2) class is improper because the class member claims are not "cohesive."  There is some debate, even after Wal-Mart, whether Rule 23(b)(2) contains an implicit cohesiveness requirement (see Newberg, Sec. 4:33), and the court of appeals for this circuit has never endorsed one.  See Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 11-12 (D. Mass. 2010) (finding that there is no

authority in the First Circuit for grafting a cohesiveness requirement onto Rule 23(b)(2)).  The court need not address that legal issue, however, because in any event, the class here is sufficiently cohesive.

A class is "cohesive" where common questions predominate and there are "few conflicting interests among its members." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 413 (5th Cir. 1998).  The State argues, primarily, that the proposed class is not cohesive given the same dissimilarities between and among class members that it believes undermine commonality, typicality, and adequacy of representation.  It argues, in sum, that the class members here do not "have a 'strong commonality of interests,'" such that all of them will benefit from a single injunction.  Def. Br., doc. no. 78, at 13 (quoting Gates v. Rohm & Hass Co., 655 F.3d 255, 264 (3d Cir. 2011) (applying cohesiveness requirement)). See also Def. Surreply, doc. no. 88, at 2.  The court has addressed and rejected the State's arguments regarding class member dissimilarities, finding that all class members share a strong common interest in enhanced options for community treatment.  Injunctive relief prohibiting a discriminatory lack of community service options would, therefore, benefit all class members. See D.G. ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1200 (10th Cir. 2010) (holding that class was cohesive, noting

42

that, "because the Named Plaintiffs assert that excessive caseloads are harming or putting at risk of harm all children in the class, the imposition of caseload limits would apply to the entire class.") (emphasis deleted).

For these reasons, the court finds that plaintiffs have met the requirements of Rule 23(b)(2).

### Conclusion

Reasonable minds may of course differ as to whether the traditional approach taken in ADA integration cases (or related disability cases) of certifying broad classes of persons with different specific disabilities, needs, and preferences (an approach taken both before and after Wal-Mart), is in tension with Wal-Mart's recent procedural commands.  But plaintiffs here have defined the class more narrowly than is usually done in ADA integration cases; their class claims are limited to parallel claims under the ADA and RA; they challenge alleged deficiencies related to a discrete set or class of services; and they seek a single declaration or injunction aimed at correcting a systemic discriminatory imbalance (not mini-injunctions for each class member), thus leaving individual treatment determinations for the State's existing individually-targeted administrative process.

All of this, the court concludes, has enabled plaintiffs to meet
Wal-Mart's commands.

Accordingly, plaintiffs' motion for class certification,
doc. no. 73, is granted in part and denied in part.  The
requirements of Federal Rule of Civil Procedure 23(a) and (b)(2)
are met with regard to the ADA and Rehabilitation Act claims, but
not with regard to the PASSAR claim.

The class certified is:

> All persons with serious mental illness who are
> unnecessarily institutionalized in New Hampshire
> Hospital or Glencliff or who are at serious risk of
> unnecessary institutionalization in these facilities.

> At risk of institutionalization means persons who,
> within a two year period: (1) had multiple
> hospitalizations; (2) used crisis or emergency room
> services for psychiatric reasons; (3) had criminal
> justice involvement as a result of their mental
> illness; or (4) were unable to access needed community
> services.

Upon certification, the court must appoint class counsel.
See Fed. R. Civ. P. 23(g).  Plaintiffs here seek the appointment
of four firms or legal services organizations as class
co-counsel: DRC, Devine, Millimet & Branch, the Bazelton Center,
and CPR.  These firms and organizations, and their designated
attorneys, meet the requirements of Rule 23(g)(1)(A).  Pursuant
to this court's authority under Rule 23(g)(1)(C)-(E), class
counsel shall submit ex parte, or under seal, a proposed budget

44

related to anticipated fees in this case within sixty (60) days from the date of this order.  Given the number of attorneys seeking active participation in this litigation, it seems prudent to ensure some control and oversight over the generation of fee claims at the outset, in the interest of both plaintiffs' counsel and defendants, who may at some point be asked to pay those fees.

Undoubtedly, class certification carries risk, but such decisions are conditional, and the court retains the authority to modify the class description, or even decertify the class, if subsequent developments suggest that either is appropriate. Should decertification become advisable or necessary, the involvement of the United States – which seeks system-wide remedies – substantially reduces the risk that litigation efforts and resources will have been wasted.

Finally, given that the class is certified under Rule 23(b)(2), and notice is discretionary, the court declines to require that notice be given to all members of the class, since the relief sought is systemic in nature and can only benefit members of the class.  See Fed. R. Civ. P. 23(c)(2)(A).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 17, 2013

cc:  Ira A. Burnim, Esq.
     Anne M. Edwards, Esq.
     Richard J. Farano, Esq.
     Deena S. Fox, Esq.
     Aaron J. Ginsberg, Esq.
     Catharine A. Mallinson, Esq.
     Jennifer Mathis, Esq.
     David W. McGrath, Esq.
     Amy B. Messer, Esq.
     Elaine M. Michaud, Esq.
     Kathryn L. Rucker, Esq.
     Steven J. Schwartz, Esq.
     James Q. Shirley, Esq.
     Brian D. Thomas, Esq.
     John M. Turner, Esq.
     Daniel E. Will, Esq.
     Rebecca L. Woodard, Esq.
     Joshua M. Wyatt, Esq.