**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| Amanda D., et al., and<br>others similarly situated,<br><br>       Plaintiffs,<br><br>      v.<br><br>Margaret W. Hassan, Governor, et al.,<br><br>      Defendants.<br>_____<br>United States of America,<br><br>      Plaintiff-Intervenor,<br><br>      v.<br><br>State of New Hampshire,<br><br>      Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civ. No. 1:12-cv-53-SM<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR ASSENTED-TO**
**MOTION FOR PLAINTIFFS' ATTORNEYS' FEES AND COSTS PURSUANT TO**
**SETTLEMENT AGREEMENT**

### I.    Introduction

On February 9, 2012, six named Plaintiffs, on behalf of themselves and all others similarly situated, filed this class action lawsuit alleging that the State's failure to provide access to necessary community mental health services resulted in the needless institutionalization of adults with serious mental illness at the New Hampshire Hospital ("NHH") and the Glencliff Home ("Glencliff"). Many experienced prolonged or repeated institutionalizations, while others were at serious risk of being institutionalized because they lacked access to needed community services.

New Hampshire's mental health system was in a state of crisis. Hundreds of individuals cycled in and out of New Hampshire Hospital each year, and emergency rooms around the State were overwhelmed and unable to meet the needs of people experiencing a psychiatric emergency. The lack of adequate community mental health services resulted in lengthy and repeated hospitalizations, criminal justice involvement, homelessness, and emergency room crises, all of which were well-documented in the State and community mental health centers' (CMHCs') reports, in the media, and in expert reviews conducted by the Plaintiffs.

As a result of this lawsuit and the State's commitments in the Proposed Class Action Settlement, there will be dramatic improvements in access to community mental health services that will significantly improve the lives of New Hampshire citizens with mental illness. The State of New Hampshire has committed to expanding services needed to prevent unnecessary institutionalization; developing effective transition planning and quality assurance processes; and, in conjunction with an Expert Reviewer and this Court, monitoring services and processes to ensure individuals with serious mental illness are afforded the opportunity to live lives of their choosing integrated in their homes and communities. The State has estimated that, pursuant to the settlement, $6 million of additional services will be developed in this biennium, and approximately $23.7 million in the next biennium.[1]

In addition to committing the State to develop approximately $29.7 million in new services and other relief for the class, the Proposed Class Action Settlement includes an agreed-to payment of attorneys' fees and costs in the amount of $2,426,800. Like the relief for the class, that fee amount was negotiated between the Parties and is the product of compromise. Approximately 80% of the agreed-to fee ($1,900,000) is compensation for time spent litigating

---

[1] Office of the Attorney General, Press Release: Settlement Agreement in Mental Health Services Lawsuit, Dec. 19, 2013, *available at* http://www.doj.nh.gov/media-center/press-releases/2013/20131219-mental-health-settlement.htm

this case and securing a settlement, which is significantly lower than Plaintiffs' "lodestar" -- their reasonable hours billed at reasonable rates. In addition to compensating Plaintiffs for past work the negotiated amount also compensates and imposes a cap of $400,000 (15% of the amount) over five years for *future* time spent monitoring the settlement. Approximately 5% of the award ($126,800) is reimbursement of Plaintiffs' litigation expenses. Exhibit 1, Plaintiffs' Attorneys' Fees & Costs.

In support of their Assented-to Motion for Plaintiffs' Attorneys' Fees and Costs Pursuant to Settlement Agreement, Plaintiffs have presented below substantial evidence that the negotiated fees and costs in the Proposed Class Action Settlement are fair and reasonable. Based on the record before the Court, the Court should approve the Parties' agreement regarding fees and costs as fair and proper.

## II.    Overview of the Litigation

### A.    *The Complaint and Claims*

Prior to filing the Complaint, Plaintiffs' Counsel spent several years investigating the lack of community mental health services in New Hampshire and the resulting unnecessary institutionalization of thousands of class members. Counsel spent significant time at New Hampshire Hospital and Glencliff interviewing individuals with serious mental illness, and scores of individuals in the community who lacked access to needed community mental health services. They met frequently with numerous family members, guardians, providers, and other stakeholders in the mental health community. Plaintiffs' Counsel sought information through Right-to-Know requests, reviews of public reports, and data gathered from numerous sources. As they gathered and analyzed reports and data, Counsel engaged experts to assist in that process as well as with framing the claims and requested relief. Plaintiffs' Counsel also conducted extensive

legal research on mental health, community integration, and related Medicaid laws and regulations.

