# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Amanda D., et al., and others similarly situated, | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Margaret W. Hassan, Governor, et al., | ) |
| | ) |
| Defendants. | ) |
| _____) | Civ. No. 1:12-cv-53-SM |
| United States of America, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| State of New Hampshire, | ) |
| | ) |
| Defendant. | ) |
| _____) | |

## DECLARATION OF AMY MESSER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

1.      I am the Legal Director of the Disabilities Rights Center, Inc. ("DRC"), New Hampshire's federally mandated Protection and Advocacy Agency, and I served as Lead Counsel in this matter.  Adrienne Mallinson and Aaron Ginsberg are staff attorneys at the DRC and were essential members of the legal team in this case.

### I.      Background and Experience of DRC Attorneys

*Background and Experience of Amy Messer*

2.      I am a 1991 graduate of Northeastern University School of Law and have been practicing law in New Hampshire for 22 years.  I am a member in good standing of the New

Hampshire Bar and am admitted to practice in the United States District Court of New Hampshire and the United States Court of Appeals for the First Circuit.

3.     Upon graduation from law school I joined the New Hampshire Public Defender (NHPD) where I litigated criminal matters, representing juveniles and adults accused in felony, misdemeanor, and juvenile delinquency cases.  In 1994, I became the Managing Attorney of NHPD's largest office in Manchester, NH, overseeing and supervising the work of an office of fifteen attorneys, as well as several investigators and administrative staff. I also continued to maintain a significant caseload of criminal matters as Managing Attorney.

4.     In 1997, I became the Assistant Director of NHPD's statewide program. In that role I worked cooperatively with the Executive Director in overseeing the effective management of NHPD's nine branch offices, with approximately 140 employees.  I provided training, oversight and assistance to Managing Attorneys on workload management, supervision, performance management, legal ethics, and court and client relations. I was also responsible for the recruitment and hiring of staff attorneys, devising training materials, and participating in the setting of Program policies and objectives to address litigation and operational issues.

5.     In 1999, I joined the Disabilities Rights Center as a Staff Attorney and became a Senior Staff Attorney in 2004.  In my role as Staff Attorney I represented children and adults with disabilities in individual and systemic class action litigation in federal and state courts, at both the trial and appellate levels.  My practice included a focus in the areas of access to Medicaid services, rights to services and supports for individuals with mental illness and developmental disabilities, special education, community integration and other disability related discrimination cases.  I have also served as Guardian ad Litem for children in the family and juvenile courts. My work also included policy advocacy and testimony before the New

Hampshire Legislature on issues of importance to individuals with disabilities.  I have provided and continue to provide, trainings for parents and community groups, as well as attorneys, on disability law issues.

6.     As a Senior Staff Attorney I continued to maintain an active caseload of individual and systemic litigation, and engage in public policy and legislative advocacy, while also providing supervision to attorneys at the DRC, including review of written work, assisting with case strategy, and serving as co-counsel.

7.     In 2007, I became the Legal Director of the DRC, responsible for overall coordination and oversight of all legal work of attorneys, advocates, and law students.  I am responsible for ensuring high quality representation through regular meetings with staff, review and editing of pleadings and reports, and providing training and necessary resources. I am responsible for determining case acceptance for full or limited representation, as well as systemic and impact litigation. I am responsible for monitoring client intake procedures and attorney caseloads to ensure program responsiveness and compliance with federal grant requirements. I also maintain an active legal practice including systemic and impact litigation in state and federal court, supervise and co-counsel individual representation cases in court and administrative hearings, and engage in education and advocacy regarding proposed legislation and regulations that impact individuals with disabilities.

