# New Hampshire Community Mental Health Agreement

## Expert Reviewer Report Number Four

### June 29, 2016

## I.    Introduction

This is the fourth semi-annual report of the Expert Reviewer (ER) under the Settlement Agreement in the case of *Amanda D. v. Hassan,; United States v. New Hampshire, No. 1:12-cv-53-SM.*   For the purpose of this and future reports, the Settlement Agreement will be referred to as the Community Mental Health Agreement (CMHA).  Section VIII.K of the CMHA specifies that:

> Twice a year, or more often if deemed appropriate by the Expert Reviewer, the Expert Reviewer will submit to the Parties a public report of the State's implementation efforts and compliance with the provisions of this Settlement Agreement, including, as appropriate, recommendations with regard to steps to be taken to facilitate or sustain compliance with the Settlement Agreement.

In this fourth six-month period (January 1, 2016 through June 30, 2016), the ER has continued to observe the State work to implement certain key service elements of the CMHA, and to have discussions with relevant parties related to implementation efforts and the documentation of progress and performance consistent with the standards and requirements of the CMHA.  In this period the ER:

- Conducted on-site reviews of Assertive Community Treatment (ACT) teams/services and Supported Employment (SE) services at the Mental Health Center of Greater Manchester; Riverbend CMHC, and Northern Human Services CMHC, Littleton Office; a non-random sample of ACT and SE records was reviewed at each of these sites;
- Conducted an on-site visit at the Cypress Center in Manchester;
- Conducted a site visit at the Peer Support Agency in Littleton;
- Met with the Central Team to review progress and discuss barriers to transition from both New Hampshire Hospital (NHH) and Glencliff;
- Met with Riverbend CMHC to assess implementation of the new mobile crisis team and crisis apartments in the Concord region;
- Met with certain CMHC Directors to discuss and receive input on the ER's Third Report;

- Participated in two meetings with New Hampshire  Department of Health and Human Services (DHHS) Commissioner Jeffrey Meyers;
- Conducted a site visit with Harbor Homes to discuss the Bridge Subsidy Rental Assistance Program and related housing issues;
- Conducted an introductory meeting with DHHS staff involved with the PASRR program;
- Participated in several meetings with representatives of the Plaintiffs and the United States (hereinafter "plaintiffs");
- Conducted several meetings with DHHS officials to discuss Quality Service Reviews (QSR), data tracking, and data elements and reporting related to the CMHA;
- Conducted a two day on-site working session with DHHS Quality Management/Quality Service Reviews (QM/QSR) staff to discuss design and implementation of the QSR process;
- Convened two meetings of a sub-set of representatives of the plaintiffs and DHHS QM/QSR staff to facilitate plaintiffs input to the QSR process; and
- Convened a meeting of all parties to discuss general progress and implementation issues related to the CMHA.

Information obtained during these on-site meetings has, to the extent applicable, been incorporated into the discussion of implementation issues and service performance below.  The ER will continue to conduct site visits going forward to observe and assess the quality and effectiveness of implementation efforts and whether they achieve positive outcomes for people consistent with CMHA requirements.

# II.  Data

The New Hampshire DHHS continues to make progress in developing and delivering data reports addressing performance in some domains of the CMHA.  Appendix A contains the two most recent DHHS Quarterly Data Reports, which incorporate standardized report formats with clear labeling and date ranges for several important areas of CMHA performance.  It is now possible to conduct and report longitudinal analyses of trends in certain key indicators of CMHA performance.  The State has also incorporated data on utilization of Designated Receiving Facilities (DRFs) in the Quarterly Report.  Specific data from the quarterly reports are included in the discussion of individual CMHA services below.

In addition to the standardized reporting of certain types of data, DHHS continues to collect and report on other data necessary to monitor performance related to the CMHA.  These include reports from the new mobile crisis services in the Concord Region; data on discharge destinations from NHH and Glencliff; reports of wait list numbers for ED boarding; and utilization of the Bridge Subsidy Program.  DHHS shares data on these special program areas with the ER and representatives of the plaintiffs, but the data are not yet incorporated in the

quarterly report. Where applicable, these additional data are incorporated in the discussion of specific CMHA performance domains below.

As noted in previous ER reports, there continue to be important categories of data that are needed but not routinely collected and reported, and which will need to be developed in order to accurately evaluate ongoing implementation of the CMHA. For example, ACT team data is reported by region, not by ACT team. Thus, data for the two ACT teams in Manchester are merged together, potentially masking information relevant to the teams separately. A new ACT team is being developed in Nashua, and there is potential for another new team to be funded in the future. Thus, it will be important to have the data reporting reflect each individual team rather than aggregate regional data.

In addition, there continues to be no reported or analyzed data on the degree to which participants in SE are engaged in competitive employment in integrated community settings consistent with their individual treatment plans. This data is important in assessing the fidelity with which supported employment services are provided.

Another gap in data is related to people receiving Supported Housing (SH) under the Bridge Subsidy Program. These participants are not yet clearly identified in the Phoenix II system, and thus, it is difficult to document the degree to which these individuals are: (a) connected to local CMHA services and supports; or (b) actually receiving services and supports to meet their individualized needs on a regular basis in the community. As noted in the January 2016 ER Report, DHHS has identified a strategy to link data from the Bridge Subsidy Program to the Phoenix II system. However, no responsive data has been produced to date, leaving a significant gap in the ER's ability to evaluate compliance with supported housing provisions of the CMHA.

Although the soon-to-be-initiated QM/QSR process will provide additional information related to the quality, effectiveness, and (where applicable) the fidelity of the services delivered, the data identified above is an essential complement to those client reviews and necessary in order for the ER, and the parties, to effectively measure ongoing implementation and to demonstrate compliance with the terms of the CMHA. A proposed deadline for reporting on the production of these data is among the action items identified at the conclusion of this Report.

# III. CMHA Services

The following sections of the report address specific service areas and related activities and standards contained in the CMHA.

## Mobile Crisis Services and Crisis Apartments

The CMHA calls for the establishment of mobile crisis capacity and crisis apartments in the Concord Region by June 30, 2015 (Section V.C.3(a)). DHHS conducted a procurement process

3

for this program, and the contract was awarded on June 24, 2015. Riverbend CMHC was the vendor selected to implement the mobile team and crisis apartments in the Concord Region.

Table I below includes Riverbend's most recent available information on activities of its new crisis program.

**Table I**

**Concord Region Self-Reported Mobile Crisis Services:  October, 2015 and April, 2016**

| | October 2015 | April 2016 |
|---|---|---|
| Total unduplicated people served | 135 | 187 |
| Services provided in response to immediate crisis: | | |
| • Phone support/triage | 179 | 253 |
| • Mobile assessments | 14 | 39 |
| • Crisis stabilization appointments | 45 | 20 |
| • Emergency services medication appointments | 18 | 29 |
| Services provided after the immediate crisis: | | |
| • Phone support/triage | 52 | 83 |
| • Mobile assessments | 5 | 6 |
| • Crisis stabilization appointments | 29 | 20 |
| • Emergency services medication appointments | 18 | 24 |
| Referral source: | | |
| • Self | 66 | 226 |
| • Family | 24 | 58 |
| • Guardian | 2 | 2 |
| • Mental health provider | 15 | 10 |
| • Personal care physician | 4 | 3 |
| • Hospital emergency department | 8 | 9 |
| • Police | 0 | 8 |
| • | | |
| Crisis apartment admissions: | 5 | 10 |
| • Bed days | 8 | 21 |
| • Average length of stay | 1.6 | 2.1 |
| Law enforcement involvement | 4 | 13 |
| Total hospital diversions | 39 | 93* |

*Hospital diversions are instances in which services are provided to individuals in crisis resulting in diversion from being assessed at the Emergency Department and/or being admitted to a psychiatric hospital.

These data indicate a growth in the number of people accessing mobile crisis services, and in the number of crisis response services delivered.  However, the number of mobile crisis assessments remains relatively low, given the volume of total crisis encounters.  Over the next six months, the ER expects to closely monitor the evolution of this service, in order to ensure that crisis services are being delivered in the community whenever possible and that decisions not to dispatch the

mobile crisis team are reported and the rationale analyzed to ensure adherence to the service model and goals.

Charts I, II, III and IV below show trends in mobile crisis services in the Riverbend region from September, 2015 through April, 2016, based on Riverbend's self reports.

**Chart I**



**Chart II**



**Chart III**



**Chart IV**



Given the data in Table I, it is evident that the vast majority of Riverbend's crisis interventions are via telephone conversations.  It appears that a relatively small percentage of crisis interventions are truly mobile  – on-site in the community with the individual in crisis.  In the future, the ER will work with the State and Riverbend to gain greater clarity on the effectiveness of both phone and on-site mobile interventions so as to better determine whether the crisis services offered are meeting individuals' needs.  In doing so, the ER will look to the outcome criteria at CMHA Section V.C.1(b) - (d).

In Table I, Riverbend reported that in April 2016, there were 13 instances of involvement with law enforcement during a crisis.  In the future, the ER will work with the State and Riverbend to gather additional information about such instances with an emphasis on whether or not the crises are resolved in the community without subsequent arrest or contact with a hospital or other institutional setting.

Going forward, the ER will also track staffing and other requirements in the Crisis System Components section of the CMHA, Section V.C.2.

In mid-June 2016, DHHS awarded a contract to the Mental Health Center of Greater Manchester to establish the second Mobile Crisis Team and Crisis Apartments.  Given the timing of the contract award, mobile crisis services will not be operational in the Manchester Region by June 30, 2016, as specified in the CMHA.  However, the implementation and early operations experience of the existing Riverbend mobile crisis program should inform implementation and could potentially assist to reduce the elapsed time between contract award and full implementation of the Mobile Crisis Team and Crisis Apartment services in Manchester.  The ER will closely monitor implementation of these services over the next several months.

