# New Hampshire Community Mental Health Agreement

## Expert Reviewer Report Number Eight

## July 23, 2018

# I. Introduction

This is the eighth semi-annual report of the Expert Reviewer (ER) under the Settlement Agreement in the case of *Amanda D. v. Sununu; United States v. New Hampshire, No. 1:12-cv-53-SM.*   For the purpose of this and future reports, the Settlement Agreement will be referred to as the Community Mental Health Agreement (CMHA).  Section VIII.K of the CMHA specifies that:

> Twice a year, or more often if deemed appropriate by the Expert Reviewer, the Expert Reviewer will submit to the Parties a public report of the State's implementation efforts and compliance with the provisions of this Settlement Agreement, including, as appropriate, recommendations with regard to steps to be taken to facilitate or sustain compliance with the Settlement Agreement.

In this six-month period (January 1, 2018 through June 30, 2018), the ER has continued to observe the State's work to implement certain key service elements of the CMHA, and has continued to have discussions with relevant parties related to implementation efforts and the documentation of progress and performance consistent with the standards and requirements of the CMHA.  During this period, the ER:

- Observed an on-site Assertive Community Treatment (ACT) fidelity review at Lakes Region Mental Health Center;
- Observed an on-site Supported Employment (SE) fidelity review at Greater Nashua Mental Health Center;
- Met with senior management and with a clinical team at New Hampshire Hospital (NHH) to review transition planning processes and issues;
- Met with senior management of NHH to discuss new transitional housing options targeted to long-stay patients at NHH;
- Met with Glencliff leadership and clinical staff to discuss transition planning processes and issues;
- Met with the Mobile Crisis Team (MCT) of Harbor Homes, the agency selected to operate the MCT and crisis apartments in the greater Nashua region;
- Observed two Quality Service Review (QSR) reviews; one at Greater Nashua Mental Health Center, and one at Northern Human Services;
- Met with the DHHS CMHA leadership team to discuss progress in the implementation of CMHA standards and requirements;
- Participated in meetings with representatives of the Plaintiffs and the United States (hereinafter "Plaintiffs");
- Met three times with DHHS Quality Management/Quality Service Review (QM/QSR) staff to discuss the Greater Nashua and Northern Human Services QSR reviews; and
- Convened an All Parties meeting to discuss progress in meeting the requirements of the CMHA.

Information obtained during these on-site meetings has, to the extent applicable, been incorporated into the discussion of implementation issues and service performance below.  The ER will continue to conduct site visits going forward to observe and assess the quality and effectiveness of implementation efforts and whether they achieve positive outcomes for people consistent with CMHA requirements.

### Summary of Progress to Date

This report reflects the end of four years of implementation of the CMHA.  Looking back on the past four years, it is possible to document that some positive steps have been taken to improve the quality and effectiveness of services as envisioned in the CMHA.  Implementation issues remain time consuming and frustrating.  And, as will be discussed in detail below, there are areas of continued non-compliance with the CMHA.  Notwithstanding these on-going concerns, the parties to the CMHA deserve credit for some real and measurable accomplishments.

One major accomplishment has been the implementation of a comprehensive and reliable QSR process.  The QSR has been implemented in ten CMHA regions this fiscal year.  The ER considers these QSR reviews to be methodologically correct and reliable, and that the QSR reviews are producing findings that are accurate and actionable in terms of taking concrete steps to address quality issues in the CMHC system.

Another major accomplishment has been contracting with the Dartmouth-Hitchcock Medical Center to conduct external ACT and SE fidelity reviews using nationally validated fidelity review instruments and criteria.  In concert with the QSR reviews mentioned above, the fidelity reviews are assisting the state and the CMHCs to develop comprehensive Quality Improvement Plans (QIPs) that address important ACT and SE quality and effectiveness issues at both the consumer and CMHC operational levels.

The ER also notes, as will be discussed below, that the State remains in compliance with regard to statewide SE penetration rates, and continues to operate a robust and effective supportive housing (SH) program.

Much of the remainder of this report will, appropriately, focus on issues and concerns related to implementation of the CMHA.  Nonetheless, it is important to recognize positive progress when it occurs within the context of the CMHA.

Two years ago the ER recommended a number of action steps and timelines intended to facilitate movement towards compliance with the CMHA and to increase transparency and accountability related to State actions under the aegis of the CMHA.  The State agreed to implement these recommendations, and has made progress in certain areas of compliance and accountability.  Specific progress related to these recommendations is summarized below:

1.  By August 1, 2016, circulate to all parties a detailed plan with implementation steps and time lines to achieve compliance with the CMHA requirements for ACT services;

    ***ER Finding:  The State has implemented this recommendation by circulating such a plan, and continues to track and report on its implementation of various action steps intended to achieve compliance with CMHA requirements.  However, as will be noted throughout this report, the State remains out of compliance with the ACT requirements of the CMHA.  In fact, there has been virtually no progress in expanding ACT capacity and enrollment over the past 18 months.   Real progress towards attainment of the CMHA requirements must be achieved over the next year.  Given the advanced stage of implementation of the CMHA, and the importance of achieving compliance with its***

*terms, the ER would benefit from the guidance of the Court. For this reason, the ER recommends, and at the Court's request will make himself available for, a meeting with Judge McAuliffe during the next three months. The ER believes that such a meeting would also aid the Court in assessing the status of compliance with the Agreement, and clarifying the work which remains to be done in order to secure a timely resolution of this case.*

2. By August 1, 2016, circulate to all parties a detailed plan with implementation steps and timelines to achieve CMHA penetration rates and fidelity standards for SE throughout New Hampshire;

   *ER Finding: The State has implemented this recommendation by circulating such a plan, and continues to track and report on its implementation of various action steps and progress towards compliance with CMHA requirements. The State is in compliance with the statewide penetration rate standards for SE, but continues to work collaboratively with the four CMHCs that remain under the standard. Fidelity reviews resulted in Quality Improvement Plans for most CMHCs in 2017 and 2018.*

3. By August 1, 2016 circulate to all parties a detailed plan with implementation steps and timelines to achieve CMHA requirements to assist 16 residents of Glencliff with complex medical needs to move into integrated settings as soon as possible;

   *ER Finding: The State has implemented this recommendation by circulating such a plan and it continues to track and report on individuals with pending discharge plans. The current status of compliance is discussed in greater detail under the Glencliff Transitions section of this report.*

4. Starting September 1, 2016, and each month following, submit to all parties a monthly progress report of the steps taken and completed under these respective plans to assure compliance with CMHA requirements as identified in this report;

   *ER Finding: The State has implemented this recommendation and continues to track and report on its progress, which varies depending on the sections of the plan. However, the delivery of this Monthly Progress Report has become quite slow. The most recent monthly report received by the ER is for February and March, 2018, but was not received until June 26, 2018. This plan does not currently contain new strategies to improve compliance with ACT capacity and enrollment. The ER continues to request that the State substantially improve the timeliness of the Monthly and Quarterly Reports. The latest version of the monthly progress report is attached as Appendix B of this report.*

5. By October 1, 2016, complete the field tests and technical assistance related to the Quality Service Review (QSR), convene a meeting with Plaintiffs to discuss any recommended design or process changes, and publish a final set of QSR documents governing the process for future QSR activities;

   *ER Finding: Working in concert with representatives of the plaintiffs and the ER, DHHS developed revised QSR instrumentation, instructions, and scoring algorithms. The revised QSR has been carried out at ten of the CMHCs. The ER has participated in a total of four of these on-site QSR reviews  A more detailed discussion of progress with regard to the QSR is included under the QSR section of this report. As noted above, the ER is satisfied that the QSR is being implemented effectively and is producing reliable and actionable results and findings.*

6. Complete at least one QSR site review per month between October 2016 and June 2017, with the exception of the month of December, and circulate to all parties the action items, plans of correction (if

applicable), and updates on implementation of needed remedial measures (if applicable) resulting from each of these reviews;

*ER Finding: See #5 above.  It should be noted that all 10 of the CMHCs had an onsite QSR review using the previous instruments and protocols during the 2016-2017 period.*

7. Starting July 1, 2016, circulate to all parties on a monthly basis the most recent data reports of the Central Team;

*ER Finding: The State has implemented this recommendation by circulating monthly reports and it continues to track and report progress towards compliance with CMHA requirements.  However, until this week, the most recent Central Team report was dated November, 2017.  The ER has now received the May, 2018 Central Team report, showing only one new referral since November of 2017.*

8. No later than October 1, 2016, assure that final rules for supportive housing and ACT services are promulgated in accordance with the draft rules developed with input from all parties;

*ER Finding:  The Supported Housing (SH) and ACT rules have been promulgated, and incorporate positive elements resulting from discussions among DHHS staff and representatives of the Plaintiffs.*

9. By October 1, 2016, augment the quarterly data report to include:

- ACT staffing and utilization data for each ACT team, not just for each region.

  *ER Finding:  The State has implemented this recommendation.*

- Discharge destination data and readmission data (at 30, 90, and 180 days) for people discharged from NHH and the other Designated Receiving Facilities (DRFs).

  *ER Finding: The State has now complied with this recommendation.  As with the previous ER report, these data are included in the Quarterly Data Reports, the most recent of which is included as Appendix A of this report.*

- Reporting from the three Mobile Crisis programs, including hospital and ED diversions.

  *ER Finding:  As noted in the prior ER Report, data for the Mobile Crisis Teams and Crisis Apartments has been included in the Quarterly Data Report.*

- Supported housing (SH) data on applications, time until eligibility determination, time on waiting list, reason for ineligibility determination, and utilization of supportive services for those receiving supportive housing.

  *ER Finding:  As of March 2018 DHHS has reported the number of people approved for the Housing Bridge Subsidy Program but on the wait list for funding. DHHS has assured the ER that it intends to supply information on the elapsed time on the waiting list and on the reasons for denials or terminations (if they occur) in the next Quarterly Data Report.  As will be discussed in the Data section of this report, the State also has provided assurances that it will produce data on the receipt of supportive services for those receiving supportive housing.  The ER will continue to closely monitor progress in reporting these essential data elements.*

10. By October 1, 2016, and then by December 1, 2016, factually demonstrate that significant and substantial progress has been made towards meeting the standards and requirements of the CMHA with regard to ACT, SE and placement of individuals with complex medical conditions from Glencliff into integrated community settings.

*ER Finding:  The State remains out of compliance with the ACT standards of the CMHA.  The State has made some progress towards compliance with the Glencliff requirements in the CMHA, but recently the progress has been slower.  More detailed discussions of issues related to ACT and Glencliff Transitions are included in the relevant sections of this report.  The ER notes that the State remains in substantial compliance with the statewide SE penetration rate requirements of the CMHA.  The ER will continue to work with DHHS to document that: (a) SE services are delivered with adequate intensity and duration to meet individuals' needs; and (b) SE services are resulting in integrated, competitive employment. In response to several prior requests, in July, 2018 DHHS produced data on the degree to which SE services are resulting in integrated, competitive employment, and going forward these data will be included  in the Quarterly Data Report.*

11. By October 1, 2016 demonstrate that aggressive executive action has been taken to address the pace and quality of transition planning from NHH and Glencliff through the development of a specific plan to increase the speed and effectiveness of transitions from these facilities.

*ER Finding:  The ER believes that both NHH and Glencliff have evidenced, at a leadership and a staff level, increased efforts and commitment to facilitating timely transitions to integrated community settings, albeit with modest result to date.  Only two people were transitioned from Glencliff to integrated community setting in the past six months.*

## II.    Data

The New Hampshire DHHS continues to make progress in developing and delivering data reports addressing performance in some domains of the CMHA.  Appendix A contains the most recent DHHS Quarterly Data Report (January to March, 2018), incorporating standardized report formats with clear labeling and date ranges for several important areas of CMHA performance.  The capacity to conduct and report longitudinal analyses of trends in certain key indicators of CMHA performance continues to improve.

As noted in the previous ER report, he Quarterly Reports include data from the mobile crisis services in the Concord, Manchester and Nashua Regions; data on discharge destinations from New Hampshire Hospital (NHH), the Designated receiving Facilities (DRFs), and Glencliff; admission, discharge and length of stay data for New Hampshire's DRFs; and some enhanced data on the SH Bridge Subsidy Program.  As of the most recent Quarterly Data Report, data on ACT screening and wait lists has also been included.

As noted in previous ER reports, there continue to be important categories of data that are needed, but not routinely collected and reported, and which will need to be reported in order to accurately evaluate ongoing implementation of the CMHA. Some of these are noted above.

One gap in data is related to people receiving SH under the Housing Bridge Subsidy Program.  As noted in the January 2016 ER Report, DHHS had identified a strategy to link data from the Bridge Subsidy Program to the Phoenix II system.  However, as noted above, these data have not yet been produced.  Further, as of the writing of this report the State has no concrete plan to produce these data.  Without the information above, the ER is

unable to determine whether the State has achieved substantial compliance with the CMHA outcomes and requirements for SH.[1]  Other outstanding data requests include SH data related to waiting lists; and ineligibility determinations, as described in the ER Findings, above.

As noted in several places above, the ER is becoming increasingly concerned with delays in reporting.  DHHS had undergone personnel changes that have impeded timely reporting.  **Nonetheless, it is critical that all data and agreed-upon reports return to a timely delivery schedule immediately.**

## III.  CMHA Services

The following sections of the report address specific service areas and related activities and standards contained in the CMHA.

### Mobile/Crisis and Crisis Apartment Programs

The CMHA calls for the establishment of a MCT and Crisis Apartments in the Concord Region by June 30, 2015 (Section V.C.3(a)).  DHHS conducted a procurement process for this program, and the contract was awarded on June 24, 2015.  Riverbend CMHC was selected to implement the MCT and Crisis Apartments in the Concord Region.

The CMHA specified that a second MCT and Crisis Apartments be established in the Manchester region by June 30, 2016 (V.C.3(b)).  The Mental Health Center of Greater Manchester was selected to implement that program.  Per CMHA V.C.3(c), a third MCT and Crisis Apartment program became operational in the Nashua region on July1, 2017.  The contract for that program was awarded to Harbor Homes in Nashua.

Table I below includes the most recent available information on activities of these three MCT/Crisis Apartment Programs.