What emerged from the investigation was a complex set of systemic deficiencies, involving thousands of individuals with serious mental illness located throughout the State of New Hampshire. Some individuals were experiencing prolonged stays at New Hampshire Hospital, the Glencliff Home, and other institutional settings, while others cycled in out of hospitals, emergency rooms, jails, and homeless shelters. There were additional access barriers related to the emergence of the managed care system, a changing landscape on service delivery, and voluminous data on complicated billing practices for mental health services, both institutional and community based. The systemic deficiencies involved a wide array of providers, including community mental health centers, private providers, and state and privately-operated facilities.

The United States similarly conducted an investigation of New Hampshire's mental health system, which resulted in findings that largely mirror those of the Plaintiffs. In 2010, Plaintiffs' Counsel summarized their findings in detailed letters to the State of New Hampshire. In 2011, the United States Department of Justice did the same. Plaintiffs' Counsel and the United States began many hours of collaboration to develop a comprehensive remedial proposal and an offer of settlement that was presented to the State in the summer of 2011. Extensive and prolonged negotiations with the State were conducted in the summer and fall of 2011 (four full days and two half days, with multiple drafts of proposed settlements exchanged), but the Parties failed to make progress. Therefore, on February 9, 2012, the Plaintiffs filed a class action lawsuit, asserting claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and 28 C.F.R pt. 35 (Title II integration mandate, and prohibitions on discrimination on the basis

of disability and in methods of administration), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, and the Nursing Home Reform Act, 42 U.S.C. §§ 1396r *et seq*. (Doc. 1.) The United States moved to intervene on March 27, 2012, (Doc. 20) and became a Party on April 4, 2012. The Defendants filed their Answer on April 17, 2012. (Doc. 32.)

       B.    *Class Certification*

Plaintiffs filed their first motion for class certification, with nine exhibits, on March 23, 2012. The Defendants fought Plaintiffs' first class certification motion by moving to strike and seeking six months of class discovery, in order to mount an exhaustive defense on the class certification issues. (Docs. 18, 24-26, 33-40, 43, 46-48, 51-52.) After further briefing and a hearing on June 11, 2012, the Court dismissed Plaintiffs' first class motion without prejudice and ordered class discovery.

Class discovery alone required the review of hundreds of thousands of pages of documents, and extensive expert reviews of class members and the state mental health system. Six Plaintiff experts conducted extensive reviews of a sample of individual class members at two institutions, other class members in the community, and an array of community programs.  These reviews were necessary to provide this Court with a comprehensive and cohesive basis for certifying a class in this case. Plaintiffs' Counsel spent many hours retaining and preparing the experts, organizing expert site visits and interviews with class members, guardians, and stakeholders, as well as reviewing and copying thousands of pages of medical records. Cognizant of the need to avoid duplication of efforts, Plaintiffs' Lead Counsel worked diligently to assign roles and tasks appropriate to each team members' level of experience and ability, thus ensuring both highly effective and efficient representation of the class. Work plans were written and distributed, which assigned specific roles and responsibilities to each firm.

Plaintiffs redrafted and filed a renewed motion for class certification, with more than twenty supporting documents, including six expert affidavits, on January 29, 2013. (Docs.72-73.) The exhibits and affidavits explained the methodology, scope, and depth of the expert reviews conducted around the State, and the systemic failures leading to the unnecessary institutionalization of class members in almost every case examined. The Defendants strongly contested the renewed motion, including the timing of its filing, (Docs. 60-71, 75-88), and filed their own lengthy set of exhibits, including expert affidavits from multiple State officials, and excerpts from Plaintiffs' medical records. A hearing was held on May 16, 2013.

After a lengthy hearing, in an order dated September 17, 2013, the Court certified the class as follows: "All persons with serious mental illness who are unnecessarily institutionalized in New Hampshire Hospital or Glencliff or who are at serious risk of unnecessary institutionalization in these facilities. At risk of institutionalization means persons who, within a two year period: (1) had multiple hospitalizations; (2) used crisis or emergency room services for psychiatric reasons; (3) had criminal justice involvement as a result of their mental illness; or (4) were unable to access needed community services." (Doc. 90.) Defendants subsequently filed their Request for Permissive Appeal to the First Circuit, to which Plaintiffs responded with a brief in Opposition.

C. *Discovery*

Concurrently with class discovery, and pursuant to intensely negotiated joint agreements on scheduling and electronic discovery (Docs. 49-50, 54-56), the Parties conducted merits discovery, beginning in August 2012 and continuing until November 1, 2013, when the Parties agreed to a stay of discovery pending the outcome of negotiations. (Doc. 94.) Negotiations on the Joint Stipulation on Electronically Stored Information ("ESI") and ESI process required many

months of meetings between the Parties and the exchange of countless drafts and custodian lists. Merits discovery was voluminous. To prove their case at trial, Plaintiffs needed to conduct systematic expert reviews of much of the mental health system in the State of New Hampshire, both institutional and non-institutional, including operations, budgets, and Medicaid funding, by, among other things, examining samples of medical records of class members and numerous State databases. Plaintiffs drafted three Requests for Production of documents (including 125 individual requests with multiple subparts) and two sets of interrogatories. They spent many hours collaborating on a coordinated discovery strategy with the United States, which submitted an additional request for production (61 individual requests). In response, the Defendants produced hundreds of thousands of pages of documents. The Plaintiffs and the United States were required to develop systems for review, prioritization, and categorization, in an ongoing process over the course of 14 months until discovery was stayed. During merits discovery, the Plaintiffs also had to respond to Defendants' discovery requests, including digitization and production of expert files, tens of thousands of pages of medical records, and Plaintiffs' investigation files.