8.     I have been lead or co-counsel in several significant class action or major impact litigation cases, most of which have resulted in significant relief for the plaintiffs, including *Bryson v. Shumway,* 308 F.3d 79 (1st Cir. 2002)*, remanded to Bryson v. Stephen*, 2006 WL 2805238 (D.N.H. 2006) (home and community based services for individuals with acquired and traumatic brain injuries); *Carter v. Toumpas*, 2009 WL 9037453 (D.N.H. 2009) (addressing

Medicaid eligibility determination delays for individuals with disabilities); *In re Parker*, 158 N.H. 149 (2009) (right of individuals with developmental disabilities to self-determination and choice); *Boutwell, et al. v. Shumway*, No. 00-E-0086 (N.H. Super. Ct., Belknap Cty, 2000) (eligibility and fair hearings under Home Care for Children with Severe Disabilities "Katie Beckett" program); *Muise v. Cheshire Medical Center*, No. 04-E-0153 (N.H. Super. Ct., Cheshire Cty, 2004) (effective communication for deaf individuals in hospital settings); *Bessie Cuming, et al. v. Governor*, No. 2003-0558 (N.H. Sup. Ct. April 14, 2004) (seeking community based services for individuals with developmental disabilities); *Gary D, et al v. New Hampshire Department of Health and Human Services*, No. 2012-0724 (N.H. Sup. Ct. *argued* Nov. 13, 2013) (right to free choice of provider for mental health services).

9.      I serve as Vice-Chair of the Board of the New Hampshire Brain Injury Association and Chair of their Public Policy Committee, and have served on the Long-term Care Ombudsman Advisory Committee, Legislative Commission on Deafness and Hearing Loss, and the Legal Panel of the New Hampshire Civil Liberties Union.

    *Background and Experience of Adrienne Mallinson*

10.     Ms. Mallinson is a 2005 *cum laude* graduate of Boston College Law School and 1992 graduate of Oxford University. She has been practicing law in New Hampshire for 8 years. She is a member in good standing of the New Hampshire Bar since 2005 and admitted to practice in the United States District Court of New Hampshire. Ms. Mallinson worked first as an intern at the Disabilities Rights Center during her 2L summer in 2004 and again during her final semester at law school. After graduation, she was hired as a Staff Attorney at the Disabilities Rights Center and has worked for the DRC continuously for the past 8 years.

4

11.     Ms. Mallinson represents children and adults with disabilities in individual and systemic litigation in federal and state courts and administrative hearings, and has been lead counsel or co-counsel in several important cases. *In re Parker*, 158 N.H. 149 (2009) (right of individuals with developmental disabilities to self-determination and choice); *Gary D, et al v. New Hampshire Department of Health and Human Services*, No. 2012-0724 (N.H. Sup .Ct. argued Nov. 13, 2013) (right to free choice of provider for mental health services); *Columbia v. Gregory*, 2008 WL 4192437 (D.N.H. Sept. 9, 2008) (ADA Title III case on right to sign language interpreter for physician appointments). Her practice focuses on access and rights to services for individuals with mental illness and developmental disabilities, special education, juvenile justice, community integration, and other disability related cases, including Medicaid, ADA, and IDEA claims. She is a certified Guardian Ad Litem, and has worked extensively on behalf of children and youth with educational and behavioral health needs in the juvenile justice system. In 2011, Ms. Mallinson served for a year in an observer capacity for a Mental Health Court. She also served from 2007 to 2012 on the New Hampshire Council on Developmental Disabilities, and currently serves on the legislative Commission on Deafness and Hearing Loss.

12.     This past November, Ms. Mallinson appeared before the New Hampshire Supreme Court in *Gary D, et al. v. New Hampshire Department of Health and Human Services*, No. 2012-0724 (N.H. S. Ct. argued Nov. 13, 2013) (rights of individuals with mental illness to choose their mental health providers). In addition to extensive involvement in this case, her recent work includes cases involving the pretrial incarceration of young adults with developmental disabilities and mental illness, and abuse and neglect investigations of facility-based care.