## Assertive Community Treatment (ACT)

ACT is a key element of the CMHA, which specifies, in part:

1. By October 1, 2014, the State will ensure that all of its 11 existing adult ACT teams operate in accordance with the standards set forth in Section V.D.2;
2. By June 30, 2014, the State will ensure that each mental health region has at least one adult ACT team; and
3. By June 30, 2016, the State will provide ACT team services consistent with the standards set forth above in Section V.D.2 with the capacity to serve at least 1,500 individuals in the Target Population at any given time.

Taken together with the other ACT provisions, the CMHA requires a robust and effective system of ACT services to be in place throughout the State as of June 30, 2015 (one year ago).  Further, as of June 30 of this year, the State is required to have the capacity to provide ACT to 1,500 priority Target Population individuals.

As displayed in Table II below, the staff capacity of the 11 adult ACT teams in New Hampshire has increased by only two FTE in the six months since September of 2015.  During the same time, the total active caseload has increased by only 93 individuals.  As of the date of this report, the State is providing ACT services to 839 unique consumers and as a result is delivering only 56 percent of the ACT capacity required by the CMHA, and is out of compliance on this key CMHA service.

9

**Table II**

**Self-Reported ACT Staffing (excluding psychiatry): May 2015 through March 2016**

| Region | FTE May-15 | FTE Sep-15 | FTE Dec-15 | FTE Mar-16 |
|---|---|---|---|---|
| Northern | 14.80 | 11.29 | 11.15 | 11.15 |
| West Central | 3.00 | 3.83 | 2.64 | 4.37 |
| Genesis | 7.10 | 7.5 | 6.4 | 7.4 |
| Riverbend | 7.00 | 7.3 | 6.7 | 7 |
| Monadnock | 8.20 | 8.5 | 7.75 | 7.75 |
| Greater Nashua | 8.70 | 5.98 | 7.5 | 6.5 |
| Manchester | 24.90 | 26.3 | 29.75 | 30.01 |
| Seacoast | 12.80 | 11.77 | 11.77 | 11.53 |
| Community Partners | 8.20 | 8.7 | 7.9 | 5.9 |
| Center for Life Management | 7.80 | 6.36 | 8.16 | 8.16 |
| Total | 102.50 | 97.53 | 99.72 | 99.77 |

Chart V below shows ACT staffing trends for the last four reporting periods.

**Chart V**

**Self-Reported ACT Staffing (excluding psychiatry) by Region: May 2015 through March 2016**



It is clear from this chart that ACT staffing has remained at best static, and in some cases has decreased, over the past four reporting periods.  This is true despite previous findings that New Hampshire was out of compliance with the standards of the CMHA.  Based on staffing shortages alone, more than 500 eligible individuals needing and choosing ACT services are not able to receive such services.

Table III and Chart VI below display trends in active caseloads for ACT services by Region.

**Table III**

**Self-Reported ACT Caseload (Unique Adult Consumers) by Region: May 2015 through March 2016**

| Region | Active Cases May-15 | Active Cases Sep-15 | Active Cases Dec-15 | Active cases Mar-16 |
|---|---|---|---|---|
| Northern | 60 | 72 | 74 | 79 |
| West Central | 16 | 19 | 21 | 26 |
| Genesis | 22 | 30 | 34 | 39 |
| Riverbend | 79 | 60 | 56 | 70 |
| Monadnock | 47 | 54 | 61 | 68 |
| Greater Nashua | 63 | 74 | 72 | 72 |
| Manchester | 254 | 265 | 270 | 293 |
| Seacoast | 73 | 65 | 65 | 72 |
| Community Partners | 16 | 70 | 76 | 73 |
| Center for Life Management | 39 | 37 | 40 | 49 |
| Total* | 669 | 746 | 766 | 839 |

* unduplicated across regions

**Chart VI**

**Self-Reported ACT Caseload (Unique Adult Consumers) Trends:  May 2015 through March 2016**



Based on self-reported staffing data, the Regions appear to have made some gains in enhancing staff capacity within certain ACT teams, while in others, there has been modest to no increase. For example, nine Regions now report substance use disorder (SUD) staff competency compared with the single region reporting SUD competency in the previous report.  And, four of the Regions reported less than one FTE Supported Employment (SE) competency, as opposed to seven of the 11 reporting less than one FTE SE competency in the previous report.

However, three of the 11 adult ACT teams continue to have fewer than the 7 - 10 professionals specified for ACT teams in the CMHA.  Two Regions have ACT staff:client ratios poorer than 1:10, which also falls outside CMHA parameters.  In addition, five of the teams have less than one FTE nurse; three regions have no peer specialist staff and five others have less than one FTE peer specialist.  Three Regions continue to have less psychiatry time than warranted by their active caseloads.  The statewide figure for ACT psychiatry staffing falls below CMHA requirements with almost half of the Regions.

As with the ACT staffing displayed in Chart I, ACT caseloads have grown only minimally since May of 2015.  As noted above, based on a minimal 1:10 staff:client ratio, the State currently has the capacity to provide ACT to 998 people, and thus is over 500 ACT slots below the required capacity.  The March 2016 caseload of 839 unduplicated individuals is 661 people lower than the planned capacity to serve high risk people with SMI/SPMI in New Hampshire by June 30, 2016.  Further, some CMHC teams are so far out of compliance with the ACT fidelity requirements for staffing and intensity of services that it is inappropriate to include their clients within the total number of people receiving ACT in New Hampshire.

While the New Hampshire DHHS has begun to take more aggressive action to work with CMHCs in certain Regions to increase their ACT staffing and caseloads, there has been difficulty increasing service capacity and ensuring ACT services are delivered consistent with the CMHA.  One Region has developed and is implementing a plan of correction, but the State has not been able achieve fidelity with this Region yet.  The State has notified two additional Regions that they must develop plans of correction.  As of the drafting of this report, both of these Centers have submitted proposed plans of correction, and DHHS is in the process of reviewing these plans. In two previous reports, the ER has noted that unused capacity for ACT or any other CMHA service could result in difficulty meeting the overall goals and outcomes for priority Target Population members identified in the CMHA.  While it is a positive development that the ACT active caseload has increased somewhat since May 2015, reports of unmet demand for ACT services are a source of significant concern across the various regions.  The system is still serving at least 661 fewer people than could be served if the state had attained the required capacity to serve 1,500 people.

The staffing data reported by DHHS for ACT services has not yet been independently verified by the ER.  In addition, neither DHHS nor the ER has, to date, reviewed compliance of all ACT teams with the performance and quality standards specified in CMHA Section V.D.2.  The new QSR being developed by DHHS will examine the provision of ACT services, and QSR findings are expected to prompt additional corrective action plans where necessary..  However, DHHS must have additional methods for evaluating ACT services and the system's adherence to fidelity standards, since the QSR process focuses primarily on the adequacy of class member services rather than program performance.

In November 2015, the New Hampshire DHHS awarded a contract to the Community Council of Nashua (the designated CMHC for the Nashua region) for a new adult ACT team.  That new team is not yet fully staffed, and does not at this point contribute to either the capacity measures or the active caseload for ACT services within the state.  DHHS reports that as of June 8, 2016, four staff have been hired for this team, and additional staff are being interviewed.

The ER has visited all ten CMHCs to receive an overview of the ACT teams in place in the state, and revisited three of the CMHCs (four teams) during the past six-month period.

The June 30, 2015 ER report contained the following statement:

*"In the coming months, it is expected that DHHS will:  1) develop one set of eligibility and discharge criteria for the provision of ACT services; 2) analyze the high degree of variation among existing ACT teams; 3) take any steps necessary to assure that ACT services are consistently meeting the CMHA standards statewide; and 4) expand the capacity of ACT to meet the requirements of the CMHA."*

DHHS has been working on new regulations defining ACT service eligibility and access standards for the past year.  The most recent draft of regulations was circulated to all parties in mid-May.  It is problematic that these standards have remained outstanding for so long, and the ER urges the parties to try to reach agreement on the final rules as soon as possible in order to ensure consistent application of eligibility criteria and appropriate access to ACT services for members of the Target Population.

In addition to the compliance letters and plans outlined above, DHHS continues to hold ACT compliance calls with the CMHCs on a monthly basis.  DHHS has modified the contract between the State and the Centers to assure that the Centers assert their understanding of and willingness to implement the standards and requirements of the CMHA.  In addition, the calculation of the Medicaid funding available to CMHCs under the Managed Care Organization (MCO) contracts has been revised, resulting in slight increases in overall Medicaid funding available to the CMHCs via these contracts.  The CMHCs are reported to be in the last stages of negotiating sub-capitation contracts with the MCOs, so it is premature to report on the impact of the increased Medicaid funding amounts.  Finally, DHHS is in the very early stages of implementing the new Medicaid 1115 Demonstration waiver that ultimately will make funds available to CMHCs for both infrastructure development and service expansion.

DHHS has new leadership at the Commissioner level as well as at within the newly formed Division of Behavioral Health.  The new leadership has adopted a more assertive and positive set of strategies to work with the regional CMHCs to assure compliance with the CMHA for both ACT and SE.  It is too early to see whether these activities will be successful, but the ER believes that steps are being taken to accelerate efforts to assure compliance.   In addition, the CMHCs have initiated efforts to identify and address issues related to workforce shortages that appear to be hindering attainment of ACT and SE CMHA requirements.  As with the state level actions, it is too early to assess the degree to which these workforce development and recruitment efforts will be successful. As will be noted below, the soon-to-be-implemented QSR process is intended to provide additional, actionable, information to support and guide the fidelity, quality, effectiveness, and capacity of ACT services, as well as all other services under the CMHA.