---

[1] The ER notes that useful data on services related to SH are gleaned from the QSR reviews.  However, these are not a substitute for system-wide data on the degree to which SH participants are linked to and receiving community mental health and related services.

**Table I**

**Self-Reported Data on Mobile Crisis Services and Crisis Apartment Programs**

| | Concord Jan-March 2018 | Manchester Jan-March 2018 | Nashua Jan-March 2018 |
|---|---|---|---|
| Total unduplicated people served | 507 | 457 | 103 |
| Services provided in response to immediate crisis: | | | |
| • Phone support/triage | 890 | 1332 | 131 |
| • Mobile assessments | 180 | 217 | 54 |
| • Crisis stabilization appointments | 46 | | |
| • Emergency services medication appointments | 45 | 6 | 2 |
| • Office based urgent assessments | 93 | 35 | 0 |
| Services provided after the immediate crisis: | | | |
| • Phone support/triage | 350 | | |
| • Mobile assessments | 46 | Not | Not |
| • Crisis stabilization appointments | 46 | Reported | Reported |
| • Emergency services medication appointments | 28 | | |
| • Office based Urgent Assessments | 93 | | |
| Referral source: | | | |
| • Self | 302 | 385 | 87 |
| • Family | 52 | 85 | 13 |
| • Guardian | 55 | 1 | 0 |
| • Mental health provider | 26 | 17 | 9 |
| • Primary care provider | 13 | 18 | 0 |
| • Hospital emergency department | 6 | 4 | 1 |
| • Police | 15 | 159 | 2 |
| • CMHC Internal | 36 | 68 | 24 |
| • Friend | 12 | 11 | 3 |
| • Other | 65 | 97 | 18 |
| Crisis apartment admissions: | 97 | 9 | 886 |
| • Bed days | 441 | 29 | 8.6 |
| • Average length of stay | 4.5 | 3.2 | |
| Law enforcement involvement | 46 | 159 | 18 |
| Total hospital diversions[2] | 450 | 844 | 130 |

The Quarterly Data Report in Appendix A contains some historical data for the three regional MCT/Crisis Apartment programs.

---

[2] Hospital diversions are instances in which services are provided to individuals in crisis resulting in diversion from being assessed at the ED and/or being admitted to a psychiatric hospital.  DHHS and the MCT providers have developed specific definition of hospital diversions, which will be utilized for future MCT reports.

As noted in the previous report, the number of hospital diversions reported by the MCTs seems disproportionate, given the continued high admission and readmission rates for NHH and the DRFs, and the high number of people waiting on a daily basis for admission to NHH. The ER continues to work with the DHHS to clarify documentation of the numbers and types of hospital diversions that are reported by the MCTs.

DHHS and the three MCT programs have recently formed a working group/learning community to improve MCT/crisis apartment performance. One initial product of this collaboration is a clarified set of definitions of MCT activities and interventions that will result in more accurate and consistent data reporting. For example, the definition of "hospital diversions" has been refined, and future MCT quarterly report data should more accurately reflect hospital diversion results in the three MCT service areas.

DHHS has added questions to the QSR interview guides to elicit information about the quality and effectiveness of the MCTs and Crisis Apartments, and to report on that information in the updated QSR instrument. To date, two of the CMHCs with MCT/Crisis Apartment programs have participated in the revised QSR process. Concord scored above the 70% minimum performance threshold for all three crisis services indicators. Nashua[3] received a 70% or higher score for crisis planning and service delivery, but scored only 36% for adequacy of crisis assessments.

### Assertive Community Treatment (ACT)

ACT is a core element of the CMHA, which specifies, in part:

1. By October 1, 2014, the State will ensure that all of its 11 existing adult ACT teams operate in accordance with the standards set forth in Section V.D.2;
2. By June 30, 2014, the State will ensure that each mental health region has at least one adult ACT team;
3. By June 30, 2016, the State will provide ACT team services consistent with the standards set forth above in Section V.D.2 with the capacity to serve at least 1,500 individuals in the Target Population at any given time; and
4. By June 30, 2017, the State, through its community mental health providers, will identify and maintain a list of all individuals admitted to, or at risk serious risk of being admitted to, NHH and/or Glencliff for whom ACT services are needed but not available, and develop effective regional and statewide plans for providing sufficient ACT services to ensure reasonable access by eligible individuals in the future.

The CMHA requires a robust and effective system of ACT services to be in place throughout the state as of June 30, 2015 (36 months ago). Further, as of June 30, 2016, the State was required to have the capacity to provide ACT to 1,500 priority Target Population individuals.

As displayed in Table II below, the staff capacity of the 12 adult ACT teams in New Hampshire has increased by only 3.95 FTEs since December of 2016. During the same time period, the twelve ACT teams added only 62 average monthly service participants.[4]

---

[3] Note that in Nashua the MCT vendor is Harbor Homes, not the Greater Nashua Mental Health Center.
[4] Because of service participant turnover, the total number of people served across several months and quarters is somewhat higher than the monthly number of service participants.

**Table II**

**Self-Reported ACT Staffing (excluding psychiatry): December 2016 – March 2018**

| Region | FTE Dec-16 | FTE Mar-17 | FTE Jun-17 | FTE Sep-17 | FTE Dec-17 | FTE Mar-18 |
|---|---|---|---|---|---|---|
| Northern | 11.49 | 11.89 | 12.54 | 12.43 | 13.04 | 11.64 |
| West Central | 5.5 | 7.75 | 7.15 | 6.95 | 6.2 | 5 |
| Genesis/LRMHC | 11 | 11 | 10.6 | 10.8 | 9.4 | 5.7 |
| Riverbend | 9 | 10 | 10 | 10 | 10 | 10.25 |
| Monadnock | 7.25 | 6.7 | 8.5 | 7.9 | 7.9 | 8.7 |
| Greater Nashua 1 | 6.25 | 6.25 | 5.25 | 6 | 5 | 5.75 |
| Greater Nashua 2 | 5.25 | 5.25 | 5.25 | 5 | 5 | 5.75 |
| Manchester – CTT | 15.53 | 14.79 | 16.57 | 16.27 | 12.83 | 17.26 |
| Manchester MCST | 21.37 | 21.86 | 21.95 | 22.31 | 19.04 | 19.51 |
| Seacoast Community | 9.53 | 9.53 | 9.53 | 10.53 | 10.53 | 11.53 |
| Partners | 6.85 | 4.08 | 8.53 | 6.73 | 7.85 | 9.75 |
| Center for Life Management | 7.17 | 8.3 | 9.3 | 9.3 | 9.3 | 9.3 |
| Total | 116.19 | 117.4 | 125.17 | 124.22 | 116.09 | 120.14 |

**Table III**

**Self-Reported ACT Caseload (Unique Adult Consumers) by Region in specified Months: December 2016 – March 2018**

| Region | Active Cases Dec-16 | Active Cases Mar-17 | Active Cases Jun-17 | Active Cases Sep-17 | Active Cases Dec-17 | Active Cases Mar-18 |
|---|---|---|---|---|---|---|
| Northern | 104 | 108 | 111 | 113 | 115 | 114 |
| West Central | 32 | 53 | 76 | 68 | 57 | 46 |
| Genesis | 64 | 70 | 74 | 74 | 65 | 64 |
| Riverbend | 73 | 83 | 97 | 87 | 81 | 80 |
| Monadnock | 63 | 64 | 70 | 69 | 53 | 55 |
| Greater Nashua | 74 | 83 | 94 | 98 | 76 | 74 |
| Manchester | 248 | 270 | 292 | 287 | 269 | 277 |
| Seacoast | 65 | 64 | 69 | 67 | 54 | |
| Community Partners | 70 | 67 | 69 | 75 | 64 | 66 |
| Center for Life Management | 47 | 55 | 55 | 54 | 55 | 59 |
| Total* | 839 | 913 | 1,006 | 992 | 881 | 901 |

\* Deduplicated across regions

It is clear from these tables that overall ACT staffing has remained low, and on four teams has actually decreased over the past four reporting periods.  Four of the 12 adult ACT teams continue to have fewer than the 7 - 10 professionals specified for ACT teams in the CMHA.. Four teams now report having no peer specialist on the ACT Team, doubling the number of teams with no peer support staff since the previous report.  Four teams report having at least one FTE peer specialist, but that means that eight of the 12 teams continue to report having less than one FTE peer on the team.  Seven teams have at least 1.0 FTE SE staff, while five  have less than a full time SE specialist. Six teams report having .5 or less FTE combined psychiatry/nurse practitioner time available to their ACT teams[5]; three teams report having 0.5  or less FTE nursing staff on the team; and four of the 12 teams report having less than one FTE nurse per team.  Staff deficiencies, as noted above, render some of the current ACT teams out of compliance with the ACT service requirements in CMHA V.D.2(d) as of the date of the Quarterly Data Report.

The combined ACT teams have a reported March 2018 staff complement of 120.14 FTEs, which is sufficient capacity to serve 1,201 individuals based on the ACT staffing ratios contained in the CMHA. Note that this is a minor increase in staff-based capacity from the previous report. With a statewide caseload of 901 as of March 2018, the existing teams should theoretically be able to accept an additional 300 new ACT clients without additional staff.  Tapping into this unused capacity, with appropriate outreach and targeting, should have an impact on alleviating ED boarding and hospital readmission rates across the state.  Further, the CMHA requires the State to have capacity to serve 1,500 individuals, but the current ACT capacity of 1,201 is 299 below

---

[5] The CMHA specifies at least .5 FTE Psychiatrists for teams with at least 70 active service participants. (CMHA V.D.2(e).  Teams with fewer than 70 clients are technically not out of compliance with this standard.

CMHA criteria.  This is a slightly larger gap between CMHA-required capacity and the current capacity of the 12 ACT teams documented in the ER's December 2017 report.  As noted in previous reports, the current level of ACT staffing is not sufficient to meet CMHA requirements for ACT team capacity.  Furthermore, current ACT enrollment is 599 below utilization levels envisioned in the CMHA.

### ACT Screening

As has been documented in previous reports, the State has been implementing a number of strategies to increase ACT enrollment and participation.  One of these strategies has been to require the ten CMHCs to conduct and report regular clinical screening for eligibility/appropriateness for ACT services,   These clinical screens are conducted:

1.  As part of the intake process at the[6] CMHCs;
2.  Upon referral to a CMHC following discharge from an inpatient facility; and
3.  As part of regular quarterly and annual assessments and plan of care amendments for current CMHC clients (including current active ACT participants) who may qualify for and benefit from ACT.

Table IV below presents data on ACT screens conducted by CMHCs between January and March, 2018.  This is the first reporting period in which these data are available, and it is too early to interpret or draw conclusions from them.  In future reports, the State plans to include data from each CMHC regarding the degree to which screening activity results in actual referrals and admissions to ACT.

---

[6] Note that a CMHC intake incorporating the ACT screen is performed when a CMHC emergency services staff or Mobile Crisis Team encounters and refers a person potentially needing CMHC services.  In some cases these Emergency Services/ MCT referrals are made on behalf of individuals who have presented in crisis in hospital emergency departments and who may be waiting for a NHH admission.

**Table IV**

**Self-Reported Number of Screens for ACT Services Conducted by CMHCs**

**January through March, 2018**

| Community Mental Health Center | January 2018 | February 2018 | March 2018 |
|---|---:|---:|---:|
| 01 Northern Human Services | 157 | 121 | 217 |
| 02 West Central Behavioral Health | 45 | 41 | 85 |
| 03 Lakes Region Mental Health Center | 181 | 250 | 244 |
| 04 Riverbend Community Mental Health Center | 500 | 445 | 598 |
| 05 Monadnock Family Services | 239 | 159 | 226 |
| 06 Community Council of Nashua | 416 | 412 | 534 |
| 07 Mental Health Center of Greater Manchester | 783 | 735 | 690 |
| 08 Seacoast Mental Health Center | 158 | 652 | 435 |
| 09 Community Partners | 207 | 170 | 202 |
| 10 Center for Life Management | 133 | 161 | 151 |
| **Total** | **2,819** | **3,146** | **3,382** |

In addition, the State has begun collecting and reporting data on the number of individuals waiting for ACT services on a statewide basis. This information is displayed in Table V below. An individual eligible for ACT may have to wait for ACT services because the specific ACT team of the individual's CMHC does not currently have staff capacity to accept new clients. The ER has documented above that there is a statewide gap between ACT staff capacity and ACT participation. However, in some CMHC regions new ACT staff must be hired before new ACT clients can be accepted into the program.

**Table V**

**Self-Reported ACT Wait List as of March 31, 2018**

|  | Time on List | | |
|---|---|---|---|
| **Total** | **0-30 days** | **31-60 days** | **61-90 days** |
| 9 | 7 | 2 | 0 |

**Based on the above information, the ER finds that the State remains out of compliance with the ACT service standards described in Section V.D. of the CMHA.  The State does not currently provide a robust and effective system of ACT services throughout the state as required by the CMHA.**

Additionally, the State reports beginning to develop but has yet to finalize a process for identifying all individuals admitted to, or at risk serious risk of being admitted to, NHH and/or Glencliff for whom ACT services are needed but not available, and to develop effective regional and statewide plans for providing sufficient ACT services.  State efforts to address these issues will be a focus of ER monitoring during the up-coming six month period.

As noted in recent ER Reports, the New Hampshire DHHS has taken deliberate action to work with CMHCs in certain Regions to increase their ACT staffing and caseloads.  These actions include: (a) monthly ACT monitoring and technical assistance with DHHS leadership and staff; (b) implementation of a firm schedule for ACT fidelity reviews; (c) incorporating a small increase in ACT funding into the Medicaid rates for CMHCs; (d) active on-site monitoring and technical assistance for CMHCs not yet meeting CMHA ACT standards; and (e) substantial and coordinated efforts to address workforce recruitment and retention.