    *D.    Settlement Agreement*

    At the end of September 2013, the Parties began to discuss the parameters of a possible settlement agreement, using as a starting point the proposals exchanged in the pre-filing negotiations *(see supra*, II.A). Between September 24 and December 9, 2013, the Parties engaged in thirteen lengthy negotiation sessions. The Parties began by discussing an array of complex substantive issues, including: (1) the target population for expanded services; (2) the essential components of the five services sought by the Plaintiffs, (3) the implementation schedule for expansion of each service; and (5) new transition planning and quality assurance

procedures (Sections V-VII of the Settlement Agreement). Upon obtaining agreement on these matters, they discussed the key legal provisions (Sections I-IV and IX), monitoring (VIII), and enforcement (X). The Parties generated multiple drafts of each section of the Agreement. A comprehensive Settlement Agreement was finalized and filed with the Court on December 19, 2013, along with a Joint Motion for Preliminary Approval of Class Action Settlement. The Court granted preliminary approval on January 3, 2014, and scheduled a hearing on final approval for February 12, 2014.

### III. In Reviewing the Negotiated Fee Award, the Court Should Give Weight to the Parties' Agreement, Negotiated at Arm's Length by Teams of Experienced Litigators in a Civil Rights Case.

#### A. The Purpose and Scope of a District Court's Review of Attorney's Fees Under Fed. R. Civ. P. 23(h).

Fed. R. Civ. P. 23(h) went into effect in 2003 to provide a consistent format for awards of attorneys' fees in class action lawsuits and to affirm the responsibility of federal courts to ensure "that the amount and mode of payment of fees are fair and proper." Fed. R. Civ. P. 23(h) Advisory Committee's Note. The Rule makes explicit the Court's responsibility to review fee awards in class action law suits, and recognizes that the nature of the Court's review depends on the circumstances of the case and should be guided by applicable case law. *Id.*

In complex litigation there is often no traditional client with authority to negotiate terms of the representation or the rate of compensation. *See* Federal Judicial Center, *Manual for Complex Litigation*, 4th ed., at 183. In such cases, Rule 23(h) provides a mechanism for the court to protect the interests of absent class members and to curb the abusive practice of collusion and negotiated settlements that provide little actual value to class members, but very high fees for class counsel. *See* Rivlin and Potts, Proposed Changes to Federal Rules of Civil Procedure,

*Harvard Envtl. Law Review,* Vol. 27, No. 2 (July 2003) at 536; *cf. In Re Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75, 94 (D. Mass 2005) ("[s]torm warnings indicative of collusive settlement of class action are lack of significant discovery and extremely expedited settlement of questionable value accompanied by enormous legal fee…." (quoting *General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 767, 801 (3d Cir. 1995)).

In exercising its responsibilities under 23(h), the court should guard against such abusive practices. The court should also take into account the basic goal of Rule 23—that settlement terms should be approved if fair and reasonable. *Harry M. v. Penn. Dep't of Public Welfare*, 2013 WL 4500051 (M.D. Pa. Aug. 21, 2013); Fed R. Civ. P. 23(e)(2) (class action settlements should be approved when they meet fair, reasonable, adequate standard); *see U.S. v Swiss American Bank, Ltd*., 191 F. 3d 30, 39 (1st Cir. 1999) (Federal Rules of Civil Procedure should be read *in pari materia*).

> B.   *In a Civil Rights Injunctive Case, the Court Should Approve a Negotiated Fee Award Where Collusion Is Absent and Arms-Length Negotiations Have Resulted in Comprehensive Relief to the Class.*

In assessing a negotiated fee award in civil rights litigation such as this, weight should be given to the agreement between class counsel and the defendants, where there are no concerns of collusion, and where months of arms-length negotiations have resulted in comprehensive and substantial relief to the class. As the U.S. Supreme Court held in *Hensley v. Eckerhart*,

> [a] request for attorney's fees should not result in a second major litigation. **Ideally, of course, litigants will settle the amount of a fee**. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.