*Background and Experience of Aaron Ginsberg*

13.     Mr. Ginsberg received his Juris Doctorate from the University of Chicago in 2007, and was subsequently licensed to practice law in Illinois.  While he completed his law degree he participated in legislative advocacy for individuals with disabilities through the Mandel Legal Aid Clinic at the Law School throughout 2006 and 2007.  In addition to legislative advocacy, while with the clinic Mr. Ginsberg work on data collection regarding the administration of electroconvulsive therapy in Illinois and helped draft the policy statement on electroconvulsive therapy for Mental Health America.  Mr. Ginsberg joined the Disabilities Rights Center, Inc. in 2007 and was licensed to practice law in New Hampshire in 2008.  Mr. Ginsberg has worked on behalf of people with disabilities and their family for the past seven years, and has been a section officer for the Mental and Physical Disabilities Law Section for the New Hampshire Bar Association since 2009.

14.     Since joining the staff of the DRC, Mr. Ginsberg has worked on a wide variety of matters including physical access cases under the ADA, denial of state services, and community services cases. These matters have ranged from administrative adjudications to state and federal court cases, including *Davis v. Ciborowski Trust*, 2012 WL 5904816 (D.N.H.); *Wallem v. Bretton Woods Adaptive, Inc.*, 1:10-cv-00020-SM (D.N.H. Jul. 27, 2010); *Columbia v. Gregory*, 2008 WL 4192437 (D.N.H. Sept. 9, 2008). Mr. Ginsberg has had several cases arranging discharges into comprehensive community services programs for people with developmental disabilities that were unnecessarily institutionalized in New Hampshire's mental health institutions.

15.     Mr. Ginsberg has concentrated his advocacy on mental health matters, addressing issues arising in the community settings, emergency rooms, and institutional facilities including New Hampshire Hospital, nursing facilities, and the Glencliff Home.  In addition to this individual advocacy and extensive involvement in this instant class action litigation, Mr. Ginsberg has also given written and oral testimony on a variety of mental health issues, including civil commitment,

conditional discharge and involuntary administration of psychotropic medication before agency rulemaking and the Joint Legislative Committee on Administrative Rules.  While at the DRC, Mr. Ginsberg has also taken a role in developing our organization's priorities for mental health advocacy.

**II.      Time Records and Documentation**

16.      The DRC maintains all time records of attorneys in a database.  Each attorney maintains contemporaneous time records and either enters the time directly into the database after completion of the activity, or when necessary, maintains them in writing until they are able to enter the time into the database.

17.      All time records are maintained in one-tenth (.1) increments.  We do, however, also utilize quarter of an hour (.25) or (.75) increments where such reporting would be more precise.  This is done because many activities often conclude, by design, after 15 or 45 minutes. Oftentimes, if we spent less than one-tenth of an hour on an activity, the time was not recorded.

18.      DRC attorneys have reviewed all of their time records in this matter and have exercised reasonable billing judgment. We have omitted or "no charged" time entries related to certain activities, including: (1) media contacts and reading the many media articles published in this matter; (2) fundraising activities for the litigation; (3) legislative advocacy and work on mental health regulations; (4) training and educational activities relevant to *Olmstead* actions or persons with serious mental illness.   We also reduced or omitted time related to the early stages of the investigation of this case, particularly, significant amounts of time visiting and monitoring at New Hampshire Hospital, the Glencliff Home, and other institutional settings. The DRC omitted or "no charged" well over 200 hours in this matter.

19.     Finally, in addition to "no charging" hours the DRC deemed were not essential or not appropriate in this case, the DRC did not charge for the work of an attorney who spent significant hours engaged in work related to the expert clients reviews.  The DRC also did not charge for the many hours of paralegal level work completed by a number of DRC's legal fellows or support staff, including many hours of time that DRC support staff spent at Glencliff and New Hampshire Hospital copying volumes of records. No support staff time has been charged in this case.

**III.     The Complexity of the Case**

20.     The DRC began investigating the lack of community mental health services and resulting institutionalization several years prior to filing the Complaint in this matter.  We sought information through Right-to-Know requests, reviews of public reports, data gathered from numerous sources, extensive monitoring visits at New Hampshire Hospital, the Glencliff Home, and other facilities.  We spoke to scores of individuals with mental illness, their family members and guardians, institutional and community service providers, and other stakeholder organizations during the early phases of this litigation. We conducted extensive legal research on mental health, community integration, and related Medicaid laws and regulations.