DHHS is currently analyzing data related to the number of active CMHC clients who are not receiving ACT services and who present in psychiatric crisis in hospital emergency rooms.

15

Since one purpose of ACT is to ameliorate and reduce psychiatric crises, this is an opportunity for state officials to work with local CMHCs to target these clients for ACT participation and thereby to reduce ED presentations, psychiatric boarding, and unnecessary inpatient admissions. This is just one example of the importance of ACT to a comprehensive system of care for people with serious mental illness.

Recent initiatives notwithstanding, New Hampshire remains out of compliance with the requirements of the CMHA with regard to ACT service capacity. This is the third consecutive ER report in which the non-compliance with the ACT standards and targets in the CMHA has been noted. It is urgent that steps be taken to arrest this pattern and to implement concrete plans for correction.

### Supported Employment

Pursuant to the CMHA's SE requirements, the State must accomplish three things:  1) provide SE services in the amount, duration, and intensity to allow individuals the opportunity to work the maximum number of hours in integrated community settings consistent with their individual treatment plans (V.F.1); 2) meet Dartmouth fidelity standards for SE (V.F.1); and 3) meet penetration rate mandates set out in the CMHA. For example, the CMHA states: "By June 30, 2016, the state will increase its penetration rate of individuals with SMI receiving supported employment …to 18.1% of eligible individuals with SMI." (Section V.F.2(d)).

The baseline SE penetration rate at the beginning of the CMHA was 12.1% (2012). In the June 2015 ER report, the SE penetration rate was 11.3% -- almost a full percentage point below the 2012 baseline. The June 2015 ER report noted that the penetration rate at that time was 4.8 percentage points below the CMHA target for June 30, 2015.

For this reporting period, the State reports that the CMHCs have achieved the 18.1% penetration rate specified for June 30, 2016 in the CMHA. Table IV and Chart VII below show the SE penetration rates for each of the 10 Regional CMHCs in New Hampshire

**Table IV**

**Self-Reported CMHC SE Penetration Rates: March 2015 through March 2016**

| Region | Penetration Mar-15 | Penetration Sep-15 | Penetration Dec-15 | Penetration Mar-16 |
|---|---|---|---|---|
| Northern | 7.10% | 8.20% | 9.50% | 10.60% |
| West Central | 13.50% | 12.90% | 14.30% | 15.30% |
| Genesis | 9.40% | 9.30% | 9.60% | 9.60% |
| Riverbend | 14.90% | 14.20% | 14.60% | 14.10% |
| Monadnock | 8.00% | 16.40% | 19.40% | 20.50% |
| Greater Nashua | 6.10% | 7.70% | 8.60% | 9.00% |
| Manchester | 14.60% | 26.10% | 31.70% | 36.70% |
| Seacoast | 10.50% | 13.10% | 12.70% | 11.00% |
| Community Partners | 8.10% | 11.60% | 13.00% | 12.60% |
| Center for Life Management | 16.30% | 15.70% | 13.00% | 24.70% |
| | | | | |
| CMHA Requirement | 16.10% | 16.10% | 16.10% | 18.10% |
| Statewide Average | 11.30% | 15.70% | 17.90% | 19.30% |

**Chart VII**

**Trends in Self-Reported SE Penetration Rates: March 2015 through March 2016**



As has been noted in previous reports, the CMHA establishes a statewide penetration rate standard, not individual CMHC penetration rate requirements.   However, examination of penetration rates by region reveals significant inconsistencies in implementation across the network of SE providers.  As with previous reports, there are three regions in the state in which priority Target Population members are reported to be receiving SE services at or above the June 30, 2016 penetration rate standard.  However, the ER notes that **seven** of the ten CMHCs have penetration rates below the June 2016 standard, and **four** of these continue to have penetration

rates below the 12.1% baseline standard for SE in the CMHA.  The number of programs falling below the required penetration rate has remained the same since the January 2016 ER Report.

The above table and chart make it clear that one CMHC, Manchester, is contributing disproportionately to the State meeting the June 2106 SE penetration rate standard.  In fact, Manchester has 24.9% of the total statewide enrolled clients with SMI/SPMI, but has 47.2% of the total clients receiving SE (see Appendix A Table 3).  If Manchester's SE clients and total clients are subtracted from the totals, the SE penetration rate would be 13.6%, barely above the original CMHA SE target of 12.1%.  This analysis demonstrates that the current statewide penetration rate is significantly skewed by one Region's performance.

As noted in previous reports, this kind of wide variation in access to and utilization of SE services on a sub-state level affects overall attainment of CMHA objectives for the Target Population.  Thus, the ER will continue to monitor and report on individual CMHC penetration rates as well as the statewide total.  The ER will also continue to monitor implementation of applicable CMHC plans of correction related to improving SE penetration and performance at the regional level.  Three CMHCs are currently developing such plans of correction under the guidance of DHHS.

Several other issues related to the implementation and monitoring of Supported Employment services will need to be resolved in the coming months.  First, as noted earlier in this report, there is currently no consistently reported data on the extent to which SE service participants are attaining and sustaining competitive employment in integrated community settings.  Success in obtaining competitive employment is not a specific numerical standard in the CMHA.  However, the CMHA does require the State to operate SE services in conformance with the Dartmouth fidelity standards, and attaining and sustaining competitive employment in the community is an indicator of adherence to those standards.  The ER will be working with the State and the CMHCs to develop a consistent and reliable method for reporting on obtaining and sustaining competitive employment in the community.  The soon-to-be implemented QSR process, in concert with related DHHS SE fidelity assessment activities, will assist in addressing SE issues, but cannot take the place of independently verified fidelity assessments.

## Supported Housing

The CMHA requires the State to achieve a target capacity of 450 SH units funded through the Bridge Subsidy Program by June 30, 2016.  As of the end of April[1] 2016, DHHS reports having 423 individuals in leased SH apartments, 26 people approved for a subsidy but not yet leased, and one person unaccounted for.  Assuming these people move into leased units soon, the State will be at or very close to compliance with the CMHA standards for SH effective June 30, 2016;

---

[1] Note that the data in Table V below extends only through March, 2016, so some figures may differ from the text of this report.

the State has already attained the SH figure of 340 units by June 30, 2015, as required by the CMHA.

Table V below summarizes recent data supplied by DHHS related to the Bridge Subsidy Program.

**Table V**

**New Hampshire DHHS Self-Reported Data on the Bridge Subsidy Program: September 2015 through March 2016**

| Bridge Subsidy Program Information | September 2015 | March 2016 |
|---|---|---|
| Total housing slots (subsidies) available | 450 | 450 |
| Total people for whom rents are being subsidized | 376 | 415 * |
| Individuals accepted but waiting to lease | 23 | 22 * |
| Individuals currently on the wait list for a bridge subsidy | 0 | 0 |
| Total number served since the inception of the Bridge Subsidy Program | 466 | 518 |
| Total number receiving a Housing Choice (Section 8) Voucher | 70 | 71 |

*As of the end of April 2016, 423 individuals have signed leases, and 26 have been approved but are still waiting to lease.

The CMHA stipulates that "…all new supported housing …will be scattered-site supported housing, with no more than two units or 10% of the units in a multi-unit building with 10 or more units, whichever is greater, and no more than two units in any building with fewer than 10 units known by the State to be occupied by individuals in the Target Population." (V.E.1(b)). Table VI below displays the reported number of units leased at the same address.

**Table VI**

**Self-Reported Bridge Subsidy Housing Concentration (Density)**

|  | September 2015 | March 2016 |
|---|---|---|
| Number of properties with one leased SH unit at the same address | 290 | 317 |
| Number of properties with two SH units at the same address | 27 | 22 |
| Number of properties with three SH units at the same address | 2 | 13 |
| Number of properties with four SH units at the same address | 4 | 1 |
| Number of properties with five SH units at the same address | 1 | 2 |
| Number of properties with six SH units at the same address | 1 | 0 |

As can be seen in the table, almost 90% of the leased units are at a unique address.   This supports a conclusion that the Bridge Subsidy Program, to a large degree, is operating as a scattered-site program.  For the 10% of the units shown in Table V to be at the same address, it is not known at this time whether the unit density standards included in the CMHA are being met.  For example, in the two properties that are noted to have five units at the same address, the total number of units at each address is not yet reported.  If those buildings have a total of 50 or more units, then having five Bridge Subsidy Program leases in that property would comport with the CMHA.  However, if those properties have fewer than 50 total units, then the five units leased in those buildings would exceed the scattered-site definition as quoted above.   DHHS is collecting information on the total units in each property where there are two or more Bridge units at the same address, and this data will be reported in the next ER report.

It should be noted that these data do not indicate whether any of the leased units are roommate situations, and if so, whether such arrangements meet the requirements of the CMHA (V.E.1(c)).

DHHS reports, and anecdotal information seems to support, that there are very few, if any, roommate situations among the currently leased Bridge Subsidy Program leased units.[2]

Current data is also not available on the degree to which Bridge Subsidy Program participants access and utilize support services and whether or not the services are effective and meet individualized needs.  Receipt of services is not a condition of eligibility for a subsidy under the Bridge Program, but the CMHA does specify that "…supported housing includes support services to enable individuals to attain and maintain integrated affordable housing and includes support services that are flexible and available as needed and desires….". (V.E.1(a)).   As noted in the January 2016 ER Report, DHHS has been working on a method to cross-match the Bridge Subsidy Program participant list with the Phoenix II and Medicaid claims data.   This will allow documentation of the degree to which Bridge Subsidy Program participants are actually receiving certain mental health or other services and supports.