However, external fidelity reviews for the ten CMHC regions have revealed deficient practices that are not in fidelity with the ACT model.  As of the date of this report the ER has reviewed six QSR reports using the revised instruments.  Five of the six CMHCs covered by these QSR reviews had scores below the 70% performance threshold on the QSR quality indicator related to the fidelity of ACT services.  Quality Improvement Plans (QIPs) have been initiated based on these QSR findings.  .  The State notes, and the ER agrees, that the QSR findings are not a substitute for the ACT fidelity reviews.  Nonetheless, as intended in the design of the QSR, the QSR findings add important documentation of the degree to which ACT participants are benefitting from fidelity ACT services.  Taken together, the fidelity reviews and the QSR findings present reasonable and actionable information related to the quality and effectiveness of ACT services under the CMHA.

The ER continues to review the State's oversight and technical assistance conducted to assure that these QIPs are being properly implemented

DHHS and the CMHCs have been attempting to identify individuals at risk of hospitalization, incarceration or homelessness who might benefit from ACT services.  Individuals boarding in hospital emergency departments

waiting for a psychiatric hospital admission, or who have done so in the recent past, are one important source of potential referrals.  DHHS is attempting to document the extent to which identifying and referring these individuals to CMHCS is: (a) reducing ED boarding episodes and lengths of stay; and (b) resulting in enrollment of new qualified individuals in ACT services.  As noted in the hospital readmission discussion below, almost one-third of all those discharged out of NHH return for readmission within 180 days.  Robust ACT services could help reduce the number of hospital readmissions throughout the state if affected individuals are promptly screened and referred, and their regional ACT teams have the capacity to deliver needed services.

The ER has requested that the State provide a report of the results of these activities.  To date, the only report available addresses internal CMHC screening for ACT (see Table IV above), but does not report on the extent to which referrals from hospital emergency departments or other external sources are resulting in new enrollments in ACT services.

The State has identified workforce recruitment and retention issues as being a major factor limiting the growth and expansion of the ACT teams.  The State has been working collaboratively with the New Hampshire Community Mental Health Association to identify and track workforce gaps and shortages, and to implement a variety of strategies to improve workforce recruitment and retention.  However, as noted above ACT staffing has remained essentially static since December of 2016.  The State reports that new funds, over and above the small rate increases noted above, are currently being made available to assist with increasing ACT staffing.  The impact of this new funding will not be measurable until at least the next ER report in December, 2018.

The ER believes the State, DHHS and many of the CMHCs are making efforts to meet the ACT capacity and fidelity standards of the CMHA.  Despite the continued compliance issues noted above, the ER believes there have been improvements in the quality and effectiveness of ACT services provided in most parts of the state.  Nonetheless, while these improvements are welcome, ***it must be noted that the State is still far from compliance with the ACT standards of the CMHA***.  As with previous reports, the ER expects DHHS and the CMHCs to make use of capacity already available in the system, while at the same time addressing additional capacity and continuing to improve fidelity.

**The ER emphasizes, as in past reports, that it must be the first priority of the State and the CMHCs to focus on: 1) assuring required ACT team composition; 2) utilizing existing ACT team capacity; 3) increasing ACT team capacity; and 4) outreach to and enrollment of new ACT clients.  As noted earlier in this report, the ER expects the State to propose new and expanded strategies for increasing ACT capacity to meet the requirements of the CMHA.  The strategies and related timelines are to be incorporated into the ACT plan and Monthly Progress Report.**

## Supported Employment

Pursuant to the CMHA's SE requirements, the State must accomplish three things: 1) provide SE services in the amount, duration, and intensity to allow individuals the opportunity to work the maximum number of hours in integrated community settings consistent with their individual treatment plans (V.F.1); 2) meet Dartmouth fidelity standards for SE (V.F.1); and 3) meet penetration rate mandates set out in the CMHA.  For example, the CMHA states:  "By June 30, 2017, the State will increase its penetration rate of individuals with SMI receiving supported employment …to 18.6% of eligible individuals with SMI." (Section V.F.2(e)).  In addition, by June 30, 2017 "the State will identify and maintain a list of individuals with SMI who would benefit from supported employment services, but for whom supported employment services are unavailable" and "develop an effective

plan for providing sufficient supported employment services to ensure reasonable access to eligible individuals in the future." (V.F.2(f)).

For this reporting period, the State reports that it has achieved a statewide SE penetration rate of 26.4 percent, 42 percent above the 18.6% penetration rate target specified in the CMHA.  Table VI below shows the SE penetration rates for each of the 10 Regional CMHCs in New Hampshire.

**Table VI**

**Self-Reported CMHC SE Penetration Rates**

| | Penetration Mar-17 | Penetration Jun-17 | Penetration Sep-17 | Penetration Dec-17 | Penetration Mar-18 |
|---|---|---|---|---|---|
| Northern | 32.30% | 37.20% | 40.90% | 39.00% | 38.80% |
| West Central | 23.20% | 22.50% | 22.30% | 25.30% | 26.20% |
| Genesis | 12.60% | 22.00% | 20.70% | 19.10% | 15.40% |
| Riverbend | 15.00% | 14.80% | 14.00% | 13.20% | 12.60% |
| Monadnock | 13.50% | 14.00% | 12.30% | 10.90% | 10.40% |
| Greater Nashua | 15.00% | 16.10% | 17.10% | 16.80% | 14.90% |
| Manchester | 39.80% | 40.00% | 42.00% | 45.30% | 43.50% |
| Seacoast | 14.40% | 19.30% | 23.40% | 28.00% | 30.10% |
| Community Part. | 7.20% | 10.30% | 14.60% | 17.70% | 21.50% |
| Center for Life Man. | 19.70% | 21.60% | 19.20% | 20.00% | 20.90% |
| CMHA Target | 18.60% | 18.60% | 18.60% | 18.60% | 18.60% |
| Statewide Average | 23.20% | 25.30% | 26.40% | 26.70% | 26.40% |

As noted in Table VI, the State has exceeded the statewide CMHA penetration rate in recent reporting periods. In the previous ER report, six of the ten regions fell below required CMHA penetration rates. For this reporting period, four of the ten continue to report penetration rates lower than the CMHA requirement. Each of these four had a slight reduction in penetration from the previous reporting period.

The New Hampshire DHHS is to be commended for continuing its efforts to: (a) measure the fidelity of SE services on a statewide basis; and (b) work with the Regions with penetration rates below CMHA criteria to increase access to and delivery of SE services to target population members in their Regions.   The ER will continue to monitor these issues going forward as the State works with the CMHCs to increase penetration rates to at least 18.6 percent in all regions.

As with ACT services, DHHS has implemented a combination of contract compliance, technical assistance, workforce recruitment and retention, and external fidelity reviews in an attempt to assure sufficient quality and accessibility of SE services statewide.  The QSR does collect information at the service participant level about the degree to which individuals have been effectively assessed for SE services;  are receiving SE services consistent with their individual treatment plans, and/or that SE services are delivered in the amount, duration, and intensity to allow individuals the opportunity to work the maximum number of hours in integrated community settings (V.F.1).

In the six CMHCs for whom new model QSR reports are available, a number of SE performance issues were identified.  For example, for the indicator related to comprehensive employment assessments, five of the six CMHCs scored below the 70% performance threshold.  In the same manner, five of the six CMHCs scored below 70% on the indicator related to the adequacy of employment service delivery.  Three of the CMHCs scored below the 70% threshold on the indicator related to employment treatment planning.  In each case these

findings have resulted in the development of QIPs, and in state technical assistance and monitoring activities designed to improve the quality and effectiveness of SE services.  As with ACT services, the QSR findings are not a substitute for SE fidelity reviews, but they do add to the overall documentation of the degree to which SE services are delivered with quality and effectiveness.  For example, a SE team can be operative a high fidelity, but if individuals are not assessed properly for inclusion in SE services, there could be issues related to matching individual needs and the services available.

The State has initiated reporting requirements in which each CMHC will report on the number and percent of SE participants working in integrated competitive settings.  The first report of these data is not ready for inclusion in this report, but is expected to be included in subsequent Quarterly Data and ER reports.

## Supported Housing

The CMHA requires the State to achieve a target capacity of 450 SH units funded through the Bridge Subsidy Program by June 30, 2016.  As of March, 2018, DHHS reports having 497 individuals in leased SH apartments, and 7 people approved for a subsidy but not yet leased.  The State is in compliance with the CMHA numerical standards for SH effective June 30, 2016, but as is discussed below, not yet in compliance with 2017 CMHA criteria.  Moreover, there has been a steady drop in recent months in SH units occupied or accepted from 591 in June 2017 to 504 in March 2018.

Table VII below summarizes recent data supplied by DHHS related to the Bridge Subsidy Program.

**Table VII**

**New Hampshire DHHS Self-Reported Data on the Bridge Subsidy Program:**

**September 2015 through March 2018**

| Bridge Subsidy Program Information | March 2016 | Sept. 2016 | Dec. 2016 | March 2017 | June 2017 | Sept. 2017 | March 2018 |
|---|---|---|---|---|---|---|---|
| Total people for whom rents are being subsidized | 415 | 451 | 481 | 505 | 545 | 509 | 497 |
| Individuals accepted but waiting to lease | 22 | 28 | 32 | 48 | 46 | 58 | 7 |
| Individuals currently on the wait list for a bridge subsidy[7] | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| Total number served since the inception of the Bridge Subsidy Program | 518 | 603 | 643 | 675 | 701 | 742 | 811 |
| Total number receiving a Housing Choice (Section 8) Voucher | 71 | 83 | 83 | 85 | 85 | 96 | 119 |

---

[7] The State did not maintain a waitlist prior to 2018.

In response to previous requests for information, the State, DHHS is now publishing quarterly reports of the number of Bridge Program applications and terminations (Table VIII) and also the wait list for Bridge Program subsidies (see Table VII above).  These are newly reported data, and no trend analysis is possible at this time.[8]

The State will be reporting on the reasons for application denials or program terminations, if these occur, in the next Quarterly Data Report.  With regard to terminations, Table VII shows that a total of 811 people have been served by the Bridge Subsidy Program since its inception.  119 of these have received Housing Choice Vouchers, and thus have moved off the Bridge Program. That leaves a total of 195 program exits that are potentially not accounted for in the current data. The State asserts that it intends to provide additional data on the reasons for people who have exited the SH program. Table VII below is the first step taken by DHHS to report some of these data.  The ER expects that expanded reporting on these items will begin with the next Quarterly Data report.

**Table VIII**

**Self-Reported Housing Bridge Subsidy Applications and Terminations**

| Measure | January – March 2018 |
|---|---|
| Applications Received | 44 |
| *Point of Contact* | *CMHCs: 43* <br> *NH Hospital: 1* |
| Applications Approved | 10 |
| Applications Denied | 0 |
| *Denial Reasons* | *NA* |
| Applications in Process | 34 |
| Terminations | 0 |
| *Termination Reasons* | *NA* |

The CMHA stipulates that "…all new supported housing …will be scattered-site supported housing, with no more than two units or 10 percent of the units in a multi-unit building with 10 or more units, whichever is greater, and no more than two units in any building with fewer than 10 units known by the State to be occupied by individuals in the Target Population." (V.E.1(b)).  Table IX below displays the reported number of units leased at the same address.

---

[8] It should be noted that Bridge funding for new subsidies was depleted for several months prior to July 1, 2018, which may have disincentivized applications; therefore, the reported application and wait list numbers may not reflect actual demand.

**Table IX**

**Self-Reported Housing Bridge Subsidy Concentration (Density)**

| | Sept. 2015 | March 2016 | June 2016 | Nov. 2016 | Feb. 2017 | May 2017 | Nov. 2017 | Feb 2018 |
|---|---|---|---|---|---|---|---|---|
| Number of properties with one leased SH unit at the same address | 290 | 317 | 325 | 339 | 349 | 367 | 383 | 372 |
| Number of properties with two SH units at the same address | 27 | 22 | 35 | 24 | 23 | 36 | 31 | 35 |
| Number of properties with three SH units at the same address | 2 | 13 | 8 | 13 | 14 | 5 | 6 | 13 |
| Number of properties with four SH units at the same address | 4 | 1 | 1 | 3 | 4 | 4 | 5 | 4 |
| Number of properties with five SH units at the same address | 1 | 2 | 2 | 0 | 0 | 3 | 0 | 1 |
| Number of properties with six SH units at the same address | 1 | 0 | 1 | 1 | 1 | 1 | 0 | 0 |
| Number of properties with seven + SH units at same address | | | | | 0 | 2 | 3 | 2 |

These data show that 95% of the leased units (and 85% of people in SH) are at a unique address or with one additional unit at that address.  This supports a conclusion that the Bridge Subsidy Program, to a large degree, is operating as a scattered-site program.  For the units shown in Table IX at the same address, it is not known at this time whether the unit density standards included in the CMHA are being met.  DHHS is collecting information on the total units in each property where there are two or more Bridge units at the same address,

and this data will be reported when it is made available. The ER expects this information to be available by the time of the next Quarterly Data Report.

It should be noted that these data do not indicate whether any of the leased units are roommate situations, and if so, whether such arrangements meet the requirements of the CMHA (V.E.1(c)).  DHHS reports, and anecdotal information seems to support, that there are very few, if any, roommate situations among the currently leased Bridge Subsidy Program units.[9]

As noted in the Data section of this report, current data is not available on the degree to which Bridge Subsidy Program participants access and utilize support services and whether or not the services are effective and meet individualized needs.  Receipt of services is not a condition of eligibility for a subsidy under the Bridge Program, but the CMHA does specify that "…supported housing includes support services to enable individuals to attain and maintain integrated affordable housing, and includes support services that are flexible and available as needed and desired…." (V.E.1(a)).   As noted in the 2016 and 2017 ER Reports, DHHS has been working on a method to cross-match the Bridge Subsidy Program participant list with the Phoenix II and Medicaid claims data.  This will allow documentation of the degree to which Bridge Subsidy Program participants who are engaged with a CMHC are actually receiving certain mental health or other services and supports.  As noted in the Data section, the ER has not yet received this requested information from the state.  The ER expects that such information will be produced and delivered to the ER no later than July 31, 2018.  The ER will also work with the State to review and analyze QSR data to determine whether or not individuals have experienced improved outcomes after obtaining SH.