461 U.S. 424, 437 (1983) (emphasis added).

This approach is consistent with the purposes of the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, which provides for awards of attorneys' fees in civil rights cases to "ensure effective access to the judicial process", and encourage private enforcement of civil rights laws. H.R. Rep. No. 94-1558 (p.1) (1976); *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (remedying a civil rights violation vindicates a policy Congress accorded the highest priority, justifying attorney's fees). The Act is designed to encourage competent counsel to take meritorious and complex civil rights cases that might otherwise be abandoned due to financial risks. *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 825 (6th Cir. 2013) (citing *City of Riverside v. Rivera*, 477 US 561, 576, 578 (1986)). The fee-shifting provisions of the Americans with Disabilities Act, 42 U.S.C. § 12205, have the same purpose. *Hutchinson v. Patrick*. 636 F.3d 1, 8 (1st Cir. 2011) (applying Section 1988 case law to ADA fee appeal).

C.    *The Negotiated Fee is Less Than Plaintiffs' Lodestar*

Having obtained substantial relief, Plaintiffs are entitled to recover attorneys' fees and costs in this case. 42 U.S.C. § 1988; *Hensley v. Eckerhart*, 461 U.S. at 433; *Hutchinson v. Patrick*, 636 F.3d 1, 11 (1st Cir. 2011) (plaintiffs are prevailing party for fee-shifting purposes in case of negotiated settlement). The starting point for establishing a proper fee is counsel's lodestar (reasonable hours expended multiplied by reasonable hourly rate of attorneys). *Hutchinson*, 636 F.3d at 13.

The lodestar represents what could and would be properly billed to a paying client. *Id.* As Congress noted in passing Section 1988:

> It is intended that the amount of fees awarded . . . be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature.

S.Rep. No. 94-1011 at 6, reprinted in 1976 U.S. Code Cong. & Admin. News 5908, 5913.

Here, the negotiated fee is less than Plaintiffs' lodestar. In the bargaining process, Plaintiffs agreed to be compensated for an amount that is substantially less than their lodestar. Exhibit 1, Plaintiffs' Attorneys' Fees & Costs; Exhibit 2, Decl. of Amy B. Messer ¶ 51. Plaintiffs also agreed to a cap on future monitoring fees that will likely under-compensate Plaintiffs for their monitoring work over the course of the Agreement. Exhibit 3, Decl. of Steven Schwartz ¶ 28-31. That the negotiated fee does not fully compensate Plaintiffs' Counsel for their time, and that Defendants, who are liable for the fee, concurred in the amount, is strong evidence that the negotiated fee is reasonable and proper. The complexity, expense, and risk associated with this case, and the extraordinary results obtained for the Plaintiff Class, discussed below, further support the reasonableness of the settlement's fee award. Accordingly, the Court should find the negotiated fees, along with the rest of the Proposed Class Action Settlement, are reasonable, fair, and adequate.

## IV.   **The Agreed-to Attorneys' Fees  Are Reasonable and Proper.**

A.   *The Time Spent by Plaintiffs' Counsel was Reasonable, Given the Complexity of the Litigation, the Aggressive Defense, the Results Obtained, and the Significant Reduction Agreed To by the Plaintiffs.*

1.   <u>The Litigation's Scope and Complexity Required the Work of Multiple Attorneys with Highly Specialized Expertise.</u>

The U.S. Supreme Court has recognized in its fee jurisprudence that civil right cases are typically complex. *Blum v. Stenson*, 465 U.S. 886, 893 (1984). Counsels' lodestar reflects the difficulty of the case in the hours expended and/or the hourly rate of experienced attorneys. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). Complex cases often require multiple attorneys. As the First Circuit has cautioned, "retaining of multiple attorneys in a significant, lengthy discrimination case . . . is understandable and not a ground for reducing the hours

claimed." *Lipsett v. Blanco*, 975 F.2d 934, 939 (1st Cir. 1992); *Rolland v. Cellucci*, 106 F. Supp. 2d 128, 135-137 (D. Mass. 2000).

This case was undeniably complex. Although grounded in well-established precedents under the Americans with Disabilities Act, it nonetheless presented a host of challenges. The sheer scale of the case was daunting, involving state services for thousands of individuals with serious mental illness, provided by two State-operated facilities and a network of regional mental health programs and individual providers, each with its own idiosyncrasies and protocols. Messer Decl. ¶¶ 20-25. A team of experts was needed to analyze the capacity of the State to implement appropriate services for individuals with serious mental illness, as well as to conduct comprehensive reviews of numerous individual cases. *Id.* Arriving at a suitable definition of the class proved challenging, which was reflected in the lengthy and factually-complex battle over class certification.