21.     What emerged from DRC's investigation was a complex set of facts, involving thousands of individuals with serious mental illness located throughout the State of New Hampshire.  Some individuals were experiencing prolonged stays at New Hampshire Hospital, the Glencliff Home, and other institutional settings, while others cycled in out of hospitals, emergency rooms, jails, and homeless shelters.  There were complexities around the emergence of the managed care system, a changing landscape on service delivery, and voluminous data on complicated billing practices for mental health services, both institutional and community based.

The case involved a wide array of providers, including community mental health centers, private providers, and state and privately operated facilities.

22.     The factual complexity of the case was met in equal measure by the complex legal issues involved.  The matter involved many aspects of federal laws and regulations, including the Medicaid Act, the Americans with Disabilities Act, the Rehabilitation Act, and the very fluid and emerging law on class certification.   The legal issues were complicated by state law and regulations governing mental health services in New Hampshire, including civil commitments, conditional discharges, community mental health services, and coverage of services under the State's Medicaid Plan.

23.     After DRC's initial investigation, it became readily apparent to me that given the labyrinth of factual issues, involving thousands of individuals with mental illness, the complexity of their legal claims, and the importance of class certification for vindicating those rights, DRC could not undertake this litigation on its own and would require significant additional expertise and resources.

24.     I was familiar with the extraordinary expertise of the Center for Public Representation (CPR) and the Judge David L. Bazelon Center for Mental Health Law (Bazelon Center) through our respective associations with the National Disability Rights Network.  I have attended trainings conducted by CPR and the Bazelon Center, utilized their written resources, and have sought their technical assistance and advice in the past.  I determined that the Bazelon Center's particular expertise in mental health law, *Olmstead* litigation, and knowledge of the remedial services necessary in this case would be essential.  I further determined that CPR's special expertise in class certification, statewide system reform litigation, identification of national experts, and the conduct of expert reviews would be critical to success.  Finally, I sought

the assistance of Devine Millimet, a large New Hampshire firm, knowing their expertise with complex litigation, discovery management, and trial preparation would be essential as the case progressed.

25.     The decision to solicit these partners before undertaking this case was, in fact, critical to Plaintiffs' success in obtaining an extraordinary resolution for the Plaintiff class. The Defendants had the skills and expertise of both the Office of the Attorney General, and a large New Hampshire law firm.  The Defendants waged an aggressive, "Stalingrad defense" that fought every issue at every turn. The Plaintiffs spent many months in contentious negotiations over discovery issues.  The Defendants fought Plaintiffs' first class certification motion by moving to strike and seeking six months on class discovery, readying to mount an exhaustive defense on the class certification issues. Class certification alone required the review of hundreds of thousands of pages of discovery, extensive expert reviews of class members and the state mental health system, requiring the work of six Plaintiff experts for class certification alone.  Similarly, the Parties engaged in two full rounds of negotiations, one prior to the filing of the Complaint and a subsequent round, with intensive negotiations lasting several months, which ultimately resulted in a Settlement Agreement.  I am confident that Plaintiffs would not have obtained the result that they did without the experience, expertise, and substantial resources committed by each member of the Plaintiffs' Team.

## IV.     Allocation of Responsibilities Among Firms and Co-counsel

26.     As the Lead Counsel in this case, I took responsibility for defining and assigning roles and coordinating activities among various firms and co-counsel.  I was cognizant of the need to avoid duplication of efforts and to assign roles and tasks appropriate to each team members' level of experience and ability, thus ensuring both highly effective and efficient

representation of the class.  Work plans were written and distributed and specific roles and responsibilities were assigned throughout the litigation.  Distinct individuals were assigned responsibilities for discovery, experts, motions, client reviews, and the drafting of pleadings. The Plaintiffs' legal team had regularly scheduled calls to review these assignments, discuss the various legal and strategic decisions associated with each task or phase of litigation planning, and to develop procedures for review and comment on critical documents including expert plans and court filings.  I was responsible for setting the agenda in advance of each call so that various team members could participate as needed.  I facilitated these team discussions and oversaw the implementation of plaintiffs' various work plans in order to ensure the most efficient use of co-counsel time and resources. I also maintained oversight of all discovery activities in the case, coordinating between plaintiffs' team and the United States Department of Justice in order to avoid duplication and maintain efficient practices.