In the previous report, the ER identified a number of important and needed data elements associated with the SH eligibility criteria and lack of a waitlist, as well as monitoring implementation of the SH program in the context of the CMHA.  These include:

- Total number of Bridge Subsidy Program applicants per quarter;
- Referral sources for Bridge Subsidy Program applicants;
- Number and percent approved for the Bridge Subsidy Program;
- Number and percent rejected for the Bridge Subsidy Program;
    - Reasons for rejection of completed applications, separately documenting those who are rejected because they do not meet federal HCV/Section 8 eligibility requirements;
- Number and disposition of appeals related to rejections of applications;
- Elapsed time between application, approval, and lease-up;
- Number of new individuals leased-up during the quarter;
- Number of terminations from Bridge subsidies;
- Reasons for termination:
    - Attained permanent subsidized housing (Section 8, public housing, etc.);
    - Chose other living arrangement or housing resource;
    - Moved out of state;
    - Deceased;
    - Long term hospitalization;
    - Incarceration;
    - Landlord termination or eviction; or
    - Other;
- Number of Bridge Subsidy Program participants in a roommate situation; and

---

[2] DHHS reports that currently there is one voluntary roommate situation reflected in the above data.

- Lease density in properties with multiple Bridge Subsidy Program leases.

This information is important in assessing whether a waitlist is properly maintained and in assessing whether or not support services are adequate to enable the individual to "attain and maintain integrated affordable housing" and whether services are "flexible and available as needed and desired." Most rental assistance programs collect and report such information, given its intrinsic value in monitoring program operations.  Further, such data enhances DHHS' ability to demonstrate the timeliness and effectiveness of access of the priority target population to this essential CMHA program component.  Most importantly, this data is necessary to help the ER determine compliance with CMHA Sections IV.B, IV.C, and VII.A.  The ER will continue to work collaboratively with DHHS to identify sources and methods for such data collection and reporting.

DHHS has been in the process of drafting Bridge Subsidy Program rules, in consultation with plaintiffs and the United States.   A final draft version is not available at the time of this report.  The ER expects DHHS to promulgate these rules promptly, as they are important to ensuring access to and assessment of the Bridge Subsidy Program.

## Transitions from Institutional to Community Settings

During the past 18 months the ER has visited both Glencliff and NHH on at least three separate occasions to meet with staff engaged in transition planning under the new policies and procedures adopted by both facilities late last year.  Transition planning activities related to specific current residents in both facilities were observed, and most recently, a small non-random sample of resident transition records have been reviewed.  Additional discussions have also been held with both line staff and senior clinicians/administrators regarding potential barriers to effective discharge to the most appropriate community settings for residents at both facilities.

The ER has participated in two meetings of the Central Team, now that it has been operationalized.   The Central Team has about eight months of operational experience, and has started reporting data on its activities.  To date, 13 individuals have been submitted to the Central Team, nine from Glencliff and four from NHH.   Table VII below summarizes the discharge barriers that have been identified by the Central Team with regard to these individuals.   Note that most individuals encounter multiple discharge barriers, resulting in a total substantially higher than the number of individuals reviewed by the Central Team.

**Table VII**

**Discharge Barriers Identified by the Central Team: September 2015 through April 2016**

| Discharge Barriers | NHH | Glencliff |
|---|---|---|
| Legal | 1 | 2 |
| Residential | 2 | 6 |
| Financial | 1 | 4 |
| Clinical | 2 | 4 |
| Family/Guardian | 1 | 0 |
| Other | 1 | 0 |

### Glencliff

In the time period from January to March 2016, Glencliff reports that it has admitted three individuals, and has had only one discharge.  The wait list for admission has remained relatively constant: averaging 15 people during this time frame.  The length of stay for the one person discharged was 1,492 days.  Since September 17, 2015, Glencliff has discharged only five individuals: one to a five+ bed community residence; one to supported residential care; one to enhanced family care; one to their own home; and one to NHH.  Only two of the five are clearly to small-scale community settings.  Glencliff reports having 23 individuals engaged in discharge planning as of April of this year.  Unfortunately, only a fraction of these individuals are in the "active" transition process and about half – 10 of 23 – are to be transitioned to institutional nursing home settings.  Eleven individuals in the transition process are reported to have a dual diagnosis of intellectual/developmental disability (IDD), as well as mental illness. Between September 2015 and April 2016, NHH reports discharging nine patients to the Glencliff Home.

The ER remains concerned about both the steady flow of referrals to Glencliff (especially those referrals coming from NHH) and the lack of discharges to integrated community settings.  In keeping with the goals of the CMHA, and its transition planning provisions, the ER recommends that any NHH patient for whom placement at Glencliff is being considered be referred to the Central Team for an evaluation of barriers to community living and an exploration of alternative dispositions.  These cases also should receive heightened scrutiny under the state PASRR process.

Section V.E.3(g) of the CMHA requires the State by June 30, 2015 to: "…have the capacity to serve in the community four individuals with mental illness and complex health care needs residing at Glencliff…."   This target increases to a total of ten such individuals to be discharged

to the community by June 30, 2016.  The CMHA includes several options for attaining that goal, including the issuance of an RFP to secure new residential services beds and/or to access existing community capacity in the residential services system.  The CMHA also anticipates collaboration with the DHHS Elderly and Adult Services component to assist with implementing transition plans for this population.

As noted in the June 30, 2015 and January 5, 2016ER reports, DHHS has been endeavoring to access the Enhanced Family Care service modality included in New Hampshire's Home and Community-Based Services waiver for people who are elderly or have disabilities.  DHHS has also been exploring other Medicaid waiver and in-plan service authorities to piece together an array of services for each of the individuals at Glencliff for whom this type of transition planning is being conducted.  Now, 12 months later, the technical and financial complexities of these mechanisms have not yet been resolved, and no Glencliff resident has yet been discharged to a community setting using these mechanisms. The CMHA specifically identifies up to $100,000 per person that can be used, in concert with other applicable Medicaid waiver or similar financing approaches, to develop or acquire the capacity for community transitions for Glencliff residents.   None of these funds have been expended to date, and no RFP for enhanced residential capacity has been issued by the State.  DHHS reports that it is in negotiations with one or more vendors to effectuate discharge of residents with complex medical needs from Glencliff into small-scale community settings..

The ER continues to find that the State is not in compliance with Section V.E.3(g) of the CMHA, as well as a number of provisions throughout Section VI.  To date, no capacity has been created or identified to transition individuals meeting the criteria of this section, and no transitions have been accomplished.   The ER believes that some of the strategies being developed by DHHS and the Central Team to effectuate such transitions have the potential to be effective both for the individuals to be transitioned, and to facilitate future transitions for similar persons now residing at Glencliff.  As in the January 2016 Report, the ER continues to find that the progress in creating capacity and effectuating transitions at Glencliff has been much too slow and ineffectual to meet the requirements of the CMHA.

### PASRR

The ER met in April of this year with the DHHS staff overseeing the PASRR functions in New Hampshire.  ,Based on verbal information provided by the staff, it appears the new PASRR vendor (University of Massachusetts Medical School) is performing PASRR functions in conformance with its contract with the State.

In the coming months, the ER will work with DHHS to develop data extraction and reporting methods that will facilitate ER analyses of this function.  Monitoring of the PASSR process of those referred for admission to Glencliff remains a high priority for the ER in 2016.

**New Hampshire Hospital**

For the time period January through March 2016,DHHS reported that NHH effectuated 309 admissions and 300 discharges.   The mean daily census was 131, and the median length of stay for discharges was 11 days.

Table VIII below compares NHH discharge destination information for the three most recent reporting periods.  The numbers are expressed as percentages because the length of the reporting periods had not previously been consistent, although the type of discharge destination data reported has been consistent throughout.

**Table VIII**

**New Hampshire Hospital Self-Reported Data on Discharge Destination**

| Discharge Destination | Percent January 2014 through May 2015 | Percent July 1 2015 through September 18, 2015 | Percent September 19, 2015 through April 20, 2016 |
|---|---|---|---|
| Home – live alone or with others | 74.4 | 67.3 | 80.2% |
| Glencliff | 0.4% | 0.02% | 0.06% |
| Homeless Shelter/motel | 3.8% | 2.4% | 2.7% |
| Group home 5+/DDS supported living, etc. | 3.4% | 9.02% | 3.2% |
| Jail/corrections | 1.5% | 0.04% | 1.4% |
| Nursing home/rehab facility | 1.9% | 3.0% | .08% |
| Unknown | 12.6% | 17.64% | 6.8% |

Based on the above data, there would appear to be some increases in discharges to independent living arrangements and parallel decreases in the number of discharges for which the destination is unknown.  For the period September 2015 through April 2016, the figures above in Table VIII are based on a denominator of 1,527 total discharges from NHH.  In addition, the State reports that there were 158 readmissions within 30 days, about ten percent of the discharges. Readmission data to NHH or equivalent institutional facilities is an important metric to help determine whether the community system is meeting individual needs and achieving outcome criteria in the CMHA.   In the coming months, the ER will work with the state to gather discharge data at NHH and the other Designated Receiving Facilities (DRFs) or equivalent facilities within 30, 90, 180, and 365 days. The ER will include this data and an analysis of this data in the next ER report.

The most recent Quarterly Data Report contains new, consistently reported, information on the hospital-based DRFs/APRTP in New Hampshire.  It is important to capture the DRF/APRTP data and combine it with NHH and Glencliff data to get a total institutional census across the state for the SMI population.  The ER appreciates the State gathering this information.. Table IX summarizes this data.