The CMHA also states that: "By June 30, 2017 the State will make all reasonable efforts to apply for and obtain HUD funding for an additional 150 supported housing units for a total of 600 supported housing units." (CMHA V.E.3(e))  In 2015 New Hampshire applied for and was awarded funds to develop a total of 191 units of supported housing under the HUD Section 811 Program.  All of these units will be set aside for people with serious mental illness.  As of the date of this report, nine[10] of these new units have been developed and are currently occupied by members of the target population and an additional 69 units are in the development pipeline.  It should be noted that over the life of the Bridge Subsidy Program the State has accessed 119 HUD Housing Choice Vouchers (HCV – Section 8).  These have allowed the State to free up 119 Bridge Subsidy slots for new applicants.  Nonetheless, the current number of SH slots/units is below the 600 figure set out in the CMHA.

In addition, the CMHA states that "By January 1, 2017, the State will identify and maintain a waitlist of all individuals within the Target Population requiring supported housing services, and whenever there are 25 individuals on the waitlist, each of whom has been on the waitlist for more than two months, the State will add program capacity on an ongoing basis sufficient to ensure that no individual waits longer than six months for supported housing." As can be seen in Table VII above, there are currently ten individuals on the wait list for the Bridge Subsidy program. DHHS is not currently reporting the length of time individuals stay on the wait list, but it is expected these data will be available for inclusion in the next Quarterly Data Report.

---

[9] DHHS reports that currently there is one voluntary roommate situation reflected in the above data.

[10] This number likely has increased since the last report.  Revised information was not available at the time this report was prepared.

## Transitions from Institutional to Community Settings

During the past 36 months, the ER has visited both Glencliff and NHH on at least seven separate occasions to meet with staff engaged in transition planning under the new policies and procedures adopted by both facilities late last year.  Transition planning activities related to specific current residents in both facilities have been observed, and a small non-random sample of resident transition records has been reviewed.  Additional discussions have also been held with both line staff and senior clinicians/administrators regarding potential barriers to effective discharge to the most appropriate community settings for residents at both facilities.

The ER has participated in five meetings of the Central Team.  The CMHA required the State to create a Central Team to overcome barriers to discharge from institutional settings to community settings.  The Central Team has now had about 30 months of operational experience, and has started reporting data on its activities.  To date, 42 individuals have been submitted to the Central Team, 27 from Glencliff and 15 from NHH.   Of these, the State reports that 13 individual cases have been resolved[11], two individuals are deceased, and 27 individual cases remain under consideration.  Table X below summarizes the discharge barriers that have been identified by the Central Team with regard to these 22 individuals.   Note that most individuals encounter multiple discharge barriers, resulting in a total higher than the number of individuals reviewed by the Central Team.  It is notable that only one new referral was made to the Central Team since the last report dated November of 2017.

---

[11] Two of these individuals were readmitted to NHH after 90 days, and the discharge dispositions for these two individuals are being reviewed.

**Table X**

**Self-Reported Discharge Barriers for Open Cases Referred from NHH and Glencliff to the Central Team:**

**March 2018[12]**

| Discharge Barriers | Number for Glencliff | Number for NHH |
|---|---|---|
| Legal | 3 (6.3%) | 3 (21.1%) |
| Residential | 16 (33.3%) | 5 (26.3%) |
| Financial | 6 (13.0%) | 3 (15.8%) |
| Clinical | 14 (29.2%) | 3 (15.8%) |
| Family/Guardian | 7 (14.6%) | 2 (10.5%) |
| Other | 2 (4.17%) | 2 (10.5%) |

**Glencliff**

In the time period from October 2017 through March 2018, Glencliff reports that it has admitted 20 individuals, and has had two discharges. The average daily census through this period was 110 people.  There have been no readmissions during this time frame.  The wait list for admission has increased slightly, from 19 people in the previous quarter to 23 people for this quarter.  Two discharges have been effectuated during this period; both of which were to integrated community settings.

CMHA Section VI requires the State to develop effective transition plans for all appropriate residents of NHH and Glencliff and to implement them to enable these individuals to live in integrated community settings.  In addition, Section V.E.3(i) of the CMHA also requires the State by June 30, 2017 to: "…have the capacity to serve in the community [a total of 16][13] individuals with mental illness and complex health care needs residing at Glencliff…."   The CMHA defines these as: "individuals with mental illness and complex health care needs who could not be cost-effectively served in supported housing."[14]

DHHS reports that the total number of people transitioned from Glencliff to integrated settings since the inception of the CMHA three years ago increased this quarter from 14 to 16[15].  There are currently ten individuals undergoing transition planning who could be transitioned to integrated community settings once appropriate living settings and community services become available.  All of these individuals have been assigned to Choices for Independence (CFI) waiver case management agencies.

---

[12] This is a point in time report for open cases.
[13] Cumulative from CMHA V.E.(g), (h), and (i).
[14] CMHA V.E.2(a)
[15] DHHS reports that one individual was transitioned to an integrated community setting in May, 2018, too late to be included in the March 2018 Quarterly Data Report.

DHHS continues to provide information about Glencliff transitions, including clinical summaries, lengths of stay, location and type of community integrated setting, and array of individual services and supports arranged to support them in the integrated community settings. This information is important to monitor the degree to which individuals with complex medical conditions who could not be cost-effectively be served in SH continue to experience transitions to integrated community settings. To protect the confidentiality of individuals transitioned from Glencliff, this person-specific information is not included in the ER reports.

DHHS has implemented action steps to enhance the process of: (a) identifying Glencliff residents wishing to transition to integrated settings; and (b) increasing the capacity, variety and geographic accessibility of integrated community settings and services available to meet the needs of these individuals. Both sets of initiatives are intended to facilitate such community transitions for additional Glencliff residents. Despite these efforts, the frequency of transitions to integrated community settings from Glencliff has reduced in the past year. DHHS is currently working to revise funding procedures and provider related requirements to facilitate new transitions to integrated setting on a timelier basis. The ER will be closely monitoring whether these initiatives result in increased transitions over the next few months.

As noted in the previous report, the ER is at this point reluctant to focus too narrowly on clinical conditions and sets of health, mental health and community services and supports for transitioned and transitioning individuals to monitor the State's progress in assisting Glencliff Home residents to transition to integrated community settings. The ER will monitor the extent to which DHHS, Glencliff, the CMHCs and an array of other community partners collaborate to effectuate as many such transitions as possible over the next two years. The primary thrust and intent of the CMHA is to assure that individuals residing in Glencliff (and their families and guardians) are offered and are willing to accept meaningful opportunities to transition to integrated community settings. It appears likely that the specific requirement in the CMHA for the State to create capacity to serve 16 individuals with complex medical conditions who cannot be cost-effectively served in SH will be attained if DHHS and its partners continue to increase the availability of integrated community settings, and provide meaningful in-reach and transition planning for Glencliff residents.

However, progress towards effectuating transitions to integrated community settings for current Glencliff residents has been slow over the past 12 months. Thus, the ER will continue to monitor the following topics/items going forward:

1. The number of transitions from Glencliff to integrated community settings per quarter. The ER will also monitor information about the clinical and functional level of care needs of these individuals; the integrated settings to which they transition; and the array of Medicaid and non-Medicaid mental health and health-related services and supports put in place to meet their needs to assure successful integrated community living.

2. The number of Glencliff residents newly identified per quarter to engage in transition planning and move towards integrated community settings. The ER will also monitor at a summary level the clinical and functional level of care needs of individuals added to the transition planning list per quarter.

3. New integrated community setting providers with the capacity to facilitate integrated community living for Glencliff residents. These could include EFCs, AFCs, and new small-scale community residential capacity for people with complex medical conditions who cannot be cost-effectively served in supported housing. The ER will monitor DHHS activities and successes relative to identification and engagement of community providers who express willingness and capacity to provide services in integrated community settings for people transitioning from Glencliff.

4. Within the discharge cohort, the number of transitioned individuals for whom the State special funding mechanism is utilized to effectuate the transition, and the ways in which these funds are used to fill gaps in existing services and supports.

5. Number and types of in-reach visits and communications by CMHCs and other community providers related to identifying and facilitating transitions of Glencliff residents to integrated community settings.

6. Specific documentation of efforts to overcome family and/or guardian resistance to integrated community transitions for Glencliff residents.

7. Number of individuals engaged in transition planning referred to the Central Team; number of these individuals who successfully transition to an integrated community setting; and the elapsed time from referral to resolution.

### Preadmission Screening and Resident Review (PASRR)

The State DHHS has provided recent data on PASRR screens for the period May 1, 2018 through May 30, 2018.

The ER was unable to analyze or summarize these data in that same manner as in the previous report.  The ER will work with the State to make sure the data reporting is complete, and to conduct trend analyses referencing the baseline information is the previous report.  The ER will circulate a separate memorandum of this analysis within the next two months.

### New Hampshire Hospital and the Designated Receiving Facilities (DRFs)

For the time period October 2017 through March 2018, DHHS reports that NHH effectuated 406 admissions and 407 discharges.  The mean daily census was 152.5, and the median length of stay for discharges was 13.5 days.

Table XII below compares NHH discharge destination information for the five most recent reporting periods (9/2015 through 3/2018).  The numbers are expressed as percentages because the length of the reporting periods had not previously been consistent, although the type of discharge destination data reported has been consistent throughout.

**Table XII**

**New Hampshire Hospital Self-Reported Data on**

**Discharge Destination**

| Discharge Destination | Percent September 2015 through April 2016 | Percent October and November 2016 | Percent January through March 2017 | Percent April through June 2017 | Percent July through September 2017 | Percent October 2017 through March 2018 |
|---|---|---|---|---|---|---|
| Home – live alone or with others | 80.2% | 85.1% | 84.5% | 85.66% | 88.3% | 81.0% |
| Glencliff | 0.60% | 0.36% | 1.55% | 0,35% | 0.49% | 1.0% |
| Homeless Shelter/motel | 2.7% | 2.54% | 2.71% | 3.5% | 2.94% | 2.5% |
| Group home 5+/DDS supported living, etc. | 3.2% | 1.62% | 5.7% | 5.59% | 3.92% | 7.1% |
| Jail/corrections | 1.4% | 2.9% | 0.8% | 1.05% | 0.49% | 1.7% |
| Nursing home/rehab facility | 0.80% | 3.6% | 1.9% | 3.50% | 2.45% | 2.7% |

The State now consistently reports information on the hospital-based DRFs and The Cypress Center in New Hampshire. It is important to capture the DRF/Cypress Center data and analyze it with NHH and Glencliff data to get a total institutional census across the state for the SMI population. The ER appreciates the State gathering this information. Table XIII summarizes this data.

**Table XIII**

**Self-Reported DRF/APRTP Utilization Data: January 2016 through March 2018**

| | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Total |
|---|---|---|---|---|---|---|
| **Admissions** | | | | | | |
| Jan - March 2016 | 69 | 257 | 46 | 65 | 121 | 558 |
| April - June 2016 | 79 | 205 | 378 | 49 | 92 | 803 |
| July - Sept 2016 | 37 | 207 | 375 | 54 | 114 | 787 |
| April - June 2017 | 60 | 228 | 363 | 52 | 101 | 804 |
| July - September 2017 | NA** | 178 | 363 | 60 | 121 | 722 |
| Oct. - Dec 2017 | 59 | 209 | 358 | 55 | 102 | 783 |
| Jan. - March 2018 | 52 | 240 | 330 | 66 | 100 | 788 |

| | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Total |
|---|---|---|---|---|---|---|
| **Percent involuntary** | | | | | | |
| Jan - March 2016 | 53.70% | 18.70% | NA | 18.50% | 30.60% | 26.20%* |
| April - June 2016 | 55.70% | 24.40% | 20.40% | 4.10% | 48.90% | 25.50% |
| July - Sept 2016 | 43.20% | 29.50% | 18.90% | 13.00% | 44.70% | 26.20% |
| April - June 2017 | 58.30% | 21.50% | 22.00% | 1.00% | 47.50% | 30.06% |
| July - September 2017 | NA** | 25.60% | 25.60% | 11.50% | 50.40% | NA |
| Oct. - Dec 2017 | 49.20% | 30.10% | 23.70% | 12.70% | 50.00% | 30.00% |
| Jan. - March 2018 | 44.20% | 28.30% | 21.50% | 6.10% | 47.00% | 27.00% |

| | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Total |
|---|---|---|---|---|---|---|
| **Average Census** | | | | | | |
| Jan - March 2016 | 7.9 | 14.7 | NA | 19.7 | 18.1 | 60.1* |
| April - June 2016 | 7.8 | 13.2 | 21.4 | 22.5 | 16.9 | 81.8 |
| July - Sept 2016 | 4.5 | 13.6 | 23.2 | 25.6 | 14.5 | 81.4 |
| April - June 2017 | 4.5 | 12 | 30.3 | 29.3 | 10 | 86.1 |
| July - September 2017 | NA** | 12.9 | 29.7 | 29.7 | 12.2 | NA |
| Oct. - Dec 2017 | 10.1 | 12.3 | 27.7 | 32.6 | 16.1 | 19.7 |
| Jan. - March 2018 | 6.7 | 11.6 | 31.7 | 34.6 | 17.5 | 20.4 |

| | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Total |
|---|---|---|---|---|---|---|
| **Discharges** | | | | | | |
| Jan - March 2016 | 76 | 261 | NA | 57 | 122 | 516* |
| April - June 2016 | 78 | 206 | 363 | 51 | 90 | 788 |
| July - Sept 2016 | 35 | 213 | 380 | 64 | 113 | 805 |
| April - June 2017 | 59 | 232 | 365 | 54 | 105 | 815 |
| July - September 2017 | NA** | 243 | 355 | 63 | 121 | NA |
| Oct. - Dec 2017 | 82 | 212 | 359 | 58 | 102 | 813 |

| | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Median |
|---|---|---|---|---|---|---|
| Jan. - March 2018 | 53 | 248 | 326 | 67 | 101 | 795 |

| Mean LOS for Discharges | Franklin | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Median |
|---|---|---|---|---|---|---|
| Jan - March 2016 | 8.6 | 4.2 | NA | 15 | 7.4 | 8.8* |
| April - June 2016 | 6 | 4 | 4 | 28 | 7 | 5 |
| July - Sept 2016 | 7 | 5 | 4 | 24 | 8 | 5 |
| April - June 2017 | 6 | 4 | 5 | 22 | 8 | 9 |
| July - September 2017 | NA** | 4 | 4 | 27 | 7 | NA |
| Oct. - Dec 2017 | 4 | 4 | 5 | 21 | 7 | 5 |
| Jan. - March 2018 | 5 | 4 | 5 | 23 | 7 | 5 |

\*  Does not include Portsmouth

\** Franklin DRF did not report data for the July - September period.