It would have been impossible to litigate this case without the team of law firms and attorneys that DRC assembled, given the many disparate and discrete issues the case raised and the enormity of the discovery involved. Messer Decl. §§ III-IV. Because of the complexity of ADA, Medicaid, and other system reform cases for persons with disabilities, multiple attorneys and firms are routinely used, including cases in which the United States has intervened. *See, e.g., Disability Advocates, Inc. v. Paterson*, 2010 WL 786657 (E.D.N.Y. Mar. 1, 2010) (community mental health suit brought by United States, five public interest law firms, and a private law firm); *Rosie D. v. Patrick*, 593 F. Supp. 2d 325 (D. Mass. 2009) (children's mental health suit involving one private and two public interest law firms, contested fees approved); *T.R. v. Dreyfus*, No. C09-1677-TSZ (D. Wash. Dec. 19, 2013) (settlement approved in children's mental health suit involving three public interest law firms and one private firm).

2.     <u>Numerous Steps Were Taken to Ensure that Plaintiff Attorneys' Work Was Efficient and Was Strategically Coordinated</u>

As the Lead Counsel in this case, Amy Messer coordinated activities among various firms and co-counsel, cognizant of the need to avoid duplication of efforts and to assign roles and tasks appropriate to each team members' level of experience and ability, thus ensuring both effective and efficient representation of the class. Messer Decl. § IV. Work plans were written and distributed, which assigned specific roles and responsibilities to each firm throughout the litigation. Distinct individuals were assigned responsibilities for discovery, experts, motions, client reviews, and the drafting of pleadings. *Id.* (detailing allocation of responsibilities among co-counsel). Ms. Messer also maintained oversight of all discovery activities in the case, coordinating between Plaintiffs' team and the United States in order to avoid duplication and maintain efficient practices. *Id.*

Class Counsel also guarded against inefficiencies, including duplication of effort, by careful management of the workload among counsel. In calculating their lodestar, Plaintiffs' attorneys exercised billing judgment, omitting hours and even timekeepers from the amount which they determined they could have reasonably and properly billed a paying client. Schwartz Decl. ¶¶ 16-20 (estimated reduction of 80 hours and elimination of two CPR attorneys); Messer Decl. ¶¶ 16-19 (eliminated 300 hours, two attorneys, two interns, and all support staff); Exhibit 4, Decl. of Ira Burnim ¶ 22 (eliminated 82 hours and all but two attorneys); Will Decl. ¶ 16 (eliminated 140 hours and two attorneys). In negotiations, Class Counsel agreed to an additional across-the-board reduction to their billings of approximately 20%. This negotiated final lodestar amount is consistent with or higher than percentage reductions for duplication or inefficiencies that courts have typically applied in lieu of reductions for particular itemized activities. *See*

*Rolland v. Cellucci*, 106 F. Supp. 2d 128, 141-42 (D. Mass. 2001) (applying 10% reduction in class action civil rights case in lieu of reductions for particular itemized activities).

The resulting, negotiated fee award of $1,900,000 for counsels' past work is reasonable, reflecting the efforts of three public interest organizations and one private law firm representing a class of several thousand individuals with disabilities.

In addition to the reductions described above, Plaintiffs agreed to a cap on future fees for monitoring. Consistent with their obligations to the class, the Plaintiffs will actively monitor implementation of the comprehensive Settlement Agreement. Although they believe it will be well below their likely fees for monitoring (Schwartz Decl. ¶ 28-31), Plaintiffs agreed in the bargaining process to cap their recovery of attorneys' fees for such work at $400,000 over this five year period. *See Rolland v. Romney*, 292 F. Supp. 2d 268, 273 (D. Mass. 2003) (post-settlement monitoring fees compensable). This negotiated cap represents a significant concession and a substantial additional discount built into the negotiated fee Plaintiffs have asked the Court to approve. Schwartz Decl. ¶ 28-31.

3.   The Defendants Aggressively Opposed Almost Every Aspect of This Case.

Another factor that underscores the reasonableness of the negotiated fee is the manner in which the Defendants approached the case. As the Supreme Court has noted, "[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside*, 477 U.S. at 580 n.11 (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980)). The First Circuit has similarly recognized that an aggressive defense is a significant consideration in evaluating the time and resources expended by the plaintiffs. *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1st Cir. 2001) (finding the defendants mounted a "Stalingrad defense" resisting the plaintiffs at each juncture.)

14

As the Court is aware, this case was intensely litigated, aggressively defended, and extensively briefed at virtually every stage of the proceedings. The Defendants were unwavering in their defense of the State's mental health system. They vigorously opposed class certification, requiring the Plaintiffs to devote considerable time and resources to a six-month class certification discovery process, and they fought relentlessly to circumscribe the scope of merits discovery, including electronic discovery. Messer Decl. § 3. Not only the New Hampshire Attorney General's Office, but also a team of five experienced litigators from Sheehan, Phinney, Bass & Green litigated this case tenaciously on the Defendants' behalf. These factors are further evidence of the reasonableness of Plaintiffs' lodestar and the negotiated fee award.