*The Center for Public Representation*

27.     The CPR was asked to take the lead role with respect to a number of critical aspects of the case.  Given their particular expertise in class certification, they performed the necessary legal research and drafted all motions, memoranda, and reply briefs on class certification.  They were also responsible for oral argument at both class certification hearings. After the Plaintiffs prevailed on class certification in the District Court, CPR was responsible for researching and drafting the Plaintiffs' Opposition to Defendants' Petition for Permission to Appeal the Class Certification Order with the First Circuit.

28.     CPR also took the lead role in identifying many of the experts used at the class certification stage and for the trial, developing the plan for the experts' client, program, and system reviews, and coordinating several of these reviews.  CPR was responsible for ensuring

the adequacy of the methodology of the reviews and had a significant role in integrating the review findings and exhibits into the Plaintiffs' Renewed Motion for Class Certification.

29.    CPR took the lead role in defining, strategizing, and drafting pleadings and discovery documents related to PASRR claims, ADA Title II Method of Administration claims, and issues related to class members at the Glencliff Home.

30.    CPR led the initial round of negotiations, and co-led the second rounds of negotiations which ultimately led to the Settlement Agreement. CPR played a central role throughout the litigation of drafting and developing litigation and document management plans, and providing essential input on strategy for all phases of the litigation.

        *The Bazelon Center*

31.    The Bazelon Center's work in this matter centered on its critical role in the development of the Plaintiffs ADA Title II Community Integration claim, the development of the remedies requested in this case, and its work with the United States Department of Justice in the initial phases of the litigation.  The Bazelon Center provided important strategic input for the drafting of the Plaintiffs' Demand Letter, as well as significant editing of the Plaintiffs' Complaint on the ADA Title II Community Integration claim.

32.    The Bazelon Center's expertise was also critical with respect to defining the class in this case, which was complicated by the essential inclusion of class members at risk of institutionalization.  Additionally, the Bazelon Center worked with subject matter experts to determine the critical components of each remedial service and to develop the overall content and scope of the Plaintiffs' requests for relief in the Complaint.

33.    Bazelon was also assigned to draft specific sections of Plaintiffs' requests for production of documents and responses to interrogatory requests related to their knowledge and

expertise on Title II community integration claims and the remedies sought in this case. As a result of this subject matter expertise, Bazelon played a central role in describing Plaintiffs' proposed relief during the first set of negotiation sessions.

34.     Finally, the Bazelon Center took the lead in all initial communications with the United States Department of Justice.

*Devine, Millimet*

35.     Devine, Millimet was assigned to take a central role in the early aspects of pre-trial discovery and document management, coordinating the entirety of the production of documents submitted to Defendants. Devine co-led negotiation of the Joint Stipulation on Electronic Discovery and assisted in the identification of hundreds of key custodians of electronic information. Josh Wyatt, an associate at Devine, was primarily responsible for undertaking this work, as well as several discovery-related legal research issues, under the supervision of senior partner Dan Will.

36.     Devine was also responsible for organizing and managing the extensive medical records of the Named Plaintiffs, and reviewing them for specific information in response to Defendants' Interrogatory Requests. Kristen Blanchette and Sean Flanagan, also associates at Devine, undertook these responsibilities under the supervision of senior partner Elaine Michaud, Two paralegals from Devine were also assigned to copy, scan and organize the medical records of dozens of individuals at New Hampshire Hospital and the Glencliff Home, for production to the client review experts in this case. This production alone was well over 150,000 pages.

37.     Finally, Devine was assigned the essential role of advising on local federal court issues and would have served as co-lead counsel had the matter gone forward to trial.