**Table IX**

**Self-Reported DRF/APRTP Utilization Data: January through March 2016**

| DRF/APRTP | Admissions | Percent Involuntary | Average Census | Discharges | Length of Stay for Discharges |
|---|---|---|---|---|---|
| Franklin | 69 | 53.6% | 7.9 | 76 | 8.6 |
| Cypress Center | 257 | 18.7% | 14.7 | 261 | 4.2 |
| Portsmouth | 46 | NA | NA | NA | NA |
| Elliot Geriatric | 65 | 18.5% | 19.7 | 57 | 15 |
| Elliot Pathways | 121 | 30.6% | 18.1 | 122 | 7.4 |
| **Total*** | **512** | **26.2%*** | **60.1** | **516** | **8.8avg** |

*Totals do not include Portsmouth

It should be noted that to date DHHS is not reporting discharge destinations for the discharges from DRFs/the APRTP.  The ER will continue to work with DHHS to develop a reporting mechanism for this information.  Anecdotally, some proportion of discharges from the DRFs/ APRTP appear to go to institutional settings – NHH and nursing facilities -- so it will be important to track this data in the future.

In the previous two reports, the ER has identified the waiting list (hospital ED boarding) for admission to NHH to be an important indicator of overall system performance.  Based on recent information reported by DHHS, the average number of adults waiting for a NHH inpatient psychiatric bed was 24 per day in FY 2014; 25 per day in FY 2015; and to date in FY 2016 has been 28 per day.  The constant and increasing number of adults awaiting inpatient admission to NHH is of concern to DHHS and many other parties in New Hampshire.  In most mental health systems, a high number of adults waiting for inpatient admissions is indicative of a need for enhanced crisis response (e.g., mobile crisis) and high intensity community supports (e.g., ACT).

As noted earlier in this report, DHHS is analyzing data related to adults boarding in EDs who may have some connection to the mental health system.  When complete, this data analysis should be used to identify members of the target population at risk of inpatient admission and to facilitate increasing enrollments in ACT and other community services designed to prevent or ameliorate mental health crisis, emergency department presentations and boarding, and hospital admissions.  The ER will follow up and make this a priority.

### Summary of Transition Issues

Over the past three reports, the ER has consistently noted that the transitions process at Glencliff is moving very slowly.  This appears to be true both at the individual consumer level, and at the system level.  Although information at this point is anecdotal, interviews with both line staff and administrators, plus some selective record reviews, indicate that it is taking substantial amounts of time to overcome the many and varied barriers to discharge to the community.  Although the Central Team is now fully operational, it has been concentrating on a small number of cases .  With respect to NHH, transition issues include the need to minimize or eliminate discharges to inappropriate settings like homeless shelters.  At the all parties meeting on May 5, 2016, the ER reiterated that DHHS needs to take aggressive executive action to increase both the speed and effectiveness of transitions from NHH and Glencliff.   The ER will closely monitor progress with discharge planning and transitions to the community over the next six months.

## Family and Peer Supports

### Family Supports

Per the CMHA, the State has maintained its contract with NAMI New Hampshire for family support services.  The ER will arrange for additional NAMI meetings during the next six months.

### Peer Support Agencies

As noted in the June 30, 2015 report, New Hampshire reports having a total of 16 peer support agency program sites, with at least one program site in each of the ten regions.   The State reports that all peer support centers meet the CMHA requirement to be open eight hours per day, five and one half days per week.  At the time of that report, the State reported that those sites had a cumulative total of 2,924 members, with an active daily participation rate of 169 people statewide.  As can be seen from the most recent quarterly data report included in Appendix A, the State currently reports total membership to be 2,879, with active daily visits averaging 142 people.  In the September 2015 data report, the total membership was reported to be 2,714 people, with average daily statewide visits of 171.  Thus, although statewide membership has remained somewhat stable, the active daily participation has gone down by about 17% in the most recent quarter.

The CMHA requires the peer support programs to be "effective" in helping individuals in managing and coping with the symptoms of their illness, self-advocacy, and identifying and using natural supports.  As noted in previous reports, enhanced efforts to increase active daily participation appear to be warranted for the peer support agency programs.

# IV.  Quality Assurance Systems

The two previous ER reports have described the collaborative process being employed to design and implement a comprehensive Quality Management and Quality Service Review (QM/QSR) process in concert with the expectations of the CMHA.  In the past 12 months, DHHS has made considerable progress in the design of the QSR process required by the CMHA.

At the request of DHHS, the ER engaged an experienced expert in QSR, Lyn Rucker, to work with the DHHS QSR team.  Over the past several months, the ER and Ms. Rucker have:

- Reviewed three iterations of documents specifically related to the QSR design and implementation;
- Created a matrix to be used to cross-walk specific requirements and outcomes of the CMHA to the QSR process;
- Met by phone and in person with QM/QSR team members at least four times;
- Conducted an on-site two day work session with members of the QM/QSR team to discuss in detail the process, instrumentation, scoring, and utilization of the QSR information within the CMHA and DHHS quality frameworks; and
- Participated in an additional joint meeting of the CMHA plaintiffs' representatives and the DHHS QM/QSR team (including legal representatives of the State as well).

The DHHS QM/QSR team has made considerable progress in all elements of the QSR design, including development of:

- A QSR manual of procedures;
- A random sampling methodology that reflects the priority populations served under the CMHA;
- A detailed schedule of on- and off-site activities related to each QSR review;
- A QSR instrument that integrates information from all the various input sources for the QSR;
- Instruments for client and staff interviews and record reviews; and
- A set of instrument scoring algorithms.

The initial field test of the QSR system will take place in July 2016.  For the second field test, scheduled for September, Ms. Rucker will accompany the QSR team on-site to review and provide technical assistance on the QSR process.  Following that September QSR field test, it is expected that the parties will meet to discuss any proposed changes to the QSR process or design, after which the QSR documents will be finalized and the QSR regional reviews will begin.

In previous reports, the ER has noted that there are separate but related issues regarding independent verification that ACT and SE services are being provided in a consistent manner by all CMHCs in conformance with the standards of the CMHA.  As noted in the sections on ACT and SE, DHHS is working on a process for assuring fidelity for ACT and SE.  Once the QSR process is fully operational, DHHS will be able to add QSR information to other data and oversight information to assure all CMHCs meet the CMHA fidelity standards.

# V.    Summary of Expert Reviewer Observations and Priorities

The CMHA and ER have now been in place for 24 months.   **At the last two all parties meetings, the ER has expressed increasing concern related to:  (a) continued lack of compliance with at least two major requirements of the CMHA; and (b) long elapsed times and/or delays related to implementation of system improvements or capacities related to the CMHA.**   The ER has emphasized the need for the State to be more aggressive, assertive, planful, and timely in its implementation and oversight efforts to assure compliance with the CMHA.

As described in several sections of this report, DHHS has begun to implement more aggressive measures to both remove potential barriers to CMHA implementation, and to assure effective action on the part of the ten CMHAs to achieve compliance.  The ER believes these management initiatives are positive and have the potential to improve performance vis-à-vis the CMHA.

**Nonetheless, the State has been and currently remains out of compliance with at least two critical provisions of the CMHA.  These are:**

1. **Sections V.D.3(a, b, and d), which together require that all ACT teams meet the standards of the CMHA; that each mental health region have at least one adult ACT Team; and that by June 30, 2016, the State provide ACT services that conform to CMHA requirements and have the capacity to serve at least 1,500 people in the Target Population at any given time; and**
2. **Sections V.E.2(b) and V.E.3(g)(h) which together require that by now the State "have the capacity to serve in the community [ten] individuals with mental illness and complex health care needs residing at Glencliff…."**

As clearly stated by the ER at the May 2016 all parties meeting, the time for patience on these issues is over**.**  Priority Target Population members are going without needed ACT services; are boarding in hospital emergency departments; and are waiting for long periods of time in NHH or Glencliff for opportunities to live in the community.  There is still insufficient data to assess compliance in other key areas of the CMHA, including fidelity with CMHA service standards and PASRR provisions.

In order to assure that the State continues to move forward with implementation obligations under the CMHA and to proactively address identified areas of noncompliance, the ER recommends that the State carry out the following action steps:

1. By August 1, 2016, circulate to all parties a detailed plan with implementation steps and time lines to achieve compliance with the CMHA requirements for ACT services;

2. By August 1, 2016, circulate to all parties a detailed plan with implementation steps and timelines to achieve CMHA penetration rates and fidelity standards for supported employment throughout New Hampshire;

3. By August 1, 2016 circulate to all parties a detailed plan with implementation steps and timelines to achieve CMHA requirements to assist 10 residents of Glencliff with complex medical needs to move into integrated settings as soon as possible;

4. Starting September 1, 2016, and each month following, submit to all parties a monthly progress report of the steps taken and completed under these respective plans to assure compliance with CMHA requirements as identified in this report;

5. By October 1, 2016, complete the field tests and technical assistance related to the QSR, convene a meeting with plaintiffs and the United States to discuss any recommended design or process changes, and publish a final set of QSR documents governing the process for future QSR activities;

6. Complete at least one QSR site review per month between October 2016 and June 2017, with the exception of the month of December, and circulate to all parties the action items, plans of correction (if applicable), and updates on implementation of needed remedial measures (if applicable) resulting from each of these visits;

7. Starting July 1, 2016, circulate to all parties on a monthly basis the most recent data reports of the Central Team;

8. No later than October 1, 2016, assure that final rules for supportive housing and ACT services are promulgated in accordance with the draft rules developed with input from all parties;

9. By October 1, 2016, augment the quarterly data report to include: (a) ACT staffing and utilization data for each ACT team, not just for each region; (b) discharge destination data and readmission data (at 30, 90, and 180, days) for people discharged from NHH and the other DRFs; (c) reporting from the two Mobile Crisis programs, including hospital and ED diversions; and (e) supportive housing data on applications, time until determination, reason for ineligibility determination, and utilization of supportive services for those receiving supportive housing.