The DRFs should theoretically relieve some of the pressure on NHH for inpatient admissions, and should also reduce the number of people waiting for psychiatric admissions in hospital EDs. However, at this time there has been no substantial reduction in NHH admissions, NHH re-admissions, or the wait list for NHH admissions of people staying in hospital emergency departments.  This could reflect an increased overall demand for inpatient psychiatric care or be a symptom of limited access to community-based mental health services like ACT.

DHHS has recently begun tracking discharge dispositions for people admitted to the DRFs and Cypress Center. Table XIV below provides a summary of these recently reported data.

**Table XIV**

**Cumulative Self-Reported Discharge Dispositions for DRFs in New Hampshire**

**October, 2017 through March, 2018**

| Disposition | Franklin ** | Cypress | Portsmouth | Eliot Geriatric | Eliot Pathways | Total |
|---|---|---|---|---|---|---|
| Home | 126 | 417 | 546 | 29 | 175 | 1,293 |
| NHH | 3 | 1 | 11 | 1 | 6 | 22 |
| Residential Facility/ Assisted Living | 2 | 11 | 0 | 77 | 5 | 95 |
| Other DRF | 1 | 7 | 1 | 0 | 0 | 2 |
| Hospital | 1 | 0 | 0 | 7 | 0 | 7 |
| Death | 0 | 0 | 0 | 9 | 0 | 9 |
| Other or Unknown | 2 | 24 | 124 | 0 | 14 | 164 |

*The Other category for Portsmouth Regional is reported to include shelters, rehab facilities, hotels/motels, friends/families, and unknown.

Based on these self-reported data, 81.2% of the 1592 discharges from DRFs and the Cypress Center are to home.  This is the same as the 81% or greater discharges to home reported by NHH.  6.7% of the total DRF discharges are to residential care or assisted living, which is similar to NHH discharges for this category.  1.4% of the DRF discharges are to NHH, 0.13% is to other DRFs.  10.3% of the total discharges are to the other/unknown category, but 76% of these are accounted for by the Portsmouth DRF.  This might point to an anomaly in the ways facilities use this category in their reports to the state.  The State reports on-going efforts with the DRFs to improve their data reporting.

**Hospital Readmissions**

DHHS is now reporting readmission rates for both NHH and the DRFs.  Table XV below summarizes these data:

**Table XV**

**Self-Reported Readmission Rates for NHH and the DRFs**

**July 2017 through March 2018**

|  | Percent 30 Days | Percent 90 Days | Percent 180 Days |
|---|---|---|---|
| **NHH** |  |  |  |
| 7 to 9/2017 | 9.80% | 21.60% | 27.90% |
| 10 to 12/2107 | 12.8% | 26.1% | 32.8% |
| 1 to 3/2018 | 13.7% | 22.7% | 29.9% |
|  |  |  |  |
| **Franklin** |  |  |  |
| 7 to 9/2017 | NA | NA | NA |
| 10 to 12/2107 | 10.2% | 10.2% | 10.2% |
| 1 to 3/2018 | 0.0% | 0.0% | 1.9% |
|  |  |  |  |
| **Cypress** |  |  |  |
| 7 to 9/2017 | 7.10% | 12.40% | 15.90% |
| 10 to 12/2107 | 12.00% | 18.70% | 24.40% |
| 1 to 3/2018 | 4.20% | 9.60% | 15.80% |
|  |  |  |  |
| **Portsmouth** |  |  |  |
| 7 to 9/2017 | 11.50% | 17.50% | 21.00% |
| 10 to 12/2107 | 8.70% | 13.70% | 17.60% |
| 1 to 3/2018 | 8.80% | 15.50% | 20.60% |
|  |  |  |  |
| **Elliot Pathways** |  |  |  |
| 7 to 9/2017 | 3.30% | 6.60% | 12.40% |
| 10 to 12/2107 | 5.80% | 7.70% | 12.50% |
| 1 to 3/2018 | NA | NA | NA |

\* Elliott Geriatric is no longer included in this report because the reported re-admission rates are always 0.00%

As of the date of this report, the 180-day readmission rate to NHH is substantial, with almost one-third of those discharged returning to NHH within six months.  Based on the data presented in Table XV above, there does not appear to have been significant changes in NHH or DRF re-admission rates since July of 2017.

**Hospital ED Waiting List**

In the previous three reports, the ER has identified the waiting list (hospital ED boarding) for admission to NHH to be an important indicator of overall system performance.  Chart A below displays daily adult admissions delays to NHH for the period July 1, 2016 through May 24, 2018.  Chart B shows the average daily ED waiting list for the same time period.

**Chart A**



**Chart B**



Based on information reported by DHHS and illustrated above, the average number of adults waiting for a NHH inpatient psychiatric bed was 24 per month in FY 2014; 25 per month in FY 2015; and through June of FY 2016 was 28 per month.  For the period September 2017 through May 2018 the average monthly wait list for admission to NHH was 49 adults.  Not surprisingly, as can

DHHS continues to analyze data related to adults boarding in EDs who may have some connection to the mental health system.  DHHS is making these data available to CMHCs on a daily basis, and expects the CMHCs to use these data to identify potential participants for ACT or related services to reduce the risk of hospitalization and support integrated community living.  In future months, DHHS will be receiving

information on the degree to which CMHCs have increased ACT (or other services') participation as a result of these analyses.  The ER plans to include summaries of this information in future reports.  The State, in conjunction with the CMHCs, is conducting targeted outreach to those individuals who may need expanded or enhanced community services so as to minimize or eliminate contact with hospital or institutional settings.

### Family and Peer Supports

#### Family Supports

Per the CMHA, the State has maintained its contract with NAMI New Hampshire for family support services. The ER will arrange for additional NAMI meetings during the next six months.

#### Peer Support Agencies

As noted in the June 30, 2015 ER report, DHHS reported having a total of 15 peer support agency program (PSA) sites, with at least one program site in each of the ten regions.  The State continues to report that all peer support centers meet the CMHA requirement to be open 44 hours per week.  The State reports that those sites have a cumulative total of 2881 members, with an active daily participation rate of 158 people statewide. Membership and active daily participation for the PSAs does not significantly change from reporting period to reporting period.

The CMHA requires the PSAs to be "effective" in helping individuals in managing and coping with the symptoms of their illness, self-advocacy, and identifying and using natural supports.  As noted in previous reports, enhanced efforts to increase active daily participation appear to be warranted for the peer support agency programs.  There continue to be anecdotal reports that some of the CMHCs are making more concerted efforts to refer service participants to the PSAs in their regions.  Increased efforts to communicate and coordinate with PSAs have also been reported.  However, as of the most recent report there has been a slight reduction in active daily participation.

In addition, the ER has received anecdotal information that in some regions of the state, relationships and communications among the CMHCs and the Peer Support Agencies have improved.  Peer Support Agencies are generally reported by CMHCs to be useful sources of employees for ACT and Mobile Crisis and Crisis Apartment services.  However, it must be noted that in two of the CMHC regions that contract with the local PSAs for staff for the ACT teams, there is currently no peer support reported for ACT services.

Finally, CMHCs have verbally stated that the peer operated crisis beds available in several regions are a useful intervention for some CMHC clients at risk of hospitalization.

# IV.  Quality Assurance Systems

As noted in the introduction to this report, the State has made substantial positive progress to implement a comprehensive, reliable and actionable QSR process.  The ER has  participated in four QSR site visits, and is increasingly confident that: (a) the revised instruments and site interview protocols are working well; and (b) the results and findings of the revised QSR instruments and process reflect, to a large degree, the quality standards of the CMHA.

One key improvement in the revised QSR process has been the addition of several Overall Clinical Review (OCR) questions that provide opportunities for the QSR teams to integrate and summarize service participant-level information collected from a variety of information sources.  These new questions include:[16]

1. Is the frequency and intensity of services consistent with the individual's demonstrated need?
2. Are there additional services the individual needs that are not identified in the assessment(s) or the treatment plan?
3. Is the individual receiving all the services s/he needs to ensure health, safety, and welfare?
4. Is the individual receiving adequate services that provide reasonable opportunities to support the individual to achieve independence and integration in the community?
5. Is the individual receiving adequate services to obtain and maintain stable housing?
6. Is the individual receiving adequate services to avoid harms and decrease the incidence of unnecessary hospital contacts and/or institutionalization?
7. Is the individual receiving adequate services to live in the most integrated setting?

Questions have also been embedded in the QSR instruments to more accurately document that: (a) the assessment(s) accurately reflect the individual's strengths, needs and goals; and (b) service delivery approaches and patterns reflect best practices, where applicable.

These types of questions reflect the essence of the QSR process: documenting that individual service participants receive the levels and types of services and supports that assist them to achieve their goals and meet their needs in the most integrated community setting possible.  These questions also directly respond to target population outcomes and quality expectations of the CMHA.  Going forward, responses to these questions are intended to form an important part of the six-month ER reports.

The ER is grateful to both the State and the representatives of the Plaintiffs who have worked long and hard to design and implement a QSR process that will legitimately and accurately reflect the quality and effectiveness of the community mental health system in New Hampshire. This QSR system is a critical element of the CMHA, but in fact it has much broader application and potential long term benefits for the entire mental health system.

As noted earlier in this report, DHHS has been conducting on-site ACT and SE fidelity reviews.  DHHS has engaged the Dartmouth/Hitchcock Center on Evidence Based practices to assist in attaining and assuring fidelity to the evidence based models of ACT and SE.  The Dartmouth/Hitchcock team will also assist on workforce development and training for these and other evidence based practices under the aegis of DHHS and the CMHCs.  This partnership with the nationally respected Dartmouth/Hitchcock Center adds valuable expertise and experienced personnel to facilitate further development and operations of fidelity model ACT and SE in conformance with the CMHA.   Year-to-year comparisons and the CMHCs Quality Improvement Plans have been included in the publication of recent ACT and SE fidelity reviews.  The ER commends DHHS for implementing the comprehensive fidelity review process and its attendant quality improvement and technical assistance activities.

Effective and valid fidelity reviews and consequent training and workforce development activities are essential to DHHS' overall quality management efforts for the community mental health system.  As noted in the previous two ER reports, the QSR and the fidelity reviews mutually support but do not supplant or replace each

---

[16] Note: detailed follow-up questions have not been included in this list.

other.  The QSR, in particular, examines outcomes from a consumer-centric perspective as opposed to an operational or organizational perspective.  It is uniquely positioned to assess the quality, appropriateness and effectiveness of specific ACT and SE services at the individual participant level.  The ER continues to believe that implementation of fidelity-based models of delivery does not necessarily mean that specific service interventions are working well or being delivered with the frequency or intensity required by a participant's individual treatment plan   The revised QSR instruments and protocols address many of these concerns.  In combination, the fidelity reviews and the QSR can mutually support conclusions about the overall quality and effectiveness of the mental health system consistent with the CMHA.

The ER will continue to monitor the degree to which the QSR process produces reliable information on individual outcomes and the quality of CMHA service delivery.  In addition, over the next six months, the ER will evaluate the extent to which CMHC Quality Improvement Plans developed as part of the 2017-2018 QSR site visits are resulting in recommended practice changes and improved outcomes for those in the target population.

The ER and the Parties to the CMHA have discussed how the QSR and external fidelity reviews can be used to measure compliance with the CMHA, including both the appropriate standard for compliance and the specific provisions of the QSR and fidelity reviews that would be used to assess compliance.  These discussions are on-going, and the ER supports the collaborative efforts of both the State and the representatives of the Plaintiffs.  The ER intends to employ both the QSR and the fidelity reviews as tools to assess individual outcomes, analyze system performance, and ultimately measure compliance with the CMHA.

## V.    New State Resources

In New Hampshire the Governor and the Legislature have evidenced increased support for implementation of the CMHA and for making continued improvement in the community mental health system.  Table XVI below summarizes new resources appropriated for the current biennium.

**Table XVI**

**New Mental Health Resources in New Hampshire for SFY 2018 and 2019**

| Item | SFY 2018 | SFY 2019 | Total |
|---|---|---|---|
| **Transitional Housing / Community Residence Beds**:  adds 20 beds in SFY 2018 and up to 20 more in SFY 2019; prioritized to support New Hampshire Hospital discharges. | $2,312,156 | $5,424,000 | $7,736,156 |
| **Mobile Crisis:**  funds additional crisis response capacity in area with high numbers of New Hampshire Hospital admissions and discharges.[17] | $1,498,551 | $3,421,696 | $4,920,247 |
| **Designated Receiving Facility (DRF) Beds:**  adds up to 20 additional DRF beds[18]. | $ 484,696 | $ 721,440 | $1,206,136 |
| **Additional Funding:** to support workforce development. | $1,500,000 | $1,500,000 | $3,000,000 |
| | | **Biennium Total** | **$16,862,539** |

In addition, a total of $4.3 million has been added to the Mental Health rate cells of the Medicaid capitation rates of the Managed Care Entities (MCEs) for the up-coming biennium in anticipation of increased utilization associated with the CMHA.  An additional $2.0 million is available for inclusion in these rates after all CMHA services (excluding fee-for-service services) have been implemented.  In addition, an additional $471,186 for general mental health services has been added to the CMHC state contracts.  This is exclusive of the separate Mobile/Crisis Team contracts.

It should be noted that the crisis model currently envisioned by the State under this new appropriation is not a replica of the model implemented under the CMHA in the Concord, Manchester and Nashua Regions.  The model currently being procured will be called a Behavioral Health Crisis Treatment Center (BHCTC), which is intended to provide center-based (as opposed to mobile) crisis services 24/7.  Services will include crisis assessments and treatment, and service participants may include people with substance use disorders.  A contract award has not yet been made for this BHCTC service, and thus a detailed scope of work and implementation schedule is not yet available.

---

[17] The State reports that no providers expressed interest in operating a new mobile crisis team, and thus has issued an RFP for a site-based Behavioral Health Crisis Treatment Center, as discussed below.