4.     The Plaintiffs Obtained Exceptional Results Through the Settlement Agreement.

The Proposed Class Action Settlement requires the State of New Hampshire to expand community mental health services that will reduce or eliminate the unnecessary institutionalization of individuals with serious mental illness and dramatically improve the lives of New Hampshire citizens. The State of New Hampshire has committed to expanding those services critical to preventing unnecessary institutionalization, to develop effective transition planning and quality assurance processes, and, in conjunction with an Expert Reviewer and this Court, to monitor those services and processes, in order to ensure that individuals with serious mental illness are afforded the opportunity to live lives of their choosing integrated in their homes and communities. Joint Mot. for Final Approval of Proposed Settlement ¶ 6. Under *Hensley*, where Plaintiffs "ha[ve] obtained excellent results", they "should recover" their lodestar, that is, "a fully compensable award." 461 U.S. at 435. Here, Plaintiffs have negotiated a fee that is 20% less than their lodestar, demonstrating the reasonableness of the negotiated fee.

B.    *Counsels' Hourly Rates Are Reasonable.*

1.    <u>The Rates of All Counsel Are Based on Market Rates in Manchester and Concord.</u>

Under the ADA and 42 U.S.C. § 1988, counsel's rates are to "be calculated according to the prevailing market rates in the relevant community…." *Blum v. Stenson*, 465 U.S. at 896-95; *Hutchinson v. Patrick*, 636 F.3d 1, 16 (1st Cir. 2011). For counsel who represent paying clients, "the best evidence [of their reasonable hourly rate] is the hourly rate customarily charged by counsel…." *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986); *see Hutchinson v. Patrick*, 636 F.3d at 16. To establish the "market rate" of public interest counsel who do not regularly bill for their services or do so at reduced rates, Plaintiffs must present evidence of the market rate of counsel of comparable skill and experience. Typically such evidence is in the form of declarations from knowledgeable private practitioners. *Blum*, 465 U.S. at 895 n.11. Current market rates are used to account for delays in payment and the lost time value of money incurred in lengthy civil rights cases. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).

In support of their motion for fees, Plaintiffs have submitted an affidavit from Gordon MacDonald of Nixon, Peabody attesting to the market rate for each of the attorneys in this case and the reasonableness -- and often the discount -- of the rates sought by these attorneys. Mr. MacDonald is a partner at Nixon Peabody, and practices in the areas of complex commercial litigation. Mr. MacDonald has extensive experience litigating complex cases, including class actions, involving federal and state constitutional claims, as well as civil rights claims in federal and state courts. Exhibit 6, Affidavit of Gordon MacDonald ¶ 4-5. Mr. MacDonald is regularly involved in establishing hourly rates for attorneys working with and for him in a variety of complex class action cases and is familiar with the New Hampshire market for hourly rates charged for complex legal services. MacDonald Aff. ¶ 4-5.

16

In addition, Plaintiffs have presented a declaration from class counsel Daniel Will of Devine, Millimet, attesting to his firm's market rate, which were used as a basis for setting hourly rates for all the attorneys in this case. Exhibit 5, Decl. of Daniel Will ¶ 18. Devine Millimet's rates are reviewed annually to ensure consistency with market rates in New Hampshire. *Id.* The hourly rates of Plaintiffs' Counsel from Devine Millimet are: Elaine Michaud ($350/hour) and Daniel Will ($345/hour), who are Shareholders with 21 and 17 years of experience respectively; Joshua Wyatt ($235/hour), an Associate with 5 years of experience and Kristen Blanchette ($190/hr), a former Associate with 3 years of experience; and Nancy Clayton ($150/hr) and Rene Dubuque ($140/hr), who are experienced paralegals. Will Decl. § I. Devine Millimet's rates in this case are comparable to the rates billed to their private clients.

The Disabilities Rights Center's rates are consistent with this standard and reasonable in the context of fair market rates in New Hampshire. MacDonald Aff. ¶ 10-11. Amy Messer ($350/hour) is the Legal Director at the DRC, with 22 years of experience, and is Lead Counsel in this case. DRC Staff Attorneys Adrienne Mallinson ($250/hr) and Aaron Ginsberg ($235/hr) have respectively 8 and 6 years of highly specialized experience in civil rights and mental health law. Their billing rates are well supported by the regularly billed, private rate of Devine, Millimet associate Joshua Wyatt (5 years - $235) and consistent with the rates charged by attorneys in the private sector with their levels of experience and expertise. MacDonald Aff. ¶ 11, 21.[2] The DRC's rates in this case, taken in conjunction with an across-the-board 20% reduction in hours and the complexity of class action litigation, are fair and reasonable.