*The Disabilities Rights Center*

13

38.     I was Lead Counsel for the Disabilities Rights Center in this case.   DRC recognized, and began looking into, the increasing crisis in New Hampshire's mental health system a number of years prior to deciding to bring this case.   In 2009, the DRC initiated a concerted effort to deepen its investigation.   The attorneys in this case spent many hours visiting individuals with serious mental illness in New Hampshire Hospital, the Glencliff Home, and other institutional settings, and speaking with those in the community in need of access to community based mental health services. The DRC collected extensive documentation and data in order to analyze and develop a legal case on behalf of individuals with serious mental illness.

39.     The DRC led the critical factual development of this case, and was responsible for drafting the Plaintiffs' Demand Letter, and developing a comprehensive presentation to State officials in early efforts to resolve this matter. After an initial round of extensive negotiations failed to progress, the DRC took primary responsibility for drafting the Complaint, with input from the Bazelon Center and CPR on specific aspects of the Complaint related to their areas of expertise.

40.     DRC attorneys were responsible for identifying and communicating with the Named Plaintiffs and their guardians, as well as all class members and stakeholders, throughout the litigation.

41.     The DRC also took the lead, with the significant partnership of Devine, on discovery issues.  The Parties engaged in contentious discovery disputes and spent nearly a full year negotiating a comprehensive Joint Stipulation on Electronic Discovery.  The DRC co-led, with Kathryn Rucker from CPR, the crafting of complex and detailed electronic search requests. DRC was also responsible for attending numerous meetings with Defendants to identify the over 200 custodians of relevant electronic information.   The DRC took the lead in drafting the

Plaintiffs' comprehensive requests for production of documents and interrogatories in this case, and responding to the Defendants' many requests for production and interrogatories.

42.     The DRC was responsible for a range of procedural and substantive court filings, as well as documents critical to the discovery and settlement processes, including the Protective Order, Discovery Plan, Joint Motion on Electronic Discovery, Requests for Production of Documents, Interrogatories, responses to Defendants' discovery requests, all documents related to preliminary approval of the Proposed Settlement Agreement, and numerous other procedural motions.

43.     While CPR took the lead on drafting and arguing class certification, the DRC took primary responsibility in developing the evidentiary support for the certification memo. The two primary activities involved coordinating and conducting the expert on-site reviews and reviewing the extensive document production that was ongoing throughout this matter. Adrienne Mallinson took the lead in coordinating the onsite reviews at the Glencliff Home, while Aaron Ginsberg took responsibility for the expert reviews at New Hampshire Hospital and for those in the community. These reviews required the DRC to engage in a carefully constructed and methodologically sound process of contacting hundreds of individuals with mental illness or their guardians to obtain releases of information for the collection of otherwise confidential information. Thousands of records were reviewed, copied, and produced to the experts. DRC was also responsible for scheduling onsite interviews with hundreds of clients, guardians, and community providers. I took the lead role in working with the expert retained for the system review, and was responsible for identifying all documents and data necessary for the completion of the review, scheduling, and participating in all onsite reviews, and developing evidentiary support by the expert for class certification.

44.     After the United States intervened in the lawsuit, I took the lead role in all day-to-day coordination with the United States. I maintained regular contact with the United States Department of Justice and worked closely with the attorneys on the drafting of joint documents and collaborating on all aspects of managing and reviewing the extensive discovery in this case.

45.     DRC also had the responsibility for identifying and developing all fact witnesses for the case, and assigning the responsibility for depositions of expected defense witnesses.

46.     I served as co-lead counsel in the second round of settlement negotiations which ultimately led to the Settlement Agreement in this case.  These negotiations entailed 13 lengthy, sometimes full-day, negotiation sessions, multiple drafting of each section of the proposed Settlement Agreement, and a multitude of communications with the United States Department of Justice and Defendants between sessions.

## V.     Reasonable Hourly Rate

47.     The reasonable market rate for my time in this case is at least $350/hour.  The reasonable market rates for Adrienne Mallinson and Adrienne Ginsberg are at least $250/hour and $235/hour, respectively.