10. By October 1, 2016, (immediately prior to the next All Parties meeting) and then by December 1, 2016 (the time just before the next ER report), factually demonstrate that significant and substantial progress has been made towards meeting the standards and requirements of the CMHA with regard to the ACT, SE and placement of individuals with complex medical conditions from Glencliff into integrated community settings.

11. By October 1, 2016 demonstrate that aggressive executive action has been taken to address the pace and quality of transition planning from NHH and Glencliff through the development of a specific plan to increase the speed and effectiveness of transitions from these facilities.

Failure to accomplish these action steps in a timely way will likely result in additional findings of non-compliance on the part of the State with regard to the terms, standards and requirements of the CMHA.



**Appendix A**

**New Hampshire Community Mental Health Agreement**

*State's Quarterly Data Reports*

*October to December 2015*

*And*

*January to March 2016*

# New Hampshire Community Mental Health Agreement Quarterly Data Report

*October to December 2015*

New Hampshire Department of Health and Human Services

Office of Quality Assurance and Improvement

March 17, 2015

*The Department of Health and Human Services' Mission is to join communities and families in providing opportunities for citizens to achieve health and independence*

# Community Mental Health Agreement Quarterly Report

**New Hampshire Department of Health and Human Services**

**Publication Date:  3/17/2016**

**Reporting Period:  10/1/2015-12/31/2015**

## Notable Changes from Prior Report

- ACT staffing data is collected and reported through a new method that was adopted to increase accuracy in reporting. Data collection was streamlined in two ways:  by redesigning the data collection tool to focus on CMHA reporting needs and by splitting the collection of full time equivalent and staff competency data. Reporting is now split into two areas, the first counts full time equivalent positions on the ACT teams by type of clinician (Nurse, Masters Level Clinician/or Equivalent, Functional Support Worker, Peer Specialist, Psychiatrist/Nurse Practitioner). The second set of reports provides staff competency tables.  These tables reflect the sum of FTE's trained to provide each service type regardless of the clinician type. The competency values are not a reflection of the volume of time available to deliver services, rather the quantity of staff available to provide each service because if staff is trained to provide multiple competencies, their entire FTE value will be credited to each competency.

- DRF reporting is collected through a new method that was adopted to increase accuracy in reporting. The new collection method captures patient stay data for all patients who were being treated in a DRF during a month and accurately and precisely records the admission and discharge dates for all patients. Additional information is also reported for each DRF to parallel the information provided for New Hampshire Hospital.  Note:  DRF data from Portsmouth only represents involuntary admissions.  DHHS is working with Portsmouth to expand their reporting.

- To be more meaningful, Glencliff Home length of stay reporting has been modified to show the actual lengths of stay for each discharge.

# Community Mental Health Agreement Quarterly Report

**New Hampshire Department of Health and Human Services**

**Publication Date:  3/17/2016**

**Reporting Period:  10/1/2015-12/31/2015**

## 1. Community Mental Health Center Services:  Unique Count of Adult Assertive Community Treatment Consumers

| Center Name | October 2015 | November 2015 | December 2015 | Unique Consumers in Quarter |
|---|---|---|---|---|
| 01 Northern Human Services | 72 | 73 | 74 | 79 |
| 02 West Central Behavioral Health | 20 | 19 | 21 | 22 |
| 03 Genesis Behavioral Health | 31 | 31 | 34 | 35 |
| 04 Riverbend Community Mental Health Center | 59 | 57 | 56 | 61 |
| 05 Monadnock Family Services | 57 | 57 | 61 | 62 |
| 06 Community Council of Nashua | 69 | 73 | 72 | 76 |
| 07 Mental Health Center of Greater Manchester | 272 | 269 | 270 | 286 |
| 08 Seacoast Mental Health Center | 64 | 64 | 65 | 68 |
| 09 Community Partners | 75 | 75 | 76 | 77 |
| 10 Center for Life Management | 39 | 40 | 40 | 42 |
| **Total** | **756** | **757** | **766** | **808** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 3/1/16; consumers are counted only one time regardless of how many services they receive.*

**2a. Community Mental Health Center Services:  Assertive Community Treatment Staffing Full Time Equivalents**

| Center Name | December 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Nurse | Clinician/or Equivalent | Support Worker | Peer Specialist | (Excluding Psychiatry) | | Psychiatrists/Nurse Practitioner |
| 01 Northern Human Services | 0.53 | 2.60 | 7.49 | 0.53 | 11.15 | | 0.70 |
| 02 West Central Behavioral Health | 0.40 | 1.05 | 1.19 | 0.00 | 2.64 | | 0.14 |
| 03 Genesis Behavioral Health | 0.60 | 2.00 | 3.00 | 0.80 | 6.40 | | 0.50 |
| 04 Riverbend Community Mental Health Center | 0.50 | 3.00 | 3.20 | 0.00 | 6.70 | | 0.40 |
| 05 Monadnock Family Services | 1.00 | 1.25 | 5.00 | 0.50 | 7.75 | | 0.65 |
| 06 Community Council of Nashua | 1.00 | 4.00 | 2.50 | 0.00 | 7.50 | | 0.25 |
| 07 Mental Health Center of Greater Manchester | 2.03 | 18.00 | 9.22 | 0.50 | 29.75 | | 1.00 |
| 08 Seacoast Mental Health Center | 1.43 | 3.34 | 6.00 | 1.00 | 11.77 | | 0.60 |
| 09 Community Partners | 0.40 | 2.00 | 5.00 | 0.50 | 7.90 | | 0.40 |
| 10 Center for Life Management | 1.00 | 2.00 | 4.16 | 1.00 | 8.16 | | 0.30 |
| **Total** | **8.89** | **39.24** | **46.76** | **4.83** | **99.72** | | **4.94** |

**2b. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Substance Use Disorder Treatment**

| Center Name | December 2015 |
|---|---|
| 01 Northern Human Services | 2.45 |
| 02 West Central Behavioral Health | 1.13 |
| 03 Genesis Behavioral Health | 4.90 |

| | |
|---|---|
| 04 Riverbend Community Mental Health Center | 1.40 |
| 05 Monadnock Family Services | 2.40 |
| 06 Community Council of Nashua | 4.00 |
| 07 Mental Health Center of Greater Manchester | 9.00 |
| 08 Seacoast Mental Health Center | 0.24 |
| 09 Community Partners | 1.00 |
| 10 Center for Life Management | 4.00 |
| **Total** | **30.52** |

**2c. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Housing Assistance**

| Center Name | December 2015 |
|---|---|
| 01 Northern Human Services | 9.28 |
| 02 West Central Behavioral Health | 3.00 |
| 03 Genesis Behavioral Health | 5.40 |
| 04 Riverbend Community Mental Health Center | 6.00 |
| 05 Monadnock Family Services | 1.00 |
| 06 Community Council of Nashua | 5.50 |
| 07 Mental Health Center of Greater Manchester | 24.50 |
| 08 Seacoast Mental Health Center | 7.00 |
| 09 Community Partners | 5.75 |
| 10 Center for Life Management | 6.86 |

| | |
|---|---|
| **Total** | **74.29** |

### 2d. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Supported Employment

| Center Name | December 2015 |
|---|---|
| 01 Northern Human Services | 0.84 |
| 02 West Central Behavioral Health | 0.19 |
| 03 Genesis Behavioral Health | 2.80 |
| 04 Riverbend Community Mental Health Center | 0.20 |
| 05 Monadnock Family Services | 1.00 |
| 06 Community Council of Nashua | 6.50 |
| 07 Mental Health Center of Greater Manchester | 1.75 |
| 08 Seacoast Mental Health Center | 1.00 |
| 09 Community Partners | 0.25 |
| 10 Center for Life Management | 0.30 |
| **Total** | **14.83** |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health CMHC ACT Staffing Census Based on CMHC self-report*

*Notes for 2b-d:  Data extracted 3/1/16; The Staff Competency values reflect the sum of FTE's trained to provide each service type. These numbers are not a reflection of the services delivered, rather the quantity of staff available to provide each service. If staff is trained to provide multiple service types, their entire FTE value will be credited to each service type.*

**3. Community Mental Health Center Services:  Annual Supportive Employment Penetration Rates for Prior 12 Month Period**

| Center Name | 12 Month Period Ending December 2015 | | |
| --- | --- | --- | --- |
| | Supported Employment Consumers | Total Eligible Consumers | Penetration Rate |
| 01 Northern Human Services | 121 | 1,277 | 9.5% |
| 02 West Central Behavioral Health | 92 | 642 | 14.3% |
| 03 Genesis Behavioral Health | 128 | 1,330 | 9.6% |
| 04 Riverbend Community Mental Health Center | 201 | 1,375 | 14.6% |
| 05 Monadnock Family Services | 188 | 971 | 19.4% |
| 06 Community Council of Nashua | 130 | 1,508 | 8.6% |
| 07 Mental Health Center of Greater Manchester | 999 | 3,154 | 31.7% |
| 08 Seacoast Mental Health Center | 159 | 1,252 | 12.7% |
| 09 Community Partners | 105 | 809 | 13.0% |
| 10 Center for Life Management | 179 | 746 | 24.0% |
| **Deduplicated Total** | **2,294** | **12,842** | **17.9%** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 2/16/16; consumers are counted only one time regardless of how many services they receive*