[18] The State reports that no providers expressed interest in operating new or expanded DRF beds, and thus $500,000 of these funds are being allocated to SH.

However, it is notable that this new BHCTC service may operate in a region *in lieu of* the mobile crisis teams and crisis apartments developed under the CMHA. The ER notes that the State has already developed the three MCT/Crisis Apartment programs required by the CMHA. However, CMHA V.C.3(d) also directs that the State shall maintain its current crisis services, or implement mobile crisis teams, in all other regions. While community-based crisis centers have been effective in some other states, those centers are typically integrated into a larger crisis service system, which includes mobile capacity and apartment settings, and are not operated as stand-alone settings. In New Hampshire, it is the mobile crisis team and crisis apartment model that has a demonstrated record of diverting individuals with mental illness from hospital emergency rooms. The ER is not aware of evidence that requiring individuals in crisis to present themselves for center-based crisis services is likely to achieve the same volume of hospital diversions for members of the target population. The ER is also not aware of evidence that it is easier for individuals in rural areas with limited transportation resources to present at a centralized crisis facility as opposed to having crisis teams go to the location most convenient and natural for individuals in crisis. It is not clear whether the BHCTC will be effective in reducing unnecessary hospitalizations for members of the Target Population or contribute to the goals of the CMHA.

The ER also notes that the transitional housing funding listed above is not intended to be included under the aegis of the CMHA. Twenty of these transitional housing units have been occupied, 14 in the greater Nashua area, and six in central New Hampshire. DHHS reports that all 20 of these units have been occupied by long stay patients from NHH. These placements, although not directly contributing to the CMHA, nonetheless provide a potentially valuable resource to reduce long stays in NHH. They may also reduce certain barriers that have prevented integrated community placements in supportive housing.

# VI.   Summary of Expert Reviewer Observations and Priorities

The CMHA and ER have now been in place for four years. Within that time frame, the ER has expressed escalating concerns related to noncompliance with CMHA requirements governing ACT and Glencliff community transitions.[19] In addition, the ER has noted long elapsed times and/or delays related to implementation of system improvements or Data reporting. Throughout these reports, the ER has emphasized the need for the State to be more aggressive, assertive, planful, and timely in its implementation and oversight efforts in these areas in order to come into compliance with the CMHA.

More recently the ER has reported that the State is improving its oversight and management of the mental health system. Examples include more comprehensive and accurate data reporting, the revised QSR process, and the growing use of state-validated fidelity reviews for ACT and SE. The QIPs that result from QSR and QIP activities are an improved tool for State-directed technical assistance and monitoring of CMHCs to assure improved quality and effectiveness of services for the CMHA target population.

Despite the management and service delivery improvements noted in this report, the ER remains seriously concerned about compliance with the CMHA standards and requirements related to ACT services. **For the last two years the ER has reported that the State is out of compliance with the ACT requirements of the Sections V.D.3(a, b, d, and e), which together require that all ACT teams meet the standards of the**

---

[19] The State reports effectuating 16 placements to integrated community settings since the inception of the CMHA. The ER and the parties remain in discussions with regard to whether these transitions meet all the criteria in the CMHA. Pending resolution of those discussions, the ER intended to keep Glencliff Transitions high on the compliance monitoring priority list.

**CMHA; that each mental health region have at least one adult ACT Team[20]; and that by June 30, 2016, the State provide ACT services that conform to CMHA requirements and have the capacity to serve at least 1,500 people in the Target Population at any given time.**

Despite the many positive initiatives and management efforts undertaken by the State, ACT capacity remains substantially below the required June 30, 2016 capacity to serve 1,500 people at any given time.  Moreover, with an active caseload of only 901 people, the state currently is providing 599 fewer people with ACT than could be served if the State had developed the CMHA-specified capacity to serve 1,500 individuals. With the current ACT staff capacity to serve 1,201 people, there are 300 fewer people receiving ACT than the current ACT system could accommodate.  ***This continues to be the single most significant issue in New Hampshire with regard to compliance with the CMHA, and one with negative implications for individuals who remain in NHH, who continue to be readmitted to EDs and inpatient facilities, or who are otherwise at risk of admission, homelessness, or incarceration due to inadequate community supports.  As stated earlier in the ACT discussion and ER Findings sections of this report, the ER recommends, and at the Court's request will make himself available for, a meeting during the next three months with Judge McAuliffe.***

In addition to the focus on ACT services for the target population, the ER intends to concentrate on the following priority CMHA compliance issues during the up-coming six month reporting period:

1. Documenting the receipt, circulation and interpretation of the new data reports as specified in the body of this report;
2. Completing an analysis and report of recent PASRR data;
3. Documenting the timeliness and completeness of all data reporting related to the CMHA;
4. Monitoring of implementation of QIPs, particularly as they address issues related to ACT and SE;
5. Monitoring of transitions from Glencliff to integrated community settings, particularly with regard to implementation of revised rules and financing procedures intended to engage new community provider capacity and facilitate individual transitions;
6. Continuing to assess the quality and effectiveness of CMHA services, including whether ACT and SE services are delivered with the intensity and duration necessary to meet individual's needs; and
7. Continuing discussions with all Parties to the CMHA regarding the use of QSR and fidelity review findings to document compliance with the standards and requirements of the CMHA.

---

[20] The ER notes that each region of the state has had at least one ACT team, or ACT team-in-development, since the inception of the CMHA.  However, as documented in the ACT section of this report, four regions continue to have ACT teams that do not meet the minimum staffing requirements for ACT as specified in the CMHA.

**Appendix A**

**New Hampshire Community Mental Health Agreement**

*State's Quarterly Data Report*

*January through March 2018*

January – March 2018



# New Hampshire Community Mental Health Agreement

# Quarterly Data Report

*January to March 2018*

January – March 2018

New Hampshire Department of Health and Human Services

Office of Quality Assurance and Improvement

June 13, 2018

# Community Mental Health Agreement Quarterly Report

**New Hampshire Department of Health and Human Services**

**Publication Date:  6/13/2018**

*The Department of Health and Human Services' Mission is to join communities and families*
*in providing opportunities for citizens to achieve health and independence*

January – March 2018

**Reporting Period:  1/1/2018 –  3/31/2018**

## Notes for Quarter

- Added Table 1b, ACT Screening.

- Added Table 1c, ACT Waiting List.

- Added Table 9a, Housing Bridge Subsidy Applications and Terminations.

- Added Waiting List to Table 9b, Housing Bridge Subsidy Census.

- Table 9b. Housing Bridge Subsidy Current Census was revised to better reflect program census.

- Certain DRF data and the quarterly unduplicated count of Riverbend's Mobile Crisis service users are not yet available for the quarter.  These data will be included in the next quarterly report.

**1a. Community Mental Health Center Services:  Unique Count of Adult Assertive Community** Treatment Consumers

| Community Mental Health Center | January 2018 | February 2018 | March 2018 | Unique Consumers in Quarter | Unique Consumers in Prior Quarter |
|---|---|---|---|---|---|
| 01 Northern Human Services | 115 | 114 | 114 | 121 | 120 |
| 02 West Central Behavioral Health | 55 | 44 | 46 | 67 | 68 |
| 03 Lakes Region Mental Health Center | 67 | 64 | 64 | 68 | 70 |
| 04 Riverbend Community Mental Health Center | 68 | 75 | 80 | 83 | 85 |
| 05 Monadnock Family Services | 58 | 48 | 55 | 58 | 57 |
| 06 Community Council of Nashua | 80 | 78 | 74 | 94 | 95 |
| 07 Mental Health Center of Greater Manchester | 267 | 272 | 277 | 289 | 294 |
| 08 Seacoast Mental Health Center | 68 | 66 | 66 | 70 | 68 |
| 09 Community Partners | 64 | 66 | 66 | 68 | 69 |
| 10 Center for Life Management | 56 | 54 | 59 | 58 | 57 |
| **Total** | **897** | **879** | **901** | **971** | **981** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 5/22/18; consumers are counted only one time regardless of how many services they receive.*

### 1b. Community Mental Health Center Services:  Assertive Community Treatment Screening

| Community Mental Health Center | January 2018 | February 2018 | March 2018 |
|---|---:|---:|---:|
| 01 Northern Human Services | 157 | 121 | 217 |
| 02 West Central Behavioral Health | 45 | 41 | 85 |
| 03 Lakes Region Mental Health Center | 181 | 250 | 244 |
| 04 Riverbend Community Mental Health Center | 500 | 445 | 598 |
| 05 Monadnock Family Services | 239 | 159 | 226 |
| 06 Community Council of Nashua | 416 | 412 | 534 |
| 07 Mental Health Center of Greater Manchester | 783 | 735 | 690 |
| 08 Seacoast Mental Health Center | 158 | 652 | 435 |
| 09 Community Partners | 207 | 170 | 202 |
| 10 Center for Life Management | 133 | 161 | 151 |

| Total | 2,819 | 3,146 | 3,382 |
|---|---|---|---|

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 6/12/18; NA=Not available from data submitter at time of reporting, will be included in next report*

**1c. Community Mental Health Center Services:  Assertive Community Treatment Waiting List**

| As of 3/31/18 | | | |
|---|---|---|---|
| | **Time on List** | | |
| **Total** | **0-30 days** | **31-60 days** | **61-90 days** |
| 9 | 7 | 2 | 0 |

*Revisions to Prior Period:  None*

*Data Source:  BMHS Report*

*Notes:  Data extracted 5/22/18*

**2a. Community Mental Health Center Services:  Assertive Community Treatment Staffing Full Time Equivalents**

| Community Mental Health Center | March 2018 | December 2017 |
|---|---|---|

| | Nurse | Clinician/or Equivalent | Support Worker | Peer Specialist | (Excluding Psychiatry) | Psychiatrist/Nurse Practitioner | (Excluding Psychiatry) | Psychiatrist/Nurse Practitioner |
|---|---|---|---|---|---|---|---|---|
| 01 Northern Human Services | 1.09 | 1.00 | 9.00 | 0.55 | 11.64 | 0.75 | 13.04 | 0.75 |
| 02 West Central Behavioral Health | 0.60 | 2.55 | 1.65 | 0.20 | 5.00 | 0.45 | 6.20 | 0.64 |
| 03 Lakes Region Mental Health Center | 1.00 | 0.00 | 3.70 | 1.00 | 5.70 | 0.75 | 9.40 | 0.75 |
| 04 Riverbend Community Mental Health Center | 0.50 | 3.00 | 6.00 | 0.75 | 10.25 | 0.48 | 10.00 | 0.48 |
| 05 Monadnock Family Services | 1.25 | 3.25 | 3.10 | 1.10 | 8.70 | 0.65 | 7.90 | 0.65 |
| 06 Community Council of Nashua 1 | 0.50 | 3.00 | 2.25 | 0.00 | 5.75 | 0.50 | 5.00 | 0.25 |
| 06 Community Council of Nashua 2 | 0.50 | 4.00 | 1.25 | 0.00 | 5.75 | 0.25 | 5.00 | 0.25 |
| 07 Mental Health Center of Greater Manchester-CTT | 1.50 | 10.00 | 5.76 | 0.00 | 17.26 | 0.63 | 12.83 | 0.63 |
| 07 Mental Health Center of Greater Manchester-MCST | 1.50 | 9.00 | 9.01 | 0.00 | 19.51 | 0.63 | 19.04 | 0.63 |
| 08 Seacoast Mental Health Center | 1.43 | 3.10 | 6.00 | 1.00 | 11.53 | 0.60 | 10.53 | 0.60 |
| 09 Community Partners | 1.00 | 2.00 | 6.25 | 0.50 | 9.75 | 0.50 | 7.85 | 0.50 |
| 10 Center for Life Management | 1.00 | 2.00 | 5.30 | 1.00 | 9.30 | 0.40 | 9.30 | 0.40 |

| Total | 11.87 | 42.90 | 59.27 | 6.10 | 120.14 | 6.59 | 116.09 | 6.53 |
|-------|-------|-------|-------|------|--------|------|--------|------|

**2b. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Substance Use Disorder Treatment**

| Community Mental Health Center | March 2018 | December 2017 |
|---|---|---|
| 01 Northern Human Services | 3.65 | 2.05 |
| 02 West Central Behavioral Health | 0.35 | 0.35 |
| 03 Lakes Region Mental Health Center | 2.65 | 3.15 |
| 04 Riverbend Community Mental Health Center | 1.48 | 1.48 |
| 05 Monadnock Family Services | 2.40 | 2.40 |
| 06 Community Council of Nashua 1 | 4.50 | 3.00 |
| 06 Community Council of Nashua 2 | 3.00 | 3.00 |
| 07 Mental Health Center of Greater Manchester-CCT | 14.60 | 12.60 |
| 07 Mental Health Center of Greater Manchester-MCST | 1.00 | 2.00 |
| 08 Seacoast Mental Health Center | 3.00 | 2.00 |
| 09 Community Partners | 3.00 | 2.00 |
| 10 Center for Life Management | 3.00 | 3.00 |

| Total | 42.63 | 37.03 |
|-------|-------|-------|

**2c. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Housing Assistance**

| Community Mental Health Center | March 2018 | December 2017 |
|---|---|---|
| 01 Northern Human Services | 9.30 | 10.70 |
| 02 West Central Behavioral Health | 4.25 | 5.35 |
| 03 Lakes Region Mental Health Center | 4.70 | 7.20 |
| 04 Riverbend Community Mental Health Center | 8.50 | 8.50 |
| 05 Monadnock Family Services | 1.00 | 1.00 |
| 06 Community Council of Nashua 1 | 3.00 | 4.00 |
| 06 Community Council of Nashua 2 | 5.00 | 4.00 |
| 07 Mental Health Center of Greater Manchester-CCT | 14.92 | 11.98 |
| 07 Mental Health Center of Greater Manchester-MCST | 16.17 | 16.54 |
| 08 Seacoast Mental Health Center | 5.00 | 6.00 |
| 09 Community Partners | 7.00 | 3.00 |
| 10 Center for Life Management | 7.00 | 7.00 |

| Total | 85.84 | 85.27 |

**2d. Community Mental Health Center Services:  Assertive Community Treatment Staffing Competencies, Supported Employment**

| Community Mental Health Center | March 2018 | December 2017 |
|---|---|---|
| 01 Northern Human Services | 1.25 | 2.00 |
| 02 West Central Behavioral Health | 0.40 | 0.15 |
| 03 Lakes Region Mental Health Center | 3.00 | 3.90 |
| 04 Riverbend Community Mental Health Center | 0.50 | 0.50 |
| 05 Monadnock Family Services | 1.00 | 0.00 |
| 06 Community Council of Nashua 1 | 2.25 | 1.50 |
| 06 Community Council of Nashua 2 | 0.25 | 0.50 |
| 07 Mental Health Center of Greater Manchester-CCT | 1.50 | 1.00 |
| 07 Mental Health Center of Greater Manchester-MCST | 2.05 | 1.20 |
| 08 Seacoast Mental Health Center | 1.00 | 1.00 |
| 09 Community Partners | 0.15 | 0.15 |
| 10 Center for Life Management | 0.30 | 0.30 |

| Total | 13.65 | 12.20 |
|---|---|---|

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Mental Health CMHC ACT Staffing Census Based on CMHC self-report*