---

[2] Plaintiffs recognize that the rates for Ms. Messer and Mr. Ginsberg are higher than has been awarded in some other cases. However, those cases were not complex cases, like the instant one. Also, those cases, like *Carter v. Toumpas*, 2009 WL 903743 (D.N.H. Mar. 31, 2009), are almost five years old. In *Davis v. Ciborowski Trust*, 2012 WL 5904816 (D.N.H. Nov. 26, 2012), the sole issue was sanctions for discovery violations and no affidavits regarding market rates were filed.

Plaintiffs have requested New Hampshire market rates for each of the attorneys at the two national public interest law firms in this case, the Washington-based Judge David L. Bazelon Center for Mental Health Law ($425/hour for Ira Burnim and $345/hour for Jennifer Mathis), and the Massachusetts-based Center for Public Representation ($425/hour for Steven Schwartz and $300/hour for Kathryn Rucker). As Plaintiffs' supporting declarations show, these rates are consistent with those of attorneys in Manchester and Concord with similar experience in complex litigation. MacDonald Aff. ¶ 12-17; Will Decl. ¶ 18. The rates for the Center for Public Representation attorneys have been approved by two district courts and the First Circuit Court of Appeals. *Rosie D. v. Patrick,* 593 F. Supp. 2d at 330-31 (noting that the rates of WilmerHale lawyers, and by comparison those of the Center for Public Representation, were substantially discounted); *Hutchinson v. Patrick*, 683 F. Supp. 2d at 128-29 (same), 636 F.3d at 16 (affirming rates as reasonable). These requested rates are significantly less than the market rates for attorneys with similar experience and expertise in their home legal communities. Schwartz Decl. ¶ 32-37.[3] That the negotiated fee is based on New Hampshire rates for CPR and Bazelon Center counsel, rather than their higher local rates, is further evidence of the reasonableness of the negotiated fee for which Plaintiffs seek the Court's approval.

---

[3] This Court has recognized that it is appropriate to award attorneys fees based on hourly rates charged by non-local attorneys in their home legal community when they have specialized expertise that local counsel needs. *Silva v. National Telewire Corp.*, 2001 WL 1609387 (D.N.H. Dec. 12, 2001); *see also IMS Health Corp. v. Schneider*, 901 F. Supp. 2d 172, 196 (D. Me. 2012) (non-local experienced counsel reimbursed at $495/hour). In this case, both Attorney Schwartz's and Attorney Burnim's firms were sought as co-counsel by the DRC for their specialized experience in bringing complex, class action claims under the Americans with Disabilities Act and the Medicaid Act. The DRC could not have undertaken the case without the specialized expertise provided by Bazelon and CPR. Messer Decl. § 3.

The Boston rates for attorneys with a similar level of expertise and the same years of experience as CPR counsel are significantly higher than those requested here. Schwartz Decl. ¶ 35. Even the rates that would apply to Mr. Burnim and Ms. Mathis under the discounted Laffey Matrix developed by the U.S. Attorney for D.C. are significantly higher than those requested here. *See* Laffey Matrix 2003-2013, *available at* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf.

2.    The Negotiated Fee Award Is Reasonable in Light of Fees Awarded in
Other Cases and in Light of the Expected Service Expansion.

The negotiated fee is more than reasonable, given the voluntary billing reductions, reasonable hourly rates, and across-the-board 20% (or almost $500,000) discount of the lodestar. Likewise, the attorneys' fees and costs in this case are reasonable in light of awards in similar cases. *See Katie A. v. Bonta,* 433 F. Supp. 2d 1065 (C.D. Cal. 2006) ($3.75 million in attorneys' fees in children's mental health case, when case settled); *Rosie D. v. Patrick*, 593 F. Supp. 2d 235 (D. Mass. 2009) ($6.8 million in children's mental health class action case); *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) (approving settlement agreement award in rental housing racketeering case of $1.25 million in attorney's fees and $2.35 million to support the work of legal aid organizations); *Blackman v. District of Columbia*, 633 F.3d 1088 (D.C. Cir. 2011) (approving $1.4 million in class action special education case, in addition to an earlier award of $1.8 million).

Furthermore, the attorneys' fees and costs in this case are reasonable in light of the benefit to the class. Not only will the State enhance its capacity to provide mental health services, estimated to include an almost $30 million dollar expansion, but the Plaintiff Class will benefit from significant non-monetary system changes designed to vastly improve the quality and delivery of services to people with serious mental illness.[4]   Significantly, the negotiated fee award represents about 8% of the $30 million expansion in services projected over the next biennium as a result of the Settlement Agreement. *Cf. In re: Stocker Yale, Inc. Securities Litigation*, 2007 WL 4589772 (D.N.H. Dec. 18, 2007) (attorneys awarded 33.3% of $3.4 million Gross Settlement Fund).