48.     These rates are consistent with DRC awards in other DRC federal and state court cases, as well as consistent with the rates regularly charged by private attorneys with similar levels of experience.  I have 22 years of experience as a litigator in both state and federal court.  I am lead counsel for the DRC in this case.  My rate of $350/hour is a modest $50/hour increase over the amount this Court found reasonable in *Carter v. Toumpas*, 2009 WL 9037453 (D.N.H.), a far less complex matter now almost five years old. My rate is also well supported by the regularly charged rates of private counsel in New Hampshire. Elaine Michaud and Dan Will, with 21 and 19 years of experience, respectively, charge $345/hour.  Similarly, DRC staff attorney Adrienne

Mallinson's rate of $250/hour is comparable to those of her experience level and expertise within the private bar. Adrienne has 8 years of highly specialized experience in civil rights and disability law and has practices in federal court and at every level of the state court system, including the New Hampshire Supreme Court. She has been both lead and co-counsel in a number of significant cases in the federal court. Aaron Ginsberg's rate of $235/hour is also clearly appropriate for someone of his experience and skill level, and comparable to similar attorneys in private practice in New Hampshire. Both during law school, and in his 6 years practicing law since, Aaron has largely devoted his practice to mental health law. He has a specialized expertise in New Hampshire mental health laws, both statutory and regulatory, and provided critical knowledge and skills to the work in this case. Both Adrienne Mallinson and Aaron Ginsberg took the lead on discrete and essential core work in this case. They conducted significant research, drafted pleadings, and each lead a specific team of experts in the client reviews. Their billing rates ($250 and $235) are well supported by the regularly billed private rate of Devine, Millimet associate Joshua Wyatt (5 years - $235) and the rates of attorneys at the firm of Nixon Peabody as set forth in the Affidavit of Gordon MacDonald for attorneys of their level of skill, experience, and expertise.[1] The DRC's rates in this case, taken in conjunction with a 20% across-the-board reduction in hours and the novelty and complexity of class action litigation are more than reasonable.

**IX.   Lodestar**

49.     Pursuant to decisions of the United States Supreme Court and the First Circuit Court of Appeals, we each have exercised reasonable billing judgment to reduce our time in this case to

---

[1] Attorney Ginsberg's billing rate in this litigation is $235, notwithstanding the lower rate ($175) awarded by this court in *Davis v. Ciborowski Trust*, 2012 WL 5904816 (D.N.H.), where supporting affidavits reflecting private market rates were not submitted, the case was not a complex class action, and the sole issue for the fee award was sanctions for discovery violations of opposing counsel..

account for possible duplication of effort with other co-counsel.   We calculated our respective lodestars by multiplying our current hourly rates times the reduced number of hours spent on this litigation. Travel time was charged at the reduced rate of fifty percent of our hourly rates.   I believe that our requested hourly rates are fair and reasonable.

50.     Our hours expended on this case and hourly rates are set forth in the attached Exhibit 1.  I believe this mount accurately reflects our lodestar in this case.

51.     The total lodestar of Plaintiffs Counsel has been set forth in Exhibit 1.  The agreed attorneys' fee award pursuant to the Settlement Agreement is substantially discounted from the Plaintiffs' total lodestar of over $2.3 million.

52.     The expenses of Plaintiffs Counsel have been set forth in Exhibit 1, and are an accurate reflection of the costs in this case.  The travel time charges are also set forth in a chart in Exhibit 1 and reflect the reduced fees for travel time in this case.

53.     All time that each of us spent on this case was done as employees of the Disabilities Rights Center. The Center is a nonprofit, public interest law firm organized under 501(c)(3) of the Internal Revenue Code.  Therefore, any fee awarded for our work will be paid directly to the DRC and used to support legal assistance to other individuals with disabilities.

Signed under the pains and penalties of perjury.


_____/s/  Amy B. Messer_____
Amy B. Messer

Dated: January 17, 2014