**4. New Hampshire Hospital:  Adult Census Summary**

| Measure | October - December 2015 |
| --- | --- |
| Admissions | 330 |

| | |
|---|---|
| Mean Daily Census | 126 |
| Discharges | 322 |
| Median Length of Stay in Days for Discharges | 12 |
| Deaths | 3 |

*Revisions to Prior Period:  None*

*Data Source:  Avatar*

*Notes:  Data extracted 3/1/16; Average Daily Census includes patients on leave and is rounded to nearest whole number*

### 5a. Designated Receiving Facilities:  Admissions

| | October - December 2015 | | |
|---|---|---|---|
| **DRF** | **Involuntary Admissions** | **Voluntary Admissions** | **Total Admissions** |
| Franklin | 27 | 42 | 69 |
| Manchester (Cypress Center) | 42 | 167 | 209 |
| Portsmouth* | 35 | NA | 36 |
| Elliot | 28 | 85 | 113 |
| **Total** | **132** | **295** | **427** |

*\* Portsmouth data only reflect involuntary admissions. DHHS is working with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

**5b. Designated Receiving Facilities:  Mean Daily Census**

| DRF | October - December 2015 |
|---|---:|
| Franklin | 7 |
| Manchester (Cypress Center) | 13 |
| Portsmouth* | 3 |
| Elliot | 13 |
| **Total** | **9** |

**5c. Designated Receiving Facilities:  Discharges**

| DRF | October - December 2015 |
|---|---:|
| Franklin | 65 |
| Manchester (Cypress Center) | 207 |
| Portsmouth* | 37 |
| Elliot | 114 |
| **Total** | **423** |

**5d. Designated Receiving Facilities:  Median Length of Stay in Days for Discharges**

| DRF | October - December 2015 |
|---|---:|
| Franklin | 5 |
| Manchester (Cypress Center) | 4 |
| Portsmouth* | 5 |
| Elliot | 7 |
| **Total** | **5** |

*\* Portsmouth data only reflect involuntary admissions. DHHS is working with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

*Revisions to Prior Period:  None*

*Data Source:  NH DRF Database*

*Notes:  Data Compiled 3/1/16; Information collection method for table was redesigned to increase accuracy*

### 6. Glencliff Home:  Census Summary

| Measure | October - December 2015 |
|---|---|
| Admissions | 4 |
| Average Daily Census | 114 |
| Discharges | 4 |
| Individual Lengths of Stay in Days for Discharges | 464, 1182, 1658, 3049 |
| Readmissions | 0 |
| Mean Overall Admission Waitlist | 16 |

*Revisions to Prior Period:  None*

*Data Source:  Glencliff Home*

*Notes:  Data Compiled 3/1/16; means rounded to nearest whole number*

## 7. NH Mental Health Consumer Peer Support Agencies:  Census Summary

| Peer Support Agency | October - December 2015 | |
|---|---|---|
| | **Total Members** | **Average Daily Visits** |
| **Alternative Life Center Total** | **455** | **39** |
| *Conway* | *135* | *10* |
| *Wolfeboro Outreach* | *18* | *0* |
| *Berlin* | *103* | *10* |
| *Littleton* | *118* | *10* |
| *Colebrook* | *81* | *9* |
| **Stepping Stone Total** | **490** | **21** |
| *Claremont* | *415* | *17* |
| *Lebanon* | *75* | *4* |
| **Cornerbridge Total** | **302** | **16** |
| *Laconia* | *133* | *4* |
| *Concord* | *133* | *12* |
| *Plymouth Outreach* | *36* | *NA* |
| **MAPSA Keene Total** | **166** | **15** |
| **HEARTS Nashua Total** | **423** | **26** |
| **On the Road to Recovery Total** | **377** | **33** |
| *Manchester* | *234* | *24* |
| *Derry* | *143* | *9* |
| **SCA Portsmouth Total** | **266** | **12** |
| **TriCity Coop Rochester Total** | **305** | **14** |

| | | |
|---|---|---|
| **Total** | **2,784** | **175** |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health Peer Support Agency Quarterly Statistical Reports*

*Notes:  Data Compiled 3/1/16; Average Daily Visits NA for Outreach Programs*

### 8. Housing Bridge Subsidy Summary to Date

| | October – December 2015 | | |
|---|---|---|---|
| **Subsidy** | **Total individuals served at start of quarter** | **New individuals added during quarter** | **Total individuals served through end of quarter** |
| Housing Bridge Subsidy | 466 | 22 | 488 |
| Section 8 Voucher | 70 | 0 | 70 |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health*

*Notes:  Data Compiled 3/5/16*

### 9. Housing Bridge Subsidy Current Census Summary

| Measure | As of 12/31/2015 |
|---|---|
| Housing Slots | 450 |
| Rents currently being paid | 412 |
| Individuals accepted but waiting to lease | 25 |
| Waiting list for slots | 0 |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health*

*Notes:  Data Compiled 3/5/16; All individuals currently on the Bridge Program are actively transitioning from the program (waiting for their Section 8 housing voucher).*

### 10. Housing Bridge Subsidy Unit Address Density

| Number of Unit(s)* at Same Address | Frequency as of 3/5/16 |
|---|---|
| 1 | 314 |
| 2 | 17 |
| 3 | 14 |
| 4 | 1 |
| 5 | 2 |
| 6 | 1 |

*All units are individual units



# New Hampshire Community Mental Health Agreement

# Quarterly Data Report

*January to March 2016*

New Hampshire Department of Health and Human Services

Office of Quality Assurance and Improvement

May 31, 2016

*The Department of Health and Human Services' Mission is to join communities and families*
*in providing opportunities for citizens to achieve health and independence*

# Community Mental Health Agreement Quarterly Report

**New Hampshire Department of Health and Human Services**

**Publication Date:  5/31/2016**

**Reporting Period:  1/1/2016-3/31/2016**

## Notes

- Additional detail was added to the Glencliff waitlist number to show the number of people who are "active" on the list.  These are people who have been fully reviewed for admission and are awaiting admission pending finalization of paperwork and other steps immediate to admission.

- Elliot's Designated Receiving Facility data is now split by their geriatric and non-geriatric units.

- Portsmouth's Designated Receiving Facility has declined to provide voluntary data as timely as the other DRFs.  We are working with Portsmouth to provide quarterly data with a one quarter lag with the expectation that beginning in next quarter's report, Portsmouth voluntary data will be included.  We plan on restating all the DRF data for the lagged quarter, including Portsmouth, to provide correct statewide totals and averages.

# Community Mental Health Agreement Quarterly Report

**New Hampshire Department of Health and Human Services**

**Publication Date:  5/31/2016**

**Reporting Period:  1/1/2016-3/31/2016**

## 1. Community Mental Health Center Services:  Unique Count of Adult Assertive Community Treatment Consumers

| Center Name | January 2016 | February 2016 | March 2016 | Unique Consumers in Quarter |
|---|---|---|---|---|
| 01 Northern Human Services | 75 | 75 | 78 | 79 |
| 02 West Central Behavioral Health | 20 | 23 | 24 | 26 |
| 03 Genesis Behavioral Health | 35 | 33 | 39 | 39 |
| 04 Riverbend Community Mental Health Center | 61 | 64 | 67 | 70 |
| 05 Monadnock Family Services | 61 | 65 | 66 | 68 |
| 06 Community Council of Nashua | 65 | 66 | 65 | 72 |
| 07 Mental Health Center of Greater Manchester | 271 | 274 | 267 | 293 |
| 08 Seacoast Mental Health Center | 68 | 68 | 65 | 72 |
| 09 Community Partners | 71 | 69 | 66 | 73 |
| 10 Center for Life Management | 45 | 43 | 41 | 49 |
| **Total** | **770** | **779** | **778** | **839** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 5/16/16; consumers are counted only one time regardless of how many services they receive.*

**2a. Community Mental Health Center Services:  Assertive Community Treatment Staffing Full Time Equivalents**

| Center Name | March 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Nurse | Clinician/or Equivalent | Support Worker | Peer Specialist | (excluding Psychiatry) | | Psychiatrist/Nurse Practitioner |
| 01 Northern Human Services | 0.53 | 2.60 | 7.64 | 0.38 | 11.15 | | 0.80 |
| 02 West Central Behavioral Health | 0.40 | 1.18 | 2.19 | 0.60 | 4.37 | | 0.14 |
| 03 Genesis Behavioral Health | 0.60 | 2.00 | 4.00 | 0.80 | 7.40 | | 0.50 |
| 04 Riverbend Community Mental Health Center | 0.50 | 3.00 | 3.50 | 0.00 | 7.00 | | 0.40 |
| 05 Monadnock Family Services | 1.00 | 1.25 | 5.00 | 0.50 | 7.75 | | 0.65 |
| 06 Community Council of Nashua | 1.00 | 3.00 | 2.50 | 0.00 | 6.50 | | 0.25 |
| 07 Mental Health Center of Greater Manchester | 2.22 | 19.00 | 8.79 | 0.00 | 30.01 | | 1.00 |
| 08 Seacoast Mental Health Center | 1.43 | 3.10 | 6.00 | 1.00 | 11.53 | | 0.60 |
| 09 Community Partners | 0.40 | 2.00 | 3.00 | 0.50 | 5.90 | | 0.40 |
| 10 Center for Life Management | 1.00 | 2.00 | 4.16 | 1.00 | 8.16 | | 0.20 |
| **Total** | **9.08** | **39.13** | **46.78** | **4.78** | **99.77** | | **4.94** |