*Notes:  Data compiled 5/1/18; for 2b-d:  the Staff Competency values reflect the sum of FTEs trained to provide each service type. These numbers are not a reflection of the services delivered, rather the quantity of staff available to provide each service. If staff is trained to provide multiple service types, their entire FTE value will be credited to each service type.*

**3. Community Mental Health Center Services:  Annual Adult Supported Employment Penetration Rates for Prior 12 Month Period**

| Community Mental Health Center | 12 Month Period Ending March 2018 | | | Penetration Rate for Period Ending December 2017 |
|---|---|---|---|---|
| | Supported Employment Consumers | Total Eligible Consumers | Penetration Rate | |
| 01 Northern Human Services | 483 | 1,244 | 38.8% | 39.0% |
| 02 West Central Behavioral Health | 199 | 759 | 26.2% | 25.3% |
| 03 Lakes Region Mental Health Center | 203 | 1,320 | 15.4% | 19.1% |
| 04 Riverbend Community Mental Health Center | 226 | 1,788 | 12.6% | 13.2% |
| 05 Monadnock Family Services | 99 | 954 | 10.4% | 10.9% |
| 06 Community Council of Nashua | 258 | 1,735 | 14.9% | 16.8% |
| 07 Mental Health Center of Greater Manchester | 1,433 | 3,292 | 43.5% | 43.5% |
| 08 Seacoast Mental Health Center | 471 | 1,565 | 30.1% | 28.0% |
| 09 Community Partners | 159 | 741 | 21.5% | 17.7% |
| 10 Center for Life Management | 194 | 930 | 20.9% | 20.0% |
| **Deduplicated Total** | **3,717** | **14,059** | **26.4%** | **26.7%** |

*Revisions to Prior Period:  None*

*Data Source:  NH Phoenix 2*

*Notes:  Data extracted 5/22/18; consumers are counted only one time regardless of how many services they receive.  Riverbend non-billable services are currently not available so are not included in this report.*

### 4a. New Hampshire Hospital:  Adult Census Summary

| Measure | January – March 2018 | October – December 2017 |
|---|---|---|
| Admissions | 211 | 195 |
| Mean Daily Census | 153 | 152 |
| Discharges | 207 | 200 |
| Median Length of Stay in Days for Discharges | 14 | 13 |
| Deaths | 1 | 0 |

*Revisions to Prior Period:  None.*

*Data Source:  Avatar*

*Notes 4a:  Data extracted 5/23/18; Mean Daily Census includes patients on leave and is rounded to nearest whole number*

**4b. New Hampshire Hospital:  Discharge Location for Adults**

| Discharge Location | January – March 2018 | October – December 2017 |
|---|---:|---:|
| Home - Lives with Others | 90 | 89 |
| Home - Lives Alone | 68 | 82 |
| CMHC Group Home | 13 | 6 |
| Private Group Home | 4 | 6 |
| Nursing Home | 2 | 3 |
| Hotel-Motel | 1 | 1 |
| Homeless Shelter/ No Permanent Home | 5 | 3 |
| Discharge/Transfer to IP Rehab Facility | 4 | 2 |
| Secure Psychiatric Unit - SPU | 1 | 0 |
| Peer Support Housing | 1 | 2 |
| Jail or Correctional Facility | 5 | 2 |
| Glencliff Home for the Elderly | 3 | 1 |
| Other | 5 | 0 |
| Unknown | 4 | 3 |

**4c. New Hampshire Hospital:  Readmission Rates for Adults**

| Measure | January – March 2018 | October – December 2017 |
|---|---|---|
| 30 Days | 13.7% (29) | 12.8% (25) |
| 90 Days | 22.7% (48) | 26.1% (51) |
| 180 Days | 29.9% (63) | 32.8% (64) |

*Revisions to Prior Period:  None.*

*Data Source:  Avatar*

*Notes 4b-c:  Data compiled 5/23/18; readmission rates calculated by looking back in time from admissions in study quarter.  90 and 180 day readmissions lookback period includes readmissions from the shorter period (e.g., 180 day includes the 90 and 30 day readmissions); patients are counted multiple times for each readmission; number in parentheses is the number of readmissions*

**5a. Designated Receiving Facilities:  Admissions for Adults**

| Designated Receiving Facility | January – March 2018 | | |
| --- | --- | --- | --- |
| | **Involuntary Admissions** | **Voluntary Admissions** | **Total Admissions** |
| Franklin | 23 | 29 | 52 |
| Cypress Center | 68 | 172 | 240 |
| Portsmouth | 71 | 259 | 330 |
| Elliot Geriatric Psychiatric Unit | 4 | 62 | 66 |
| Elliot Pathways | 47 | 53 | 100 |
| **Total** | **213** | **575** | **788** |
| Designated Receiving Facility | October – December 2017 | | |
| | **Involuntary Admissions** | **Voluntary Admissions** | **Total Admissions** |
| Franklin | 29 | 30 | 59 |
| Cypress Center | 63 | 146 | 209 |
| Portsmouth | 85 | 273 | 358 |
| Elliot Geriatric Psychiatric Unit | 7 | 48 | 55 |
| Elliot Pathways | 51 | 51 | 102 |

| | | | |
|---|---|---|---|
| **Total** | **235** | **548** | **783** |

## 5b. Designated Receiving Facilities:  Mean Daily Census for Adults

| Designated Receiving Facility | January – March 2018 | October – December 2017 |
|---|---|---|
| Franklin | 6.7 | 10.1 |
| Cypress Center | 11.6 | 12.3 |
| Portsmouth | 32.5 | 27.7 |
| Elliot Geriatric Psychiatric Unit | 34.6 | 32.6 |
| Elliot Pathways | NA | 16.1 |
| **Total** | NA | 19.7 |

**5c. Designated Receiving Facilities:  Discharges for Adults**

| Designated Receiving Facility | January – March 2018 | October – December 2017 |
|---|---:|---:|
| Franklin | 53 | 82 |
| Manchester (Cypress Center) | 248 | 212 |
| Portsmouth | 326 | 359 |
| Elliot Geriatric Psychiatric Unit | 67 | 58 |
| Elliot Pathways | 101 | 102 |
| **Total** | **795** | **813** |

**5d. Designated Receiving Facilities:  Median Length of Stay in Days for Discharges for Adults**

| Designated Receiving Facility | January – March 2018 | October – December 2017 |
|---|---:|---:|
| Franklin | 5 | 4 |
| Manchester (Cypress Center) | 4 | 4 |
| Portsmouth | 5 | 5 |
| Elliot Geriatric Psychiatric Unit | 23 | 21 |
| Elliot Pathways | 7 | 7 |

| Total | 5 | 5 |
|---|---|---|

## 5e. Designated Receiving Facilities: Discharge Location for Adults

| Designated Receiving Facility | January – March 2018 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Assisted Living/Group Home | Deceased | DRF | Home | Other Hospital | NH Hospital | Other |
| Franklin | 2 | 0 | 1 | 48 | 0 | 1 | 1 |
| Manchester (Cypress Center) | 4 | 0 | 2 | 232 | 0 | 0 | 10 |
| Portsmouth Regional Hospital | 0 | 0 | 1 | 266 | 0 | 10 | 46 |
| Elliot Geriatric Psychiatric Unit | 42 | 2 | 0 | 17 | 4 | 0 | 0 |
| Elliot Pathways | 1 | 0 | 0 | 90 | 0 | 3 | 6 |
| **Total** | **49** | **2** | **4** | **653** | **4** | **14** | **63** |
| Designated Receiving Facility | October – December 2017 | | | | | | |
| | Assisted Living/Group Home | Deceased | DRF | Home | Other Hospital | NH Hospital | Other |
| Franklin | 0 | 0 | 0 | 78 | 1 | 2 | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Manchester (Cypress Center) | 7 | 0 | 5 | 185 | 0 | 1 | 14 |
| Portsmouth Regional Hospital | 0 | 0 | 0 | 280 | 0 | 1 | 78 |
| Elliot Geriatric Psychiatric Unit | 35 | 7 | 0 | 12 | 3 | 1 | 0 |
| Elliot Pathways | 4 | 0 | 0 | 85 | 0 | 3 | 8 |
| **Total** | **46** | **7** | **5** | **640** | **4** | **8** | **101** |

*Dispositions to 'DRF' represent a change in legal status from Voluntary to Involuntary within the DRF.*

### 5f. Designated Receiving Facilities:  Readmission Rates for Adults

| | January – March 2018 | | |
|---|---|---|---|
| **Designated Receiving Facility** | **30 Days** | **90 Days** | **180 Days** |
| Franklin | 0% (0) | 0% (0) | 1.9% (1) |
| Manchester (Cypress Center) | 4.2% (10) | 9.6% (23) | 15.8% (38) |
| Portsmouth | 8.8% (29) | 15.5% (51) | 20.6% (68) |
| Elliot Geriatric Psychiatric Unit | 0% (0) | 0% (0) | 0% (0) |
| Elliot Pathways | NA | NA | NA |
| **Total** | NA | NA | NA |

| Designated Receiving Facility | October – December 2017 | | |
| --- | --- | --- | --- |
| | **30 Days** | **90 Days** | **180 Days** |
| Franklin | 10.2% (6) | 10.2% (6) | 10.2% (6) |
| Manchester (Cypress Center) | 12.0% (25) | 18.7% (39) | 24.4% (51) |
| Portsmouth | 8.7% (31) | 13.7% (49) | 17.6% (63) |
| Elliot Geriatric Psychiatric Unit | 0% (0) | 0% (0) | 0% (0) |
| Elliot Pathways | 5.8% (6) | 7.7% (8) | 12.5% (13) |
| **Total** | **8.7% (68)** | **13% (102)** | **16.9% (133)** |

*Revisions to Prior Period:  None.*

*Data Source:  NH DRF Database*

*Notes:  Data compiled 6/11/18; NA=Not available from data submitter at time of reporting, will be included in next report.*

*Discharge location of "DRF" are patients discharged back to the same DRF for a different level of care within the DRF; readmission rates calculated by looking back in time from admissions in study quarter; patients are counted multiple times for each readmission; number in parentheses is the number of readmissions*

**6. Glencliff Home:  Census Summary**

| Measure | January – March 2018 | October – December 2017 |
|---|---|---|
| Admissions | 12 | 8 |
| Average Daily Census | 112 | 108 |
| Discharges | 1 (1-Supported Apartment) | 1 (1-medical model group home) |
| Individual Lengths of Stay in Days for Discharges | 426 | 274 |
| Deaths | 3 | 3 |
| Readmissions | 0 | 0 |
| Mean Overall Admission Waitlist | 23 (13 Active) | 19 (13 Active) |

*Revisions to Prior Period:  None.*

*Data Source:  Glencliff Home*

*Notes:  Data Compiled 4/4/18; means rounded to nearest whole number; Active waitlist patients have been reviewed for admission and are awaiting admission pending finalization of paperwork and other steps immediate to admission.*

**7. NH Mental Health Consumer Peer Support Agencies:  Census Summary**

| Peer Support Agency | January – March 2018 | | October – December 2017 | |
|---|---|---|---|---|
| | Total Members | Average Daily Visits | Total Members | Average Daily Visits |
| **Alternative Life Center Total** | **567** | **47** | **532** | **46** |
| *Conway* | 191 | 14 | 189 | 15 |
| *Berlin* | 116 | 10 | 102 | 10 |
| *Littleton* | 153 | 10 | 141 | 8 |
| *Colebrook* | 107 | 13 | 100 | 13 |
| **Stepping Stone Total** | **405** | **16** | **386** | **18** |
| *Claremont* | 319 | 11 | 308 | 12 |
| *Lebanon* | 86 | 5 | 78 | 6 |
| **Cornerbridge Total** | **327** | **15** | **293** | **20** |
| *Laconia* | 126 | 4 | 109 | 6 |
| *Concord* | 143 | 11 | 127 | 14 |
| *Plymouth Outreach* | 58 | NA | 57 | NA |

| Peer Support Agency | January – March 2018 | | October – December 2017 | |
| --- | --- | --- | --- | --- |
| | Total Members | Average Daily Visits | Total Members | Average Daily Visits |
| **MAPSA Keene Total** | **150** | **12** | **208** | **11** |
| **HEARTS Nashua Total** | **280** | **31** | **247** | **37** |
| **On the Road to Recovery Total** | **606** | **10** | **516** | **53** |
| *Manchester* | 442 | 5 | 382 | 31 |
| *Derry* | 164 | 5 | 134 | 22 |
| **Connections Portsmouth Total** | **284** | **13** | **278** | **11** |
| **TriCity Coop Rochester Total** | **262** | **24** | **225** | **24** |
| **Total** | **2,881** | **158** | **2,685** | **167** |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Mental Health Peer Support Agency Quarterly Statistical Reports*

*Notes:  Data Compiled 5/20/18; Average Daily Visits NA for Outreach Programs; The Bureau of Mental Health Services has instructed Peer Support Agencies to "purge member lists" annually to increase confidence and consistency in this information.*

**8. Housing Bridge Subsidy Summary to Date**

| Subsidy | January – March 2018 | | |
|---|---|---|---|
| | **Total individuals served at start of quarter** | **New individuals added during quarter** | **Total individuals served through end of quarter** |
| Housing Bridge Subsidy | 798 | 13 | 811 |
| Section 8 Voucher | 108 | 11 | 119 |
| Subsidy | October – December 2017 | | |
| | **Total individuals served at start of quarter** | **New individuals added during quarter** | **Total individuals served through end of quarter** |
| Housing Bridge Subsidy | 742 | 56 | 798 |
| Section 8 Voucher | 96 | 12 | 108 |

*Revisions to Prior Period:  Total served for Section 8 in the prior period was 108, not 102*

*Data Source:  Bureau of Mental Health*

*Notes:  Data Compiled 5/17/18*

### 9a. Housing Bridge Subsidy Applications and Terminations

| Measure | January – March 2018 |
|---|---:|
| Applications Received | 44 |
| *Point of Contact* | *CMHCs: 43*<br>*NH Hospital: 1* |
| Applications Approved | 10 |
| Applications Denied | 0 |
| *Denial Reasons* | *NA* |
| Applications in Process | 34 |
| Terminations | 0 |
| *Termination Reasons* | *NA* |

### 9b. Housing Bridge Subsidy Current Census

| Measure | As of 3/31/2018 |
|---|---:|
| Rents Currently Being Paid | 497 |
| Individuals Accepted and Working Towards Bridge Lease | 7 |
| Waiting list for Housing Bridge funding | 10 |

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Mental Health*

*Notes:  Data Compiled 5/17/18; all individuals currently on Bridge Program are intended to transition from the program to other permanent housing).*

## 10. Housing Bridge Subsidy Unit Address Density

| Number of Unit(s)* at Same Address | Frequency as of 5/30/18 | Frequency as of 2/7/18 |
|---|---|---|
| 1 | 353 | 372 |
| 2 | 28 | 35 |
| 3 | 12 | 13 |
| 4 | 5 | 4 |
| 5 | 0 | 1 |
| 6 | 0 | 0 |
| 7 | 0 | 0 |
| 8 or more | 2 | 2 |

*All units are individual units

*Revisions to Prior Period:  None*

*Data Source:  Bureau of Mental Health data compiled by Office of Quality Assurance and Improvement*

*Notes:  Data Compiled 5/31/18*

**11a. Mobile Crisis Services and Supports for Adults:  Riverbend Community Mental Health Center**

| Measure | January 2018 | February 2018 | March 2018 | January – March 2018 | October – December 2017 |
|---|---|---|---|---|---|
| **Unduplicated People Served in Month** | 200 | 186 | 196 | NA | 516 |
| | | | | | |
| **Services Provided by Type** | | | | | |
| Mobile Community Assessments | 52 | 61 | 67 | 180 | 156 |
| Crisis Stabilization Appointments | 11 | 13 | 22 | 46 | 33 |
| Office-Based Urgent Assessments | 28 | 36 | 29 | 93 | 64 |
| Emergency Service Medication Appointments | 2 | 27 | 16 | 45 | 90 |
| Phone Support/Triage | 303 | 257 | 330 | 890 | 776 |
| Walk in Assessments | 5 | 6 | 9 | 20 | 17 |
| | | | | | |
| **Services Provided after Immediate Crisis** | | | | | |
| Mobile Community Assessments-Post Crisis | 17 | 11 | 18 | 46 | 29 |

| Measure | January 2018 | February 2018 | March 2018 | January – March 2018 | October – December 2017 |
|---|---|---|---|---|---|
| Crisis Stabilization Appointments | 11 | 13 | 22 | 46 | 33 |
| Office-Based Urgent Assessments | 28 | 36 | 29 | 93 | 64 |
| Emergency Service Medication Appointments | 10 | 12 | 6 | 28 | 72 |
| Phone Support/Triage | 111 | 88 | 151 | 350 | 219 |
| | | | | | |
| **Referral Source** | | | | | |
| Emergency Department/EMS | 1 | 4 | 1 | 6 | 22 |
| Family | 21 | 18 | 13 | 52 | 40 |
| Friend | 5 | 3 | 4 | 12 | 11 |
| Guardian | 20 | 20 | 15 | 55 | 52 |
| Mental Health Provider | 11 | 3 | 12 | 26 | 36 |
| Police | 4 | 3 | 8 | 15 | 20 |
| Primary Care Provider | 3 | 3 | 7 | 13 | 13 |
| CMHC Internal | 11 | 12 | 13 | 36 | 41 |

| Measure | January 2018 | February 2018 | March 2018 | January – March 2018 | October – December 2017 |
|---|---|---|---|---|---|
| Self | 107 | 96 | 99 | 302 | 313 |
| Other | 17 | 24 | 24 | 65 | 39 |
| | | | | | |
| **Crisis Apartment** | | | | | |
| Apartment Admissions | 33 | 32 | 32 | 97 | 77 |
| Apartment Bed Days | 155 | 154 | 132 | 441 | 258 |
| Apartment Average Length of Stay | 4.7 | 4.8 | 4.1 | 4.5 | 3.4 |
| | | | | | |
| **Law Enforcement Involvement** | 6 | 9 | 31 | 46 | 33 |
| | | | | | |
| **Hospital Diversions Total** | 142 | 151 | 157 | 450 | 416 |

*Revisions to Prior Period:  None*

*Data Source:  Riverbend CMHC submitted reports*

*Notes:  Data Compiled 6/1/18; reported values other than the Unduplicated People Service in Month value are not de-duplicated at the individual person level; individual people can account for multiple instances of service use, hospital diversions, etc.*

**11b. Mobile Crisis Services and Supports for Adults:  Mental Health Center of Greater Manchester**

| Measure | January 2018 | February 2018 | March 2018 | January – March 2018 | October – December 2017 |
|---|---|---|---|---|---|
| **Unduplicated People Served by Month** | 185 | 165 | 194 | 457 | 513 |
| | | | | | |
| **Services Provided by Type** | | | | | |
| Phone Support/Triage | 479 | 413 | 440 | 1,332 | 1,219 |
| Mobile Community Assessments | 75 | 73 | 69 | 217 | 218 |
| Office-Based Urgent Assessments | 18 | 7 | 10 | 35 | 32 |
| Emergency Service Medication Appointments | 4 | 1 | 1 | 6 | 4 |
| Crisis Apartment Service | 71 | 24 | 10 | 105 | 212 |
| | | | | | |
| **Referral Source** | | | | | |
| Emergency Department | 0 | 3 | 1 | 4 | 3 |
| Family | 30 | 22 | 33 | 85 | 118 |
| Friend | 5 | 2 | 4 | 11 | 5 |

| Guardian | 0 | 1 | 0 | 1 | 2 |
|---|---|---|---|---|---|
| Mental Health Provider | 6 | 5 | 6 | 17 | 18 |
| Police | 53 | 55 | 51 | 159 | 196 |
| Primary Care Provider | 6 | 2 | 10 | 18 | 23 |
| CMHC Internal | 28 | 22 | 18 | 68 | 57 |
| Self | 130 | 113 | 142 | 385 | 334 |
| Other | 27 | 42 | 28 | 97 | 97 |
| | | | | | |
| **Crisis Apartment** | | | | | |
| Apartment Admissions | 3 | 3 | 3 | 9 | 11 |
| Apartment Bed Days | 8 | 13 | 8 | 29 | 38 |
| Apartment Average Length of Stay | 4.0 | 3.3 | 2.7 | 3.2 | 3.5 |
| | | | | | |
| **Law Enforcement Involvement** | 53 | 55 | 51 | 159 | 136 |
| | | | | | |
| **Hospital Diversion Total** | 285 | 266 | 293 | 844 | 840 |

*Revisions to Prior Period: None.*

*Data Source:  Mobile Crisis Data Reporting System*

*Notes:  Data Compiled 5/29/18; reported values other than the Unduplicated People Service in Month value are not de-duplicated at the individual person level; individual people can account for multiple instances of service use, hospital diversions, etc.*

**11c. Mobile Crisis Services and Supports for Adults:  Harbor Homes**

| Measure | January 2018 | February 2018 | March 2018 | January – March 2018 | October – December 2017 |
|---|---|---|---|---|---|
| **Unduplicated People Served by Month** | 53 | 11 | 46 | 103 | 70 |
| | | | | | |
| **Services Provided by Type** | | | | | |
| Phone Support/Triage | 53 | 30 | 48 | 131 | 93 |
| Mobile Community Assessments | 20 | 17 | 17 | 54 | 16 |
| Office-Based Urgent Assessments | 0 | 0 | 0 | 0 | 5 |
| Emergency Service Medication Appointments | 0 | 2 | 0 | 2 | 0 |
| Crisis Apartment Service | 2 | 0 | 5 | 7 | 1 |
| Consultation | 4 | 1 | 0 | 5 | 31 |
| Case Management | 24 | 8 | 0 | 32 | 12 |
| | | | | | |
| **Referral Source** | | | | | |
| Emergency Department | 1 | 0 | 0 | 1 | 4 |

| | | | | |
|---|---|---|---|---|
| Family | 5 | 0 | 8 | 13 | 8 |
| Friend | 3 | 0 | 0 | 3 | 1 |
| Guardian | 0 | 0 | 0 | 0 | 0 |
| Mental Health Provider | 5 | 1 | 3 | 9 | 2 |
| Police | 1 | 1 | 0 | 2 | 5 |
| Primary Care Provider | 0 | 0 | 0 | 0 | 0 |
| CMHC | 11 | 1 | 12 | 24 | 11 |
| Self | 47 | 7 | 33 | 87 | 77 |
| Other | 15 | 2 | 1 | 18 | 27 |
| | | | | | |
| **Crisis Apartment** | | | | | |
| Apartment Admissions | 3 | 1 | 4 | 8 | 1 |
| Apartment Bed Days | 25 | 3 | 58 | 86 | 4 |
| Apartment Average Length of Stay | 8.3 | 3.0 | 14.5 | 8.6 | 4 |
| | | | | | |
| **Law Enforcement Involvement** | 14 | 4 | 0 | 18 | 3 |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Hospital Diversion Total** | 71 | 10 | 49 | 130 | 124 |

*Revisions to Prior Period: None*

*Data Source:  Mobile Crisis Data Reporting System*

*Notes:  Data Compiled 5/31/18; reported values other than the Unduplicated People Service in Month value are not de-duplicated at the individual person level; individual people can account for multiple instances of service use, hospital diversions, etc.*

**Appendix B**

**New Hampshire Community Mental Health Agreement**

***Monthly Progress Reports***

***February - March, 2018***

# New Hampshire Community Mental Health Agreement Monthly Progress Report

*February-March 2018*

New Hampshire Department of Health and Human Services

June 25, 2018

## Acronyms Used in this Report

ACT:        Assertive Community Treatment
BMHS:       Bureau of Mental Health Services
CMHA:       Community Mental Health Agreement
CMHC:       Community Mental Health Center
DHHS:       Department of Health and Human Services
SE:         Supported Employment
SFY:        State Fiscal Year

## Background

This Monthly Progress Report is issued in response to the June 29, 2016 Expert Reviewer Report, Number Four, action step 4.  It reflects the actions taken in February and March 2018, and month-over-month progress made in support of the Community Mental Health Agreement (CMHA) as of February 28, 2018. Data contained may be subject to change upon further reconciliation with CMHCs.  This report is specific to achievement of milestones contained in the agreed upon CMHA Project Plan for Assertive Community Treatment (ACT), Supported Employment (SE) and Glencliff Home Transitions.  Where appropriate, the Report includes CMHA lifetime-to-date achievements.

## Progress Highlights

**Assertive Community Treatment (ACT)**

| Goal | Status | Recent Actions Taken |
|---|---|---|
| CMHC fidelity to ACT evidence-based practice model annually assessed. | 2018:<br>10 of 10 Completed* | • 10 reports issued, 8 improvement plans in place; 2 in development process. |
| Provide ACT team services, consistent with standards set forth, with the capacity to serve at least 1,500 individuals. | Capacity:<br>Feb. – 1,119<br>Mar. – 1,201<br><br>Enrollment:<br>Feb. – 877<br>Mar. -- 813 | • 11 post ACT Fidelity Review consultations with participating CMHCs have occurred during State Fiscal Year 2018 thus far.<br>• February newly* enrolled individuals: 29<br>• March newly enrolled individuals: 30<br>*New is defined as an individual who is new to the ACT program or an individual who has not received an ACT service in more than 90 days. |

**Supported Employment (SE)**

| Goal | Status | Recent Actions Taken |
|---|---|---|
| CMHC fidelity to SE evidence-based practice model annually assessed. | 2018:<br>9 of 10 completed* | • 8 fidelity reports issued, 1 are in development. 7 improvement plans in place. |
| Increase penetration rate of individuals with a Serious Mental Illness (SMI) receiving SE services to 18.6%. | Statewide penetration rate:<br>Feb. – 26.9%<br>Mar. – 26.4% | • 8 post SE Fidelity Review consultations with participating CMHCs have occurred during State Fiscal Year 2018 thus far. |

*Information as of report date (not limited to March 31, 2018).

**Glencliff Home Transitions into Integrated Community Setting**

| Goal | Status | Recent Actions Taken |
|---|---|---|
| Have capacity to serve in the community 16 (cumulatively) individuals with mental illness and complex health care needs residing at Glencliff who cannot be cost-effectively served in supported housing. | 16 of 16 completed[21] | • In May 2018, a resident who initially transitioned from the Glencliff Home in May 2017 to a 10-bed residence, was successfully transitioned to an independent apartment. |
| By June 30, 2017, identify and maintain a list of all individuals with mental illness and complex health care needs residing at the Glencliff Home who cannot be cost-effectively served in supported housing and develop an effective plan for providing sufficient community-based residential supports for such individuals in the future. | Completed; ongoing | • 13 residents on the list<br>• 12 of the 13 residents who are planning to transition with CFI services have selected their CFI transition case management service provider to actively support transition.<br>• The 13th resident is seeking transition under a DD Waiver at this time. |

---

[21] Indicates residents have been transitioned into an integrated community setting; compliance with additional CMHA requirements for such transitions is under review.







* Data is a combination of preliminary monthly and finalized quarterly data from CMHA Quarterly Data Reports.