---

[4] *See* Governor Hassan's Statement on Settlement Agreement in Mental Health Services Lawsuit. Dec. 19, 2013, *available at* http://www.governor.nh.gov/media/news/2013/pr-20131219-mental-health.htm; Office of the Attorney General, Press Release: Settlement Agreement in Mental Health Services Lawsuit, Dec. 19, 2013, *available at* http://www.doj.nh.gov/media-center/press-releases/2013/20131219-mental-health-settlement.htm.

## V.     The Agreed-to Costs Are Reasonable

Under Section 1988 and the ADA, 42 U.S.C. § 12205, the Plaintiffs are entitled to recover their reasonable litigation expenses as well as attorneys' fees. *Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir. 1983). Such expenses include witness fees, necessary travel, meals, and lodging, copying costs, attorney travel, and other expenses that are typically billed to paying clients and "conferred a benefit to the prevailing party by helping to produce a favorable result." *Waldo v. Consumers Energy Co.,* 726 F.3d at 827 (internal citation omitted); *see Palmigiano*, 707 F.2d at 637; *Grendel's Den v. Larkin,* 749 F.2d 945, 956 (1st Cir. 1984).

Here, the Parties agreed that Plaintiffs would be reimbursed $126,800 in litigation costs. For the most part, these costs were incurred for experts, client records production, and travel.[5] A statement of costs is submitted as an exhibit. Exhibit 1, Plaintiffs' Attorneys' Fees & Costs. Plaintiffs have not charged for telephone, mailing, copying, fax, electronic data, and myriad other daily expenses absorbed at the offices of the DRC. The expenses listed in the statement of costs are reasonable.

## VI.    Conclusion

For the reasons set forth above, and as supported by the declarations and attachments referenced herein, the Court should approve the Parties' agreement for fees and costs  in the amount of $2,426,800, which includes $1,900,000 for attorney time already expended, $400,000 for future monitoring work, and $126,800 for expenses as detailed in Exhibit 1, Plaintiffs' Attorneys' Fees & Costs.

---

[5] Attorneys' fees for travel time were billed at 50% of the hourly rate for DRC, CPR, and Bazelon Center attorneys, and included in the lodestar. Exhibit 1. Devine, Millimet does not maintain separate records for travel time in contemporaneous billing records; however, their travel time in this case was limited, and a reduced hourly rate for travel is taken into account by the overall reduction in the fee request.

Dated:  January 17, 2014

FOR THE PLAINTIFFS:

Respectfully submitted,

Amanda D., Kenneth R., by his guardian, Tri-County CAP, Inc./GS; Sharon B., by her guardian, Office of Public Guardian, Inc.; Amanda E., by her guardian, Office of Public Guardian, Inc.; and Jeffrey D., by his guardian, Monique Doukas,

By their attorneys:

*Pro Hac Vice* Applications Accepted:

Steven Schwartz (MA BBO 448440)
Kathryn Rucker (MA BBO 644697)
CENTER FOR PUBLIC
REPRESENTATION
22 Green Street
Northampton, MA  01060
(413) 586-6024
SSchwartz@cpr-ma.org
KRucker@cpr-ma.org

Ira Burnim (DC Bar 406154)
Jennifer Mathis (DC Bar 444510)
JUDGE DAVID L. BAZELON
CENTER FOR MENTAL HEALTH
LAW
1101 15th Street, NW, Suite 1212
Washington, DC  20005
(202) 467-5730
irab@bazelon.org
jenniferm@bazelon.org

DISABILITIES RIGHTS CENTER

By:  ___/s/ Amy B. Messer_____
     Amy B. Messer (NH Bar 8815)
     Adrienne Mallinson (NH Bar 17126)
     Aaron Ginsberg (NH Bar 18705)
     18 Low Avenue
     Concord, NH  03301
     (603) 228-0432
      amym@drcnh.org
      adriennem@drcnh.org
      aarong@drcnh.org

By: /s/   Daniel Will_____
     DEVINE, MILLIMET & BRANCH
     PROFESSIONAL ASSOCIATION
     Elaine M. Michaud (NH Bar 10030)
     Daniel E. Will (NH Bar 12176)
     Joshua M. Wyatt (NH Bar 18603)
     111 Amherst Street
     Manchester, NH  03101
      (603) 669-1000
     emichaud@devinemillimet.com
     dwill@devinemillimet.com
      jwyatt@devinemillimet.com

21

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically and served on all Parties of record by operation of the court's electronic filing system.

January 17, 2014                                   /s/ Amy Messer_____