**2b. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Substance Use Disorder Treatment**

| Center Name | March 2016 |
|---|---|
| 01 Northern Human Services | 2.55 |
| 02 West Central Behavioral Health | 1.13 |
| 03 Genesis Behavioral Health | 5.90 |
| 04 Riverbend Community Mental Health | 1.40 |

| | |
|---|---|
| Center | |
| 05 Monadnock Family Services | 2.40 |
| 06 Community Council of Nashua | 3.00 |
| 07 Mental Health Center of Greater Manchester | 9.00 |
| 08 Seacoast Mental Health Center | 0.00 |
| 09 Community Partners | 1.00 |
| 10 Center for Life Management | 4.00 |
| **Total** | **30.38** |

## 2c. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Housing Assistance

| Center Name | March 2016 |
|---|---|
| 01 Northern Human Services | 9.28 |
| 02 West Central Behavioral Health | 5.40 |
| 03 Genesis Behavioral Health | 5.80 |
| 04 Riverbend Community Mental Health Center | 6.00 |
| 05 Monadnock Family Services | 1.00 |
| 06 Community Council of Nashua | 5.00 |
| 07 Mental Health Center of Greater Manchester | 25.09 |
| 08 Seacoast Mental Health Center | 7.00 |
| 09 Community Partners | 3.75 |
| 10 Center for Life Management | 6.86 |
| **Total** | **75.18** |

**2d. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Supported Employment**

| Center Name | March 2016 |
|---|---:|
| 01 Northern Human Services | 0.84 |
| 02 West Central Behavioral Health | 0.19 |
| 03 Genesis Behavioral Health | 2.80 |
| 04 Riverbend Community Mental Health Center | 0.50 |
| 05 Monadnock Family Services | 1.00 |
| 06 Community Council of Nashua | 5.00 |
| 07 Mental Health Center of Greater Manchester | 1.78 |
| 08 Seacoast Mental Health Center | 1.00 |
| 09 Community Partners | 1.25 |
| 10 Center for Life Management | 0.30 |
| **Total** | **14.66** |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health CMHC ACT Staffing Census Based on CMHC self-report*

*Notes for 2b-d:  Data extracted 5/16/16; The Staff Competency values reflect the sum of FTE's trained to provide each service type. These numbers are not a reflection of the services delivered, rather the quantity of staff available to provide each service. If staff is trained to provide multiple service types, their entire FTE value will be credited to each service type.*

**3. Community Mental Health Center Services:  Annual Supportive Employment Penetration Rates for Prior 12 Month Period**

| Center Name | 12 Month Period Ending March 2016 | | |
| --- | --- | --- | --- |
| | Supported Employment Consumers | Total Eligible Consumers | Penetration Rate |
| 01 Northern Human Services | 130 | 1,226 | 10.6% |
| 02 West Central Behavioral Health | 97 | 634 | 15.3% |
| 03 Genesis Behavioral Health | 125 | 1,308 | 9.6% |
| 04 Riverbend Community Mental Health Center | 207 | 1,465 | 14.1% |
| 05 Monadnock Family Services | 203 | 992 | 20.5% |
| 06 Community Council of Nashua | 136 | 1,510 | 9.0% |
| 07 Mental Health Center of Greater Manchester | 1,185 | 3,225 | 36.7% |
| 08 Seacoast Mental Health Center | 137 | 1,248 | 11.0% |
| 09 Community Partners | 102 | 812 | 12.6% |
| 10 Center for Life Management | 192 | 777 | 24.7% |
| **Deduplicated Total** | **2,509** | **12,975** | **19.3%** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 5/16/16; consumers are counted only one time regardless of how many services they receive*

**4. New Hampshire Hospital:  Adult Census Summary**

| Measure | January - March 2016 |
| --- | --- |
| Admissions | 309 |

| | |
|---|---|
| Mean Daily Census | 131 |
| Discharges | 300 |
| Median Length of Stay in Days for Discharges | 11 |
| Deaths | 0 |

*Revisions to Prior Period:  None*

*Data Source:  Avatar*

*Notes:  Data extracted 5/16/16; Average Daily Census includes patients on leave and is rounded to nearest whole number*

### 5a. Designated Receiving Facilities:  Admissions

| | January – March 2016 | | |
|---|---|---|---|
| **DRF** | **Involuntary Admissions** | **Voluntary Admissions** | **Total Admissions** |
| Franklin | 37 | 32 | 69 |
| Manchester (Cypress Center) | 48 | 209 | 257 |
| Portsmouth* | 46 | NA | NA |
| Elliot Geriatric Psychiatric Unit | 12 | 53 | 65 |
| Elliot Pathways | 37 | 84 | 121 |
| **Total** | **143** | **NA*** | **NA*** |

*NA = Not available;*

*\* Total not available due to lack of Portsmouth voluntary admission data. DHHS continues to work with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

**5b. Designated Receiving Facilities:  Mean Daily Census**

| DRF | January - March 2016 |
|---|---|
| Franklin | 7.9 |
| Manchester (Cypress Center) | 14.7 |
| Portsmouth | NA |
| Elliot Geriatric Psychiatric Unit | 19.7 |
| Elliot Pathways | 18.1 |
| **Total** | **NA\*** |

*NA = Not available;*

*\* Total not available due to lack of Portsmouth voluntary admission data. DHHS continues to work with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

**5c. Designated Receiving Facilities:  Discharges**

| DRF | January - March 2016 |
|---|---|
| Franklin | 76 |
| Manchester (Cypress Center) | 261 |
| Portsmouth | NA |
| Elliot Geriatric Psychiatric Unit | 57 |
| Elliot Pathways | 122 |
| **Total** | **NA\*** |

*NA = Not available;*

*\* Total not available due to lack of Portsmouth voluntary admission data. DHHS continues to work with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

### 5d. Designated Receiving Facilities:  Median Length of Stay in Days for Discharges

| DRF | January - March 2016 |
| --- | --- |
| Franklin | 8.6 |
| Manchester (Cypress Center) | 4.2 |
| Portsmouth | NA |
| Elliot Geriatric Psychiatric Unit | 15.0 |
| Elliot Pathways | 7.4 |
| **Total** | **NA\*** |

*NA = Not available;*

*\* Total not available due to lack of Portsmouth voluntary admission data. DHHS continues to work with Portsmouth to expand their reporting to cover voluntary admissions for future releases of data.*

*Revisions to Prior Period:  None*

*Data Source:  NH DRF Database*

*Notes:  Data Compiled 5/16/16*

## 6. Glencliff Home:  Census Summary

| Measure | January – March 2016 |
|---|---:|
| Admissions | 3 |
| Average Daily Census | 113 |
| Discharges | 1 |
| Individual Lengths of Stay in Days for Discharges | 1,492 |
| Readmissions | 0 |
| Mean Overall Admission Waitlist | 15 (6 Active*) |

*Revisions to Prior Period:  None*

*Data Source:  Glencliff Home*

*Notes:  Data Compiled 5/10/16; means rounded to nearest whole number.  * Active waitlist patients have been reviewed for admission and are awaiting admission pending finalization of paperwork and other steps immediate to admission.*

## 7. NH Mental Health Consumer Peer Support Agencies:  Census Summary

| | January - March 2016 | |
|---|---|---|
| **Peer Support Agency** | **Total Members** | **Average Daily Visits** |
| **Alternative Life Center Total** | **453** | **45** |
| *Conway* | *138* | *12* |
| *Wolfeboro Outreach* | *18* | *0* |
| *Berlin* | *106* | *12* |
| *Littleton* | *122* | *12* |
| *Colebrook* | *69* | *9* |
| **Stepping Stone Total** | **520** | **18** |
| *Claremont* | *438* | *13* |
| *Lebanon* | *82* | *5* |
| **Cornerbridge Total** | **310** | **12** |
| *Laconia* | *137* | *4* |
| *Concord* | *137* | *8* |
| *Plymouth Outreach* | *36* | *NA* |
| **MAPSA Keene Total** | **170** | **14** |
| **HEARTS Nashua Total** | **444** | **25** |
| **On the Road to Recovery Total** | **396** | **44** |
| *Manchester* | *250* | *35* |
| *Derry* | *146* | *9* |
| **SCA Portsmouth Total** | **267** | **12** |
| **TriCity Coop Rochester Total** | **319** | **16** |

| | | |
|---|---|---|
| **Total** | **2,879** | **142** |

*Revisions to Prior Period:  Prior period total of average daily visits was inadvertently listed as 179, the correct value is 142*

*Data Source:  Bureau of Behavioral Health Peer Support Agency Quarterly Statistical Reports*

*Notes:  Data Compiled 5/16/16; Average Daily Visits NA for Outreach Programs*

### 8. Housing Bridge Subsidy Summary to Date

| | January – March 2016 | | |
|---|---|---|---|
| **Subsidy** | **Total individuals served at start of quarter** | **New individuals added during quarter** | **Total individuals served through end of quarter** |
| Housing Bridge Subsidy | 488 | 30 | 518 |
| Section 8 Voucher | 70 | 1 | 71 |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health*

*Notes:  Data Compiled 5/9/16*

### 9. Housing Bridge Subsidy Current Census Summary

| Measure | As of 3/31/2016 |
|---|---|
| Housing Slots | 450 |
| Rents currently being paid | 415 |
| Individuals accepted but waiting to lease | 22 |
| Waiting list for slots | 0 |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Behavioral Health*

*Notes:  Data Compiled 5/9/16; All individuals currently on the Bridge Program are actively transitioning from the program (waiting for their Section 8 housing voucher).*

### 10. Housing Bridge Subsidy Unit Address Density

| Number of Unit(s)* at Same Address | Frequency as of 3/31/16 |
|---|---|
| 1 | 317 |
| 2 | 22 |
| 3 | 13 |
| 4 | 1 |
| 5 | 2 |
| 6 | 0 |

*All units are